## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **Association of Jewish Camp Operators**, | ) | |
| | ) | |
| **Samuel Werzberger, MD, FAAP**, | ) | |
| | ) | |
| **Ariela Orkaby, MD, MPH**, | ) | |
| | ) | |
| **Beth Statfeld**, | ) | |
| | ) | |
| **Gail Zahtz**, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| *v.* | ) | Case No.  1:20-CV-0687 (GLS/DJS) |
| | ) | |
| **Andrew M. Cuomo**, Governor of the | ) | |
| State of New York, in his official capacity, | ) | |
| | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

### VERIFIED COMPLAINT
### FOR DECLARATORY AND INJUNCTIVE RELIEF
### FROM CONSTITUTIONAL DEPRIVATIONS

Plaintiffs, by and through their undersigned counsel Troutman Sanders LLP, respectfully allege as follows:

### PRELIMINARY STATEMENT

1.     For more than one hundred years, Jewish overnight camps have provided an immersive, seamless Jewish experience to their campers whose parents choose Jewish camping for their children.  Every summer, tens of thousands of Jewish children in New York State benefit from the 24/7 immersive camp experience which offers them the opportunity to not only observe their religious practices but to live them.  Jewish overnight camps foster a sense of cultural identity and instill traditional religious values in Jewish children.  In Jewish overnight camps, they jointly

recite prayers three times a day.  Part of every day is devoted to religious study.  They recite blessings over the food they eat throughout the day.  They observe the weekly Shabbos.  They learn about Jewish history, Jewish customs and Jewish heroes.

2.       By teaching Jewish values, Jewish overnight camps have become a critical facet of the development and growth of the Jewish community.  Children who attend Jewish overnight camps grow up more connected to the Jewish community and have an increased commitment to religious practice and to the Jewish faith.  Overnight camps allow Jewish children to adhere to Jewish practices and education for weeks without withdrawal into the secular world, thereby strengthening their intensity in Jewish values throughout their daily life.  The success of Jewish overnight camps is owed to their immersive experience that separates children from the outside world and envelops them in an enclosed, safe society.

3.       The need for Jewish overnight camps is particularly true this summer, after several months of shutdowns of the yeshiva schools, to provide for the structured Jewish learning and living offered by the Jewish overnight camps.

4.       To combat the transmission of COVID-19, Defendant Governor Andrew M. Cuomo has declared a state of emergency in New York State and has issued a series of executive orders restricting in-person gathering to varying degrees and imposing other health-related requirements through the State.

5.       On June 12, 2020, Defendant announced that overnight camps would be closed for the summer of 2020 under his COVID-19 orders, without making any exceptions for Jewish overnight camps, notwithstanding that these overnight camps involve core religious exercise.

6.       In contrast, Defendant has made a broad First Amendment exception from his COVID-19 orders for First Amendment activities that he favors.  In particular, Defendant has

created a de facto exemption from his COVID-19 orders for mass demonstrations, explicitly proclaiming agreement with the message invoked by the protestors and actively encouraging the mass gatherings.  Defendant has done so even though these mass protests pose greater risks of the transmission of COVID-19 than do Jewish overnight camps.

7.    Defendant also has allowed a wide array of similar, secular activities to remain open, such as numerous "non-essential" businesses and entities, child care services for "essential" workers, summer day camps, and special education services, provided that such entities follow health-related guidelines issued by the New York Department of Health to prevent the transmission of COVID-19.

8.    Unlike all of those entities, Defendant has not allowed Jewish overnight camps to adopt and implement health-related guidelines that would permit them to operate while balancing the twin goals of health and safety with the desire to reopen New York.

9.    Defendant has refused to consider the health and safety protocols developed by Jewish overnight camps, in consultation with an esteemed group of physicians and health policy professionals.  These health and safety protocols would render overnight camps considerably safer than the exempted mass protests as they relate to the transmission of COVID-19.  The health protocols that the overnight camps would implement are similar to, but even more protective than, those issued by the Department of Health governing comparable secular conduct, such as day camps and child care services.

10.    Plaintiffs do not criticize or challenge Defendant's treatment of protests and protesters, or their exemption from in-person gathering restrictions.  Plaintiffs encourage governmental respect for and accommodation of the First Amendment rights of protesters to engage in free speech and assembly.  Plaintiffs merely request the same treatment for Jewish

overnight camps, which the First Amendment protects as vigorously as it protects the mass protests, which are safer than the mass protests, and which will adhere to detailed health and safety protocols similar to those the State has imposed on comparable secular activity designed to curb the transmission of COVID-19.

11.      Defendant's statewide closure of all Jewish overnight camps this summer violates Plaintiffs' constitutional rights of the free exercise of religion and the fundamental rights of parents to control the *religious* education and upbringing of their children, guaranteed by the First and Fourteenth Amendments of the United States Constitution and Article III, § 3 of the New York Constitution.

12.      This action seeks immediate judicial relief from Defendant's statewide ban on all Jewish overnight camps by way of a temporary restraining order, followed by a preliminary and permanent injunction and a declaratory judgment that the challenged regulation is unconstitutional and void because it deprives Plaintiffs of their constitutional rights without constitutionally-sufficient justification.

**PARTIES, JURISDICTION, AND VENUE**

13.      Plaintiff Association of Jewish Camp Operators (the "Association") is a consortium of independent Jewish summer camps that have a shared commitment to creating immersive and unique camp environments to instill traditional religious Jewish values to children.  The members of the Association serve more than 40,000 Jewish children at camps in New York each summer.

14.      Plaintiff Samuel Werzberger, MD, FAAP lives in New Jersey.  He practices in New York and New Jersey as a pediatrician and serves as the medical director of Chai Urgent Care in New Jersey.  Dr. Werzberger has worked on the front lines during the COVID-19 pandemic, caring for between fifty and one hundred COVID-19 patients each day during the initial weeks of the

pandemic.  Dr. Werzberger is the father of nine children who range from 18 months to 18 years of age, four of whom he would send to Jewish overnight camps in New York State but for Defendant's statewide closure.

15.    Plaintiff Ariela Orkaby, MD, MPH lives in Massachusetts.  She practices in Massachusetts as a physician and is an assistant professor of medicine at Harvard Medical School. Dr. Orkaby has cared for dozens of patients with COVID-19 over the past several months.  Dr. Orkaby is the mother of three children who she would send to Jewish overnight camps in New York State but for Defendant's statewide closure.

16.    Plaintiff Beth Statfeld lives in New York.  She is the Chief Financial Officer of Hand in Hand Development, Inc., which is a provider of early intervention program services in New York for children who have or are suspected of having a developmental delay and/or disability.  Ms. Statfeld is the mother of two children who she would send to Jewish overnight camps in New York State but for Defendant's statewide closure.

17.    Plaintiff Gail Zahtz lives in New York.  She works in healthcare coordinating chronic disease management for patients who must obtain care at home, including those who must do so because of the COVID-19 pandemic.  Ms. Zahtz is the mother of two children who she would send to Jewish overnight camps in New York State but for Defendant's statewide closure.

18.    Defendant Cuomo is and was the Governor of the State of New York and is and was acting under color of State law, in his official capacity, at all times relevant to the allegations herein.  Defendant's principal place of business is located at the State Capitol Building, Albany, New York.

19.     This action raises federal questions under the First and Fourteenth Amendments of the United States Constitution and under federal law, 28 U.S.C. §§ 2201 and 2202, as well as 42 U.S.C. §§ 1983 and 1988.

20.     This Court has jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367.

21.     This Court has authority to grant the requested injunctive relief under 28 U.S.C. § 1343(3), the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Plaintiffs' prayer for costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

22.     Venue is proper in the Northern District pursuant to 28 U.S.C. § 1391, as Defendant resides in this District and a substantial part of the events giving rise to the claims herein arose in this District.

## **BACKGROUND**

### **New York State Restrictions**

23.     On March 7, 2020, Defendant issued Executive Order No. 202 declaring a disaster emergency in the State of New York until September 7, 2020 to "address[ ] the threat that COVID-19 poses to the health and welfare of [New York State's] residents and visitors," stating that "both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and more are expected to continue."  Exhibit A at 1–3.

24.     Following the issuance of Executive Order No. 202, Defendant has issued several dozen executive orders temporarily suspending various statutes, local laws, ordinances, and rules and regulations, under the auspice of the authority granted to Defendant pursuant to New York Executive Law § 29-a(1).  Each order is predicated on Executive Order No. 202's original

declaration that "both travel-related cases and community contact transmission of COVID-19 have been documented in New York State and more are expected to continue."  Exhibit A at 1.

25.     On March 12, Defendant issued Executive Order No. 202.1, canceling or postponing any "gathering" of over 500 individuals.  *See* Exhibit A at 4–7.

26.     Defendant issued Executive Order No. 202.3 on March 16, modifying previous orders to cancel or postpone any "gathering" over 50 individuals.  *See* Exhibit A at 8–9.

27.     Defendant issued a series of orders implementing a statewide closure of schools for the rest of the school year.  On March 16, Defendant issued Executive Order No. 202.4, directing "every school in the state of New York . . . to close no later than Wednesday, March 18, 2020 for a period of two weeks, ending April 1, 2020," and stating that the State would reassess at that time whether to extend the closure.  Exhibit A at 10.  The order required school districts to "develop a plan for . . . child care."  *Id.*  Defendant extended such closures on March 27 pursuant to Executive Order No. 202.11, *see* Exhibit A at 25, on April 7 pursuant to Executive Order No. 202.14, *see* Exhibit A at 31, and on April 16 pursuant to Executive Order No. 202.18, *see* Exhibit A at 36.  On May 7, Defendant issued Executive Order No. 202.28 ordering that "all schools shall remain closed through the remainder of the school year."  Exhibit A at 39.

28.     On March 18, Defendant issued Executive Order No. 202.6 requiring any non-"essential business or entity" to use, to the maximum extent possible, telecommuting or work from home procedures and to reduce the in-person workforce by 50%.  *See* Exhibit A at 15–16.  The order exempted the following "essential" businesses from the in-person restrictions:

> essential health care operations including research and laboratory services; essential infrastructure including utilities, telecommunication, airports and transportation infrastructure; essential manufacturing, including food processing and pharmaceuticals; essential retail including grocery stores and pharmacies; essential services including trash collection, mail, and shipping services; news media;  banks and related financial institutions; providers of basic necessities to

economically disadvantaged populations; construction; vendors of essential services necessary to maintain the safety, sanitation and essential operations of residences or other essential businesses;  vendors that provide essential services or products, including logistics and technology support, child care and services needed to ensure the continuing operation of government agencies and provide for the health, safety and welfare of the public . . . .

*Id.* at 16.  The order also required the Empire State Development Corporation to "issue guidance as to which businesses are determined to be essential."  *Id.*

29.     The Empire State Development Corporation subsequently issued guidance designating "essential businesses" and stating that essential businesses "must continue to comply with the guidance and directives for maintaining a clean and safe work environment issued by the Department of Health" and are "strongly urged to maintain social distancing measures to the extent possible."  Exhibit B at 1.

30.     On March 20, Defendant issued Executive Order No. 202.8 requiring all non-essential businesses "to reduce the in-person workforce at any work locations by 100% no later than March 22 at 8 p.m."  Exhibit A at 17–18.  The order provided that "[a]ny business violating the above order shall be subject to enforcement as if this were a violation of an order pursuant to section 12 of the Public Health Law."  *Id.* at 18.

31.     Throughout the declared state of emergency, Defendant has never issued an order requiring the closure of businesses deemed by the State to be "essential."

32.     Defendant issued Executive Order No. 202.10 on March 23 providing that "[n]on-essential gatherings of individuals of any size for any reason (e.g. parties, celebrations or other social events) are canceled or postponed at this time."  Exhibit A at 19–22.

33.     Defendant issued Executive Order No. 202.14 on April 7 providing that "violation of the foregoing directives on and after April 7, 2020, in addition to any other enforcement mechanism stated in any prior executive orders, shall be a violation punishable as a violation of

public health law section 12-b(2) and the Commissioner of Health is directed and authorized to issue emergency regulations." Exhibit A at 30–32. The order continued that "[t]he fine for such violation by an individual who is participating in any gathering which violates the terms of the orders or is failing to abide by social distancing restrictions in effect in any place which is not their home shall not exceed $1,000." *Id.* at 31.

34. Defendant has not ordered child care services to close throughout the state of emergency, instead issuing Executive Orders Nos. 202.1 and 202.5, suspending or modifying various child care regulations, and Executive Order No. 202.13, allowing school districts to pay for the cost of child care services. *See* Exhibit A at 4–7, 12–14, 27–29.

35. In accordance with Defendant's orders, the New York Office of Children and Family Services promulgated health-related guidelines for child care services to follow, including limiting the density of rooms and requiring employees wear face coverings, and directed providers to review the detailed health-related advice set forth in the Centers for Disease Control and Prevention's Supplemental Guide for Child Care. *See* Exhibit C.

36. In May, the State announced a phased, regional approach for non-essential businesses to reopen based on regions of the State satisfying certain health-related metrics defined by the Department of Health. *See* Exhibit D.

37. On May 14, Defendant issued Executive Order No. 202.31 that permitted certain regions in the State to enter Phase One of the State's reopening plan. *See* Exhibit A at 40–41. Phase One of the State's reopening plan allows "non-essential businesses or other entities" in construction, agriculture, forestry, fishing and hunting, retail (curbside or in-store pickup or drop off), manufacturing, and wholesale trade to reopen without in-person limitations, provided that

such non-essential businesses and entities are "operated subject to the guidance promulgated by the Department of Health."  *Id.* at 40.

38.     On May 21, Defendant issued Executive Order No. 202.32 to "permit a gathering of ten or fewer individuals for any religious service or ceremony, . . . provided that social distancing protocols and cleaning and disinfection protocols required by the Department of Health are adhered to . . . ."  Exhibit A at 42–44.

39.     Defendant issued Executive Order No. 202.33 on May 22, allowing non-essential gatherings of ten or fewer individuals for any purpose, provided that individuals adhere to the Department of Health social distancing protocols and cleaning and disinfection requirements. Exhibit A at 45.

40.     On May 28, Defendant issued Executive Order No. 202.34, which extended the Phase One reopening for "non-essential businesses" in numerous regions of the State, provided the businesses or entities "operate[ ] subject to the guidance promulgated by the Department of Health."  Exhibit A at 46–47.

41.     Defendant issued Executive Order No. 202.35 on May 29, stating that the in-person restrictions no longer apply to Phase Two "non-essential businesses or other entities" in professional services, administrative support, information technology, real estate services, building and property management, leasing, rental, sales services, retail in-store shopping, rental, repair, cleaning, barbershops and hair salon (limited services), and motor vehicle leasing, rental, and sales, provided that such non-essential businesses or entities are "operated subject to the guidance promulgated by the Department of Health."  Exhibit A at 48–49.  Defendant's order permitted certain regions of the State to open under Phase Two.  *Id.* at 49.

42.     On June 2, Defendant issued Executive Order No. 202.36 permitting "outdoor, low-risk recreational activities and businesses providing such activities, as determined by Empire State Development Corporation" to resume in Phase One regions, in accordance with Department of Health guidance.  Exhibit A at 50–51.  Defendant's order also allowed for the opening of barbershops and hair salons for Phase Two regions.  *Id.* at 51.

43.     That same day, Defendant announced that summer day camps statewide can open beginning on June 29.  Exhibit E at 4.  In allowing the opening of summer day camps, Defendant emphasized that if "[y]ou look at the progress we have made [in New York], it's breathtaking. How far we've come and how fast we've come."  *Id.*

44.     Defendant issued Executive Order No. 202.37 on June 5, which allowed special education services and instruction required under Federal, state or local laws, rules or regulations to be provided "in person for the summer term in school districts."  Exhibit A at 52.

45.     The following day, Defendant issued Executive Order No. 202.38 allowing "any non-essential gatherings for houses of worship at no greater than 25% of the indoor capacity of such location" in Phase Two regions.  Exhibit A at 53–54.

46.     On June 7, Defendant announced that outdoor graduations with up to 150 individuals could commence beginning June 26.  Exhibit E at 19.

47.     On June 8, the State released guidance on mandatory and recommended health practices to ensure children and staff at child care services and day camp programs are protected from the transmission of COVID-19.  These guidelines provide practices relating to physical distancing, protective equipment, recreational and food activities, hygiene, cleaning, and disinfection, communication, and screening.  *See* Exhibit F.

48.     Defendant declared on June 11 that the State would allow localities to open public pools and playgrounds at their discretion.  Exhibit E at 33–34.

49.     Defendant issued Executive Order No. 202.41 on June 13 providing that the reductions and restrictions on the in-person workforce at "non-essential businesses or other entities" including restaurants / food services and personal care no longer apply to Phase Three industries in eligible regions of the State, provided the non-essential businesses or entities are "operated subject to the guidance promulgated by the Department of Health."  Exhibit A at 55–56. Defendant's executive order also extended the provisions of previous orders "which each closed or otherwise restricted public or private businesses or places of public accommodation" and "which required postponement, cancellation, or restriction on size of all non-essential gatherings of more than ten individuals" through July 13.  *Id.*

50.     On June 15, Defendant issued Executive Order No. 202.42 allowing gatherings of up to 25 individuals, for any lawful purpose or reason, in regions that have reached Phase 3 of the State's reopening plan.  Exhibit A at 57.

51.     As provided in Executive Order No. 202.14 and extended by Executive Order No. 202.41, the Department of Health's website states that "[t]he maximum fine for violations of the state's social distancing protocol is $1,000."  Exhibit A at 31, 55.

**New York State's Closure of All Overnight Camps, Without Making Any Exception For Jewish Overnight Camps**

52.     On June 12, New York State Health Commissioner Dr. Howard Zucker announced that the State would enforce the Governor's COVID-19 orders by prohibiting all overnight children's camps this summer.  *See* Exhibit G.  Defendant and Commissioner Zucker held a press briefing the following day, during which Defendant reiterated the statewide closure of all overnight camps.  *See* Exhibit H.

53.     Defendant's closure does not allow for the consideration and adoption of health, safety, and social distancing protocols of the sort that have been deemed sufficient for day camps, child care and other activities deemed essential to guard against the transmission of COVID-19.

54.     Importantly, Defendant flatly refused to permit Jewish overnight camps from this closure order, notwithstanding the fact that those *religious* camps involve the exercise of First Amendment-protected religious activity of conveying Jewish values to children and have expressed their willingness to adopt health and safety protocols similar to, but even more protective than, those issued by the State for child care services and day camp programs to ensure that children and staff are protected from the transmission of COVID-19.

### Defendant Has Exempted Mass Protests from In-person Gathering Restrictions

55.     On May 25, 2020, a Minneapolis Police Department officer killed George Floyd, a black man, by pressing his knee on Mr. Floyd's neck for almost ten minutes, suffocating him.  This killing sparked widespread protests around the United States, including throughout the State, to raise awareness of racial injustice that black individuals suffer.

56.     Each day for the past few weeks, tens of thousands of individuals around the State have gathered in mass demonstrations to protest racial injustice.

57.     These protests were flatly contrary to Defendant's COVID-19 orders, so Defendant created a de facto exemption from his orders for this First Amendment activity.

58.     Defendant agrees with the message of the protestors and has encouraged the mass demonstrations.  For example, on June 1, in response to a question of whether Defendant would "suggest people not go out and protest" to protect against the transmission of COVID-19, Defendant declared "[n]o, I think you can protest, but do it smartly and intelligently . . . Protest. Just be smart about it."  Exhibit I at 20–21.

59.     Similarly, Defendant proclaimed on June 2 that he "agree[s] with the[
] . . . [r]ightful outrage" and "rightful indignation" of the protestors, and he declared that they have
"[t]he right to protest, the right to air grievances, and the right to raise issues so government
responds."  Exhibit E at 4–5.

60.     Defendant professed similarly on June 4 that "I want to thank the protestors who
were mainly peaceful which was smart because they could make their point," that "I stand with
the protestors in the point that we need meaningful reform," and that "meaningful change . . . only
happens when the people get fully mobilized and informed. . . ."  *Id.* at 11–12.

61.     Defendant has acknowledged that the protests constitute "mass gathering[s] at the
time of COVID," and that the demonstrations "cause a complication on dealing with the COVID
virus . . . ."  *Id.* at 29, 34.

62.     Defendant has recognized publicly that "there's no social distancing" at these mass
gatherings and that individuals at the protests are "right in [each other's] face."  *Id.* at 15.

63.     During these mass protests, theaters, which are supposed to remain closed until
Phase Four of the State's reopening plan, *see* Exhibit J, have implemented an "Open Your Lobby"
campaign whereby theaters around the State open their premises to protestors for rest, use of Wi-
Fi and bathrooms, and provision of water and snacks.  *See* Exhibit K.

64.     Defendant has exempted these "mass gathering[s]" of protestors from the State's
COVID-19 orders, despite their continuing each day for several weeks.

65.     Defendant similarly has exempted New York theaters engaging in a statewide
"Open Your Lobby" campaign from the State's COVID-19 orders.

66.     Defendant cannot constitutionally create a First Amendment exemption for
protesters that he agrees with, while ignoring the First Amendment rights of Plaintiffs by enforcing

his COVID-19 orders to ban on all overnight camps, without making a similar exemption for First

Amendment-protected camps, such as the Jewish overnight camps.

**The Safety of Overnight Camps from COVID-19**

67.     Overnight camps are uniquely positioned to segregate children and staff from the

community at-large and protect against the transmission of COVID-19.

68.     Unlike day camp children and staff who will remain in their at-home communities

this summer and will interact with fellow campers and a rotating cast of relatives, friends,

neighbors, and shopkeepers every night, especially in areas of New York City with considerable

population density, children and staff who attend Jewish overnight camps are removed from the

community and isolated among the same group of individuals.

69.     Jewish overnight camps also are located in areas of the State which will be in Phase

Three of the State's reopening plan by the time camp opens.  In contrast to entities permitted to

open in Phase Three pursuant to specified health-related guidelines, the State provided no such

permission for overnight camps even with their adoption of health and safety protocols.

70.     Jewish overnight camps have engaged physicians and health policy professionals

to develop health and safety protocols to ensure that Jewish overnight camps are safe for children

and staff.

71.     Under those protocols, camp administrators and staff will be rigorously trained in

these special measures to ensure a healthy camp experience that mitigates the exposure of campers

and staff to COVID-19.  In contrast to the overnight camps' protocol, the mass protests that

Defendant has exempted from the State's in-person gathering restrictions do not similarly

implement rigorous training designed to curb the transmission of COVID-19 during the mass

gatherings.

72.     All campers and staff will be subject to testing for COVID-19 antibodies and for COVID-19, and campers who test negative will be required to remain isolated at home until the commencement of camp.  Defendant has not imposed any similar COVID-19 antibody or COVID-19 testing requirement on individuals who attend mass protests, nor has Defendant required that individuals who test negative for COVID-19 and COVID-19 antibodies remain isolated at home for a specified period of time prior to attending a demonstration.

73.     No individual with a high-risk medical history will be allowed to attend camp, and staff of 50 years of age or older will be limited to those who test positive for Immunoglobulin G antibodies via a qualified laboratory.  Defendant has implemented no such restrictions relating to at-risk individuals for the mass protests.

74.     Each camp also will be required to have an on-site health director, report COVID-19 cases to local jurisdictions, engage in the monitoring of possible COVID-19 symptoms in campers and staff before and during camp, including conducting daily temperature checks of all individuals, and follow aggressive sanitization measures.  Any potentially infected individual quickly will be separated from other children and staff.  In contrast, Defendant has exempted mass protests from the State's in-person gathering restrictions without implementing similar measures, and the mass protests do not engage trained professionals to implement and manage COVID-19 health safety protocols.  The mass protests of thousands of individuals have no mechanism for contact tracing, unlike isolated, contained overnight camps.

75.     Camps also will implement protocols for proper spacing and configuration among beds to further guard against possible transmission.  Defendant has not enforced any such spacing requirements for the mass protests.

76.     Additionally, overnight camps will restrict visitors and will not allow off-site activities.  Defendant has permitted—indeed, encouraged—any individual to participate in mass protests anywhere in the State, without enforcing the State's in-person gathering restrictions.

77.     Finally, overnight camps will require the parents of children attending the camps to sign consent forms requiring adherence to these health requirements.

78.     Overnight camps thus present a safe environment for campers and staff.  Overnight camps also are safer than day camps or child care services, which allow children and staff to go home each night, expose themselves to relatives, friends, neighbors, and others and then return to the program the following day.

79.     Data demonstrates that COVID-19 health concerns in children are significantly lower than in the rest of the population.  Cases among children are exceptionally low compared with older individuals, and COVID-19 has caused almost no hospitalizations.

## PLAINTIFF ASSOCIATION OF JEWISH CAMP OPERATORS

80.     Plaintiff Association of Jewish Camp Operators is a coalition of independent Jewish summer camps that have a shared commitment to create and offer immersive and unique camp environments that foster a sense of religious identity and instill traditional Jewish values.

81.     Each summer, tens of thousands of Jewish children attend Jewish overnight camps in New York where they experience Jewish living in a communal setting removed from the outside secular world.  This unique setting promotes a passion for traditional Jewish practice and belief.

82.     The members of the Association weave religious instruction into the very fabric of overnight camp, allowing Jewish children to live Judaism 24/7.

83.     The members of the Association wish to hold overnight camps this summer to provide this vital religious and developmental experience for Jewish children, but Defendant's restrictions render such conduct illegal and subject to penalty.

84.     If allowed to open overnight camps, the members of the Association would adhere to the health and safety guidelines designed to curb the transmission of COVID-19 at overnight camps, as discussed above.

85.     These health protocols will ensure that the overnight camps are much safer than the mass protests that Defendant has exempted from the State's in-person gathering restrictions, which raise the same or greater health concerns for the transmission of COVID-19 as do overnight camps.

86.     These health protocols will ensure that the overnight camps are as safe, if not safer, than the State-approved child care and day camp programs.  These protocols include mandatory and recommended practices relating to protective equipment, recreational and food activities, hygiene, cleaning, and disinfection, communication, and screening.

**PLAINTIFF SAMUEL WERZBERGER, MD, FAAP**

87.     Plaintiff Samuel Werzberger, MD, FAAP is a sincere practitioner of Judaism.  He is a father of nine children, ages 18 months to 18 years, who has sent his children to Jewish overnight camps in New York in previous summers because he perceives the immersive experience offered by the overnight camps is an essential component of his children's educational and religious growth and wellbeing.

88.     Plaintiff Werzberger has sent his children to overnight camps in New York because the overnight camp setting provides a unique, seamless experience that fosters a sense of religious identity and instills traditional Jewish values to children, thereby inspiring a religious understanding of the world and inculcating the Jewish way of life.

-18-

89.     Plaintiff Werzberger has sent his children to overnight camps in New York because his children can live together for weeks as a community, enclosed in a safe society and removed from outside influences, thereby forming bonds in the Jewish community and a yearning for the Jewish faith not possible through other means.

90.     Plaintiff Werzberger believes that his children who attend Jewish overnight camps maintain a deeper connection to the Jewish community and maintain an increased commitment to Jewish practices and beliefs.  Jewish camping is thus an essential component of the religious upbringing he wishes for his children.

91.     As a pediatrician and as a parent of nine children, Plaintiff Werzberger is keenly aware of the immense educational, social, and psychological toll that the State's restrictions have had—and continue to have—on children.

92.     Because COVID-19 cases have been minimal to non-existent in the communities of children that Plaintiff Werzberger serves and the scientific data demonstrates that children are not spreading the disease and are not the drivers of the pandemic, Plaintiff Werzberger believes that his children must resume activities critically important to their physical, emotional, and religious wellbeing.

93.     For the reasons discussed above, Plaintiff Werzberger wishes to send four of his children to Jewish overnight camps in New York this summer, but Defendant's restrictions render such conduct illegal and subject to penalty, thus prohibiting him from acting on his sincerely held religious beliefs and his wish to direct the religious education and upbringing of his children.

94.     If the State's absolute ban on overnight camps is lifted, Plaintiff Werzberger would send his children to Jewish overnight camps in New York this summer that adhere to the health-related guidelines specified above.

## PLAINTIFF ARIELA ORKABY, MD, MPH

95.     Plaintiff Ariela Orkaby, MD, MPH is a sincere practitioner of Judaism.  She is the mother of three children who she has sent to Jewish overnight camps in New York in previous summers because she believes that the immersive experience offered by the overnight camps is an essential component of her children's educational and religious growth and wellbeing.

96.     Plaintiff Orkaby has sent her children to overnight camps in New York because the overnight camp setting provides a unique, immersive environment that grows and strengthens her children's religious understanding of the world and of Judaism.

97.     Plaintiff Orkaby believes that Jewish overnight camps allow her children the opportunity not only observe and learn about their religious practices, but to live them 24/7 while isolated from the outside, secular world.  Jewish camping is thus an essential component of the religious upbringing she wishes for her children.

98.     As a physician and a mother of three children, Plaintiff Orkaby is mindful of the tremendous negative impact that the State's restrictions have on the interpersonal, emotional, and spiritual growth of her children.

99.     For the reasons discussed above, Plaintiff Orkaby wishes to send her three children to Jewish overnight camps in New York this summer, but Defendant's restrictions render such conduct illegal and subject to penalty, thus prohibiting her from acting on her sincerely held religious beliefs and her wish to direct the religious education and upbringing of her children.

100.    If the State's absolute ban on overnight camps is lifted, Plaintiff Orkaby would send her children to Jewish overnight camps in New York this summer that adhere to the health-related guidelines specified above.

## PLAINTIFF BETH STATFELD

101.     Plaintiff Beth Statfeld is a sincere practitioner of Judaism.  She is the mother of two children, one 23 years of age who suffers from developmental challenges and one 16 years of age, each of whom she has sent to Jewish overnight camps in New York in previous summers because she perceives the immersive experience offered by the overnight camps as an essential component of her children's educational and religious growth and wellbeing.

102.     Plaintiff Statfeld has sent her children to overnight camps in New York because the overnight camp setting provides an unparalleled setting for inculcating her children with Jewish religious and cultural values and for forging strong ties to the Jewish community, which she believes cannot be similarly obtained outside the immersive, 24/7 environment.  Jewish camping is thus an essential component of the religious upbringing she wishes for her children.

103.     As an employee of an organization who cares for children with developmental delays and/or disabilities and a mother of two children, Plaintiff Statfeld is aware of the tremendous negative impact that the State's restrictions have on the interpersonal, emotional, and spiritual growth of children.

104.     For the reasons discussed above, Plaintiff Statfeld wishes to send her two children to Jewish overnight camps in New York this summer, but Defendant's restrictions render such conduct illegal and subject to penalty, thus prohibiting her from acting on her sincerely held religious beliefs and her wish to direct the religious education and upbringing of her children.

105.     If the State's absolute ban on overnight camps is lifted, Plaintiff Statfeld would send her children to Jewish overnight camps in New York this summer that adhere to the health-related guidelines specified above.

**PLAINTIFF GAIL ZAHTZ**

106.    Plaintiff Gail Zahtz is a sincere practitioner of Judaism.  She is a single mother of two children, ages 13 and 14, who she has sent to Jewish overnight camps in New York in previous summers because she perceives the immersive experience offered by the overnight camps as an essential component of her children's educational and religious growth and wellbeing.

107.    Plaintiff Zahtz has sent her children to overnight camps in New York because the overnight camp setting provides an immersive environment for teaching her children Jewish religious and cultural values that she believes binds them to the Jewish community and the Jewish faith, and allows her children to engage in and learn about Jewish practices 24/7 while isolated from the outside, secular world.  Jewish camping is thus an essential component of the religious upbringing she wishes for her children.

108.    As a healthcare employee and a single mother of two children, Plaintiff Zahtz is aware of the tremendous negative impact that the State's restrictions have on the interpersonal, emotional, and spiritual growth of children.  She believes that if the State does not allow her children to attend overnight camps, their risk of exposure in their current community will be much greater than if they are at a Jewish overnight camp, essentially quarantined from the outside world.

109.    For the reasons discussed above, Plaintiff Zahtz wishes to send two children to Jewish overnight camps in New York this summer, but Defendant's restrictions render such conduct illegal and subject to penalty, thus prohibiting her from acting on her sincerely held religious beliefs and her wish to direct the religious education and upbringing of her children.

110.    If the State's absolute ban on overnight camps is lifted, Plaintiff Zahtz would send her children to Jewish overnight camps in New York this summer that adhere to the health-related guidelines specified above.

## COUNT I

**Violation of the First Amendment to the United States Constitution
42 U.S.C. § 1983**

111.     Plaintiffs incorporate and reallege Paragraphs 1 through 110 as if fully set forth herein.

112.     The First Amendment to the United States Constitution, as applied to the States through the Fourteenth Amendment, forbids the States from enacting laws inhibiting the free exercise of religion.  *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

113.     Plaintiffs have a constitutional right to freely exercise their religious beliefs and practices by providing a religious upbringing for their children.  *See Wisconsin v. Yoder*, 406 U.S. 205, 213–14, 232 (1972).

114.     Defendant's statewide closure of all overnight camps violates Plaintiffs' constitutionally-protected right to the free exercise of religion by prohibiting entirely Plaintiffs' ability to send their children to Jewish overnight camps and to instill Jewish values and beliefs and to foster and promote Jewish religious practices.

115.     Defendant's statewide closure of all overnight camps is not neutral toward religious practice.

116.     While Defendant has strictly enforced his COVID-19 orders to enforce an absolute ban on overnight camps, without making any exemption for Jewish overnight camps, Defendant concurrently created an exemption from his COVID-19 orders for mass gatherings throughout the State of protestors of racial injustice.  These exempted protests should raise greater health concerns regarding the congregation of individuals as do overnight camps, which demonstrates that the closure of all overnight camps infringes upon such practices because Defendant sees less First Amendment value in Jewish overnight camps than he does in the mass protests.

117.     Defendant also concurrently has permitted a broad array of comparable secular activity, such as summer day camps and child care services, as long as they adhere to specified health-related guidelines, while not permitting overnight camps to operate if they are willing to adhere to those health-related guidelines.  This further demonstrates that the closure of all overnight camps infringes upon overnight camps because of their religious mission and orientation.

118.     Despite strictly enforcing his COVID-19 orders as blocking overnight camps, without making any exemption for First Amendment-protected activity despite overnight camps' willingness to adopt health and safety protocols to ensure that children and staff are protected from the transmission of COVID-19, Defendant made a First Amendment exemption from his COVID-19 orders for mass protests, which endangers the health and welfare of New York residents and travelers through the transmission of COVID-19 to the same or greater degree than do Jewish overnight camps.

119.     Defendant similarly has provided exemptions to a wide array of other comparable secular activity with the same or greater health concerns as overnight camps, such as summer day camps and child care services as long as they adhere to health-related guidelines.

120.     Because Defendant's COVID-19 orders, through their statewide closure of all Jewish overnight camps, are not neutral and generally applicable, it cannot be sustained unless narrowly tailored to serve a compelling state interest of the highest order.

121.     Defendant does not have a sufficient interest in barring outright all Jewish overnight camps from opening this summer.  In contrast to the strict approach taken toward Jewish overnight camps, Defendant has created an exemption from his in-person gathering restrictions for mass protests of racial injustice, which purportedly pose alleged harm of the same sort comparable to

overnight camps.  Defendant likewise has offered comparable secular activity such as child care and day camps the ability to operate if they adopt health-related guidelines while denying that same opportunity to overnight camps, which overwhelmingly have a religion mission and orientation, even if they adopt similar health and safety guidelines.

122.     The statewide closure of all Jewish overnight camps also is not sufficiently related to any such purported interest.  Less restrictive means clearly are available for the State to diminish the risk of exposure to COVID-19, as evidenced by the wholesale exemption Defendant has granted to mass protests, as well as the widespread permissions granted to comparable secular conduct as long as they implement specified health-related guidelines.

123.     Absent declaratory and injunctive relief, Plaintiffs will be irreparably injured.

124.     Plaintiffs have no adequate remedy at law for the violation of their constitutional rights.

## COUNT II

### Violation of the Fourteenth Amendment to the United States Constitution
### 42 U.S.C. § 1983

125.     Parent-Plaintiffs incorporate and reallege Paragraphs 1 through 110 as if fully set forth herein.

126.     The Due Process Clause of the Fourteenth Amendment to the United States Constitution affords parents a fundamental, protected right to control the upbringing and the education of their children.  *See Pierce v. Society of Sisters*, 268 U.S. 510, 534 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923).

127.     Parent-Plaintiffs have a constitutionally-protected interest in sending their children to Jewish overnight camps that provide their children with instruction consistent with Parent-Plaintiffs' values and beliefs.

128.     Defendant's statewide closure of all Jewish overnight camps this summer deprives Parent-Plaintiffs of their due process right to control the education of their children.

129.     Defendant does not have a sufficient interest in barring Jewish all overnight camps this summer, and the restriction is not sufficiently related to any interest in curbing the transmission of COVID-19.

130.     Absent declaratory and injunctive relief, Parent-Plaintiffs will be irreparably injured.

131.     Parent-Plaintiffs have no adequate remedy at law for the violation of their constitutional rights.

## COUNT III

### Violation of the First and Fourteenth Amendments to the United States Constitution
### 42 U.S.C. § 1983

132.     Parent-Plaintiffs incorporate and reallege Paragraphs 1 through 110 as if fully set forth herein.

133.     The Free Exercise Clause of the First Amendment affords Parent-Plaintiffs the right to the free exercise of their religion, and the Due Process Clause of the Fourteenth Amendment furnishes Parent-Plaintiffs the right to direct the upbringing of their children.

134.     Together, the First and Fourteenth Amendments provide Parent-Plaintiffs with a hybrid right to control the religious education of their children.

135.     Pursuant to the United States Supreme Court's opinions in *Yoder* and *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), Parent-Plaintiffs' hybrid right to provide for and choose the religious education for their children is afforded heightened constitutional protection.

136.     Defendant does not have a sufficient interest in barring outright all Jewish overnight camps from opening this summer.  In contrast to the strict approach taken toward Jewish overnight camps, Defendant has created an exemption from the State's COVID-19 orders for mass protests of racial injustice, which purportedly pose alleged harm of the same sort comparable to overnight camps.  Defendant likewise has offered comparable secular activity such as child care and day camps the ability to operate if they adopt health-related guidelines while denying that same opportunity to overnight camps, which overwhelmingly have a religion mission and orientation, even if they adopt similar health and safety guidelines.

137.     The statewide closure of all overnight camps also is not sufficiently related to any such purported interest.  Less restrictive means clearly are available for the State to diminish the risk of exposure to COVID-19, as evidenced by the wholesale exemption Defendant has granted to mass protests, as well as the widespread permissions granted to comparable secular conduct as long as they implement specified health-related guidelines.

138.     Absent declaratory and injunctive relief, Parent-Plaintiffs will be irreparably injured.

139.     Parent-Plaintiffs have no adequate remedy at law for the violation of their constitutional rights.

## COUNT IV

**Violation of the Article I, § 3 of the New York Constitution
42 U.S.C. § 1983**

140.     Plaintiffs incorporate and reallege Paragraphs 1 through 110 as if fully set forth herein.

141.     Article I, § 3 of the New York Constitution guarantees the free exercise and enjoyment of religious worship, without discrimination or preference, in New York State to all humankind.

142.     Plaintiffs have a constitutional right to freely exercise their religious beliefs and practices by providing a religious upbringing for their children.

143.     Defendant's statewide closure of all Jewish overnight camps violates Plaintiffs' constitutionally-protected right to the free exercise of religion by prohibiting entirely Plaintiffs' ability to send their children to overnight camp to inculcate Jewish values and religious practices.

144.     Any interest advanced by the State in closing Jewish overnight camps to purportedly curb the transmission of COVID-19 is outweighed by the substantial burden imposed on the right to free exercise of religion in sending children to camps that promote the Jewish faith and a sense of Jewish community.

145.     Defendant does not have a sufficient interest in barring outright all Jewish overnight camps from opening this summer.  In contrast to the strict approach taken toward Jewish overnight camps, Defendant has created an exemption from his COVID-19 orders for protests of racial injustice, which purportedly pose alleged harm of the same sort comparable to overnight camps. Defendant likewise has offered comparable secular activity such as child care and day camps the ability to operate if they adopt health-related guidelines while denying that same opportunity to overnight camps, which overwhelmingly have a religion mission and orientation, even if they adopt similar health and safety guidelines.

146.     Absent declaratory and injunctive relief, Plaintiffs will be irreparably injured.

147.     Plaintiffs have no adequate remedy at law for the violation of their constitutional rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a)      a temporary restraining order, followed by a preliminary and final injunction restraining Defendant, and all those acting in concert with him, from enforcing his COVID-19 orders to close all Jewish overnight camps;

(b)      a declaratory judgment that the statewide closure of all Jewish overnight camps is unconstitutional, both facially and as applied to plaintiffs;

(c)      an award of costs of this litigation, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920;

(d)      award such other and further relief as the Court may deem just and proper.

This 18th day of June, 2020.

_____

Avi Schick
avi.schick@troutman.com

TROUTMAN SANDERS LLP
875 Third Avenue
New York, NY  10022
(212) 704-6000

Misha Tseytlin (WI Bar No. 102199)
misha.tseytlin@troutman.com
*Pro Hac Vice Pending

TROUTMAN SANDERS LLP
227 W. Monroe Street, Suite 3900
Chicago, IL  60606
(312) 759-1920

W. Alex Smith (GA Bar No. 532647)
alex.smith@troutman.com
*Pro Hac Vice Pending

TROUTMAN SANDERS LLP
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia  30308
(404) 885-3000

***Attorneys for Plaintiffs***

## <u>VERIFICATION</u>

I, **Ariela Orkaby, MD, MPH**, am over the age of 18 and am a Plaintiff in this action. The allegations that pertain to me in this VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FROM CONSTITUTIONAL DEPRIVATIONS are true and correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Executed on the 18th day of June, 2020.

_____
Ariela Orkaby, MD, MPH

## **VERIFICATION**

I, **Beth Statfeld**, am over the age of 18 and am a Plaintiff in this action.  The allegations that pertain to me in this VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FROM CONSTITUTIONAL DEPRIVATIONS are true and correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would and could do so competently.  I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Executed on the /8 th day of June, 2020.

_____
Beth Statfeld

## VERIFICATION

I, **Samuel Werzberger, MD, FAAP**, am over the age of 18 and am a Plaintiff in this action. The allegations that pertain to me in this VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FROM CONSTITUTIONAL DEPRIVATIONS are true and correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Executed on the ___th day of June, 2020.

_____
Samuel Werzberger, MD, FAAP

## <u>VERIFICATION</u>

I, Milton Frischman, am over the age of 18 and am Founder of the Association of Jewish Camp Operators, a Plaintiff in this action. The allegations that pertain to me in this VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FROM CONSTITUTIONAL DEPRIVATIONS are true and correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Executed on the __th day of June, 2020.

Milton Frischman, Founder

## **<u>VERIFICATION</u>**

I, **Gail Zahtz**, am over the age of 18 and am a Plaintiff in this action.  The allegations that pertain to me in this VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF FROM CONSTITUTIONAL DEPRIVATIONS are true and correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would and could do so competently.  I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Executed on the __th day of June, 2020.

Gail Zahtz
_____
Gail Zahtz

**Signature:** _Gail Zahtz_
Gail Zahtz (Jun 18, 2020 15:05 EDT)

**Email:** gailzahtz@gmail.com