**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **Association of Jewish Camp Operators**, ) | |
| ) | |
| **Samuel Werzberger, MD, FAAP**, ) | |
| ) | |
| **Ariela Orkaby, MD, MPH**, ) | |
| ) | |
| **Beth Statfeld**, ) | |
| ) | |
| **Gail Zahtz**, ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| *v.* ) | Case No. 1:20-CV-0687 (GLS-DJS) |
| ) | |
| **Andrew M. Cuomo**, Governor of the ) | |
| State of New York, in his official capacity, ) | |
| ) | |
| ) | |
| *Defendant.* ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 4

I.     Defendant's Selective and Discriminatory Enforcement of the State's COVID-19
Restrictions ............................................................................................................. 4

     A.     Defendant's COVID-19 Restrictions .................................................... 4

     B.     Defendant's Selective Exemptions from His COVID-19 Restrictions ................. 4

     C.     Defendant's Enforcement of His COVID-19 Restrictions Against
Overnight Camps ............................................................................... 6

II.    Jewish Overnight Camps Are a Vital Component to the Jewish Faith ............................ 7

III.   Overnight Camps Are Uniquely Position to Protect from the Transmission of
COVID-19 ............................................................................................................. 8

ARGUMENT ......................................................................................................... 11

I.     Plaintiffs Are Likely to Succeed on Their Claims That Defendant's Restrictions
Are Unconstitutional ............................................................................................... 12

     A.     Defendant's Discriminatory Restrictions Violate Plaintiffs' First
Amendment Right to the Free Exercise of Religion ........................................... 12

     B.     Defendant's Discriminatory Restrictions Infringe Upon Parent-Plaintiffs'
Fourteenth Amendment Right to Due Process .................................................. 20

     C.     Defendant's Discriminatory Restrictions Violate Parent-Plaintiffs' Hybrid
Right to Direct the Religious Education of Their Children .............................. 21

II.    Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief .................. 22

III.   The Balance of the Hardships Tips in Plaintiffs' Favor ................................................ 24

IV.   Injunctive Relief Would Serve the Public Interest ...................................................... 25

CONCLUSION ....................................................................................................... 26

# TABLE OF AUTHORITIES

CASE                                                                                    Page(s)

*Antietam Battlefield KOA v. Hogan*,
    2020 U.S. Dist. LEXIS 88883 (D. Md. May 20, 2020) ........................................................16

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015) ...................................................................................................11

*Cassell v. Snyders*,
    2020 U.S. Dist. LEXIS 77512 (N.D. Ill. May 3, 2020) .........................................................16

*Cent. Rabbinical Congress of the U.S. & Can. v. NYC Dep't of Health & Mental Hygiene*,
    763 F.3d 183 (2d Cir. 2014) .............................................................................................12, 18

*Chestnut Hill NY, Inc. v. City of Kingston*,
    2017 U.S. Dist. LEXIS 226807 (N.D.N.Y. Feb. 22, 2017) ...................................................11

*Church of Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993) ........................................................................................................ *passim*

*Commack Self-Service Kosher Meats, Inc. v. Hooker*,
    680 F.3d 194 (2d Cir. 2012) .......................................................................................13, 16, 17

*Elrod v. Burns*,
    427 U.S. 347 (1976) ...............................................................................................................23

*Employment Div., Dep't of Human Res. of Ore. v. Smith*,
    494 U.S. 872 (1990) ..........................................................................................................21, 22

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009) ...................................................................................................11

*Farrington v. Tokushige*,
    273 U.S. 284 (1927) ..........................................................................................................20, 21

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*,
    170 F.3d 359 (3d Cir. 1999) .......................................................................................13, 16, 17, 18

*Holt v. Hobbs*,
    574 U.S. 352 (2015) .......................................................................................14, 18, 19, 22

*Jacobson v. Commonwealth of Mass.*,
    197 U.S. 11 (1905) .................................................................................................................19

*Jolly v. Coughlin*,
  76 F.3d 468 (2d Cir. 1996)........................................................................22, 23

*LeBlanc-Sternberg v. Fletcher*,
  67 F.3d 412 (2d Cir. 1995).............................................................................23

*Leebaert v. Harrington*,
  332 F.3d 134 (2d Cir. 2003)...........................................................................22

*Litzman v. NYC Police Dep't*,
  2013 U.S. Dist. LEXIS 162968 (S.D.N.Y. Nov. 15, 2013)..................................13

*Meyer v. Nebraska*,
  262 U.S. 390 (1923)..................................................................................20, 21

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013)...........................................................................25

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015)..................................................................................20

*Phillips v. City of New York*,
  775 F.3d 538 (2d Cir. 2015)...........................................................................19

*Pierce v. Society of Sisters*,
  268 U.S. 510 (1925)..................................................................................20, 21

*Reno v. Flores*,
  507 U.S. 292 (1993)......................................................................................20

*Roberts v. Neace*,
  958 F.3d 409 (6th Cir. 2020) ...............................................................14, 18, 25

*S. Bay United Pentecostal Church v. Newsom*,
  2020 U.S. LEXIS 3041 (May 29, 2020) .................................................16, 18

*Spell v. Edwards*,
  2020 U.S. App. LEXIS 19148 (5th Cir. June 18, 2020) .................................18

*Troxel v. Granville*,
  530 U.S. 57 (2000)........................................................................................20

*Ward v. Polite*,
  667 F.3d 727 (6th Cir. 2012) .............................................................. *passim*

*Williams v. Annucci*,
  895 F.3d 180 (2d Cir. 2018)...............................................................14, 19, 22

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)............................................................................................12, 20, 21, 22

**OTHER AUTHORITIES**

U.S. CONST. amend. I.............................................................................................. *passim*

U.S. CONST. amend. XIV ..........................................................................................2, 12, 20, 21

N.Y. Exec. Order No. 202..........................................................................................4

Plaintiffs Association of Jewish Camp Operators (the "Association"); Samuel Werzberger, MD, FAAP; Ariela Orkaby Sherman, MD, MPH; Beth Statford; and Gail Zahtz respectfully submit this memorandum of law in support of their Motion for Temporary Restraining Order and Preliminary Injunction. The Motion and this memorandum are supported by the Declarations of Daniel S. Berman, MD; Meir Frischman; Avi Schick; Rabbi Avrohom Schwartz; Ariela Orkaby Sherman, MD, MPH; and Gail Zahtz, and the Exhibits attached thereto.

## INTRODUCTION

Since March 2020, Defendant Governor Andrew M. Cuomo has issued Executive Orders prohibiting gatherings of individuals in order to slow the spread of COVID-19. Recently, however, Defendant has made several exceptions to these gathering restrictions, including for mass protests of racial injustice. Defendant has proclaimed that he "agree[s]" with the "[r]ightful outrage" and "righteous indignation" of the protestors and has vowed to protect their "right to protest." Avi Schick Declaration ("Schick Decl.") Ex. E at 4–5, 11–12. He has exempted these protests—and theaters' related "Open Your Lobby" indoor gatherings, *see id.* at Ex. K —from his restrictions even though, in his words, they constitute "mass gathering[s]" with "no social distancing," *id.* at Ex. E at 15, 29, 34, and thus plainly violate his restrictions. Defendant also has extended widespread exemptions to secular activities, such as "non-essential" businesses and entities, child care services, summer day camps, and special education services, provided that such entities follow New York Department of Health guidelines to prevent the transmission of COVID-19.

Yet on June 12, 2020, Defendant announced that he would *not* permit Jewish overnight camps (which constitute all or just about all of the overnight camps attempting to operate this summer in New York), even though overnight camps have agreed to implement more protective health and safety protocols than those the State requires for comparable secular activity and are

uniquely positioned to segregate children and staff from the community at-large and protect against the transmission of COVID-19.

Defendant's statewide ban on all Jewish overnight camps this summer violates Plaintiffs' constitutional right of the free exercise of religion and due process right to direct the religious upbringing of their children, guaranteed by the First and Fourteenth Amendments of the United States Constitution.  The prohibition infringes Plaintiffs' ability to send their children to Jewish overnight camps to instill Jewish values, beliefs, and religious practices.  The exempted First Amendment mass protest activity raises *greater* health concerns than do overnight camps regarding the congregation of individuals, demonstrating that Defendant's refusal to similarly exempt Jewish overnight camps infringes upon Plaintiffs' religious practices because of their religious nature. They are not the First Amendment rights that Defendant wishes to respect.

Additionally, Defendant's broad exemptions for comparable secular conduct as long as it adheres to certain health guidelines, without allowing Jewish overnight camps the same permission to operate even though they have agreed to employ more protective health protocols and can better isolate and safeguard children from the community at-large and protect against the transmission of COVID-19, unfairly and unequally burdens the exercise of constitutionally protected rights.

For each of these reasons, Plaintiffs are likely to succeed on the merits of their claims. Plaintiffs also will suffer irreparable harm if Defendant is allowed to infringe upon their constitutional rights, which courts presume causes irreparable injury.  The public interest similarly favors safeguarding Plaintiffs' constitutional rights.

By contrast, there will be no harm to any legitimate government interest if Defendant is enjoined from enforcing his gathering and closure restrictions against Jewish overnight camps. Medical evidence demonstrates that there now is an "extremely low prevalence" of COVID-19 in

New York, particularly so in children, and that children are much less susceptible to spread of the virus and serious illness.  Declaration of Daniel S. Berman, MD ("Berman Decl.") ¶¶ 7–9, 19–31.  To further decrease the "minuscule likelihood of an infected individual entering camp," *id.* at ¶ 10, Jewish overnight camps have engaged physicians and epidemiologists to implement strict health protocols "to ensure the availability of a healthy, summer camp experience that reasonably mitigates the exposure of campers and staff to COVID-19."  Declaration of Meir Frischman ("Frischman Decl."), Ex. A at 4; *see also id.* at ¶ 11; Berman Decl. ¶ 10.

Pursuant to these health and safety protocols, the camps will conduct regular testing to ensure that only individuals who test positive for COVID-19 antibodies or who isolate for two weeks after testing negative for COVID-19 can enter the camp.  Frischman Decl. at ¶ 13, Ex. A at 5–7; Berman Decl. ¶¶ 11–17.  Camps also will preclude at-risk individuals.  Frischman Decl. at ¶ 14, Ex. A at 5–7.  Camps will retain an on-site health director, and, once at camp, administrators will enforce stringent health protocols to stem transmission (again, in the unlikely event that such infection is introduced in the first place, *see* Berman Decl. ¶¶ 7–9, 19–31), routine temperature checks and COVID-19 symptom monitoring in individuals, and aggressive sanitization measures.  Frischman Decl. at ¶ 15, Ex. at 7–12; Berman Decl. ¶ 18.  Camps also will isolate any individual with symptoms and provide testing and/or send the individual home.  Frischman Decl. at ¶ 15, Ex. A at 8, 14–15.  Outbreak of the virus at camp thus is "quite remote."  Berman Decl. ¶ 31.

To protect their constitutional rights, Plaintiffs respectfully request that the Court enter a temporary restraining order and preliminary injunction prohibiting Defendant, and all those acting in concert with him, from enforcing his restrictions to block the operation of Jewish overnight camps.  This will allow parents who wish to provide their children with the Jewish educational experience offered by Jewish overnight camps the ability to do so.

## STATEMENT OF FACTS

**I.**     **Defendant's Selective and Discriminatory Enforcement of the State's COVID-19 Restrictions**

    **A.**     **Defendant's COVID-19 Restrictions**

To combat the "transmission of COVID-19" and the "threat that COVID-19 poses to the health and welfare" of the State of New York, Defendant issued Executive Order No. 202 on March 7, 2020 declaring a disaster emergency in New York.  Schick Decl. Ex. A at 1–3.  In the following months, Defendant issued several dozen orders imposing business closures, in-person gathering restrictions, and other requirements throughout the State.  *See generally id.* at Ex. A.  Defendant ordered all businesses not deemed to be "essential" by the State to close, *id.* at 17–18, and he barred all "[n]on-essential gatherings of individuals of any size for any reason," *id.* at 22.  Defendant issued a subsequent order authorizing non-essential gatherings of up to ten individuals throughout the State.  *Id.* at 45.  Defendant expanded this number to twenty-five individuals in regions that have reached Phase Three of the State's reopening plan, discussed more fully below, *id.* at 57, and he has allowed houses of worship gatherings in Phase Two regions to use up to 25% of indoor capacity, *id.* at 53–54.  Defendant has instituted strict penalties to enforce his prohibitions, ordering that any individual who violates these orders can be fined up to $1,000.  *Id.* at 31.  Defendant most recently extended these restrictions through July 13.  *Id.* at 55–56.

    **B.**     **Defendant's Selective Exemptions from His COVID-19 Restrictions**

Defendant has instituted a series of exemptions from his COVID-19 gathering and closure restrictions.  Defendant has never ordered child care services to close, instead allowing the New York Office of Children and Family Services to promulgate health and safety guidelines for those programs.  Schick Decl. Exs. A at 5–6, 10, 13–14, 18; C.  In May, the State announced that it would allow a phased, regional approach for non-essential businesses and entities to reopen, based

on regions satisfying certain health-related metrics specified by the New York Department of Health.  *Id.* at Ex. D.  Pursuant to that plan, Defendant has issued orders exempting non-essential businesses and entities such as construction, manufacturing, retail, offices, barbershops, salons, restaurants, and personal care, as well as outdoor recreational activities, from his gathering and closure restrictions in certain regions of the State, provided that such entities operate subject to Department of Health guidance.  *Id.* at Exs. A at 46–49, 51, 55–56; D.  Defendant also has excused summer day camps and special education services from his restrictions, with the State releasing guidance on mandatory and recommended health and safety protocols to protect the children and staff at child care services and day camp programs from the transmission of COVID-19.  *Id.* at Exs. A at 50–52; F.  And Defendant has declared that he will not enforce his restrictions against localities that decide to open pools and playgrounds.  *Id.* at Ex. E at 33–34.

Defendant also has exempted mass protests from his restrictions because he agrees with their First Amendment activity.  On May 25, 2020, a Minneapolis police officer killed George Floyd, a black man, by pressing his knee on Mr. Floyd's neck for almost ten minutes, suffocating him.  Schick Decl. Ex. L.  This killing sparked widespread protests to raise awareness of racial injustice, with tens of thousands of individuals gathering in mass demonstrations around the State each day for several weeks.  *Id.*  Defendant has admitted that these protests "cause a complication on dealing with the COVID virus," acknowledging that they constitute "mass gathering[s] at the time of COVID" with "no social distancing" and that individuals are "right in [each other's] face."  *Id.* at Ex. E at 15, 29, 34.  These "mass gathering[s]" are plainly contrary to Defendant's gathering restrictions.  *See id.* at Ex. A at 45, 57.

Nevertheless, Defendant has created a de facto exemption from his orders for this First Amendment activity.  Defendant did so, proclaiming that he "agree[s] with the[ ] . . . [r]ightful

outrage" and "righteous indignation" of the protestors and declaring that they have "[t]he right to protest, the right to air grievances, and the right to raise issues so government responds."  Schick Decl. at Ex. E at 4–5.  During these mass protests, theaters, which are supposed to remain closed under Defendant's closure restrictions, *id.* at Ex. J, have implemented an "Open Your Lobby" campaign whereby theaters around the State open their premises to protestors for rest, use of Wi-Fi and bathrooms, and provision of water and snacks, *id.* at Ex. K.  Defendant likewise has exempted these theaters from his gathering and closure restrictions.  *See* Schick Decl. Ex. M.

**C.    Defendant's Enforcement of His COVID-19 Restrictions Against Overnight Camps**

On June 12, 2020, Defendant announced that he would enforce his gathering and closure restrictions by prohibiting all overnight children's camps this summer.  Schick Decl. Exs. H; *see also id.* at Ex. G.  In making this announcement, Defendant did not acknowledge that "almost all, if not all, of the non-Jewish overnight camps in New York State had already announced that they would not be opening this summer," Frischman Decl. ¶ 3, so Defendant's decision effectively affects only Jewish overnight camps, *id.* at ¶¶ 4–5.  Defendant's closure does not allow for the consideration and adoption of health and safety protocols of the sort that the State has deemed sufficient for day camps, child care services, and other activities deemed essential.  Defendant issued a flat prohibition of Jewish overnight camping, notwithstanding the fact that those *religious* camps involve the exercise of First Amendment-protected religious activity of conveying Jewish religious and cultural values to children, *see infra* 7–8, and have expressed their willingness to adopt health and safety protocols similar to, and even more protective than, those issued by the State for child care services and day camp programs, Frischman Decl. ¶ 11, Ex. A.

II.     **Jewish Overnight Camps Are a Vital Component of Jewish Education**

Jewish overnight camps provide an immersive, unique experience to foster a sense of identity among Jewish children and to instill traditional Jewish values.  For over a century, Jewish overnight camps have offered children "an invaluable and unique setting to inspire a religious understanding of the world and to inculcate the Jewish way of life."  Frischman Decl. ¶ 6.  "The overnight camp's immersive environment also 'powerfully promotes interest in, and passion for, Jewish literacy and living."  *Id.* at ¶ 7 (quoting Amy L. Sales and Leonard Saxe, *Limud by the Lake: Fulfilling the Educational Potential of Jewish Summer Camps* 1–2 (Oct. 2012)).  The camps are "[e]nsconced in an atmosphere of purity, without any outside, negative influences," and teach children "by their lived experiences – that Jewish learning and Jewish life never stops, but instead continues in all contexts."  Declaration of Rabbi Avrohom Schwartz ("Schwartz Decl.") ¶¶ 3, 6.

Jewish overnight camps are "a critical facet of the development and growth of the Jewish community."  Frischman Decl. ¶ 8.  "The foundation of Jewish life is built upon community, and Jewish education is the cornerstone of [Jewish] society."  Schwartz Decl. at ¶ 2.  Studies show that campers become "more connected to the Jewish community and have an increased adherence to religious practice."  Frischman Decl. ¶ 8.  Jewish values are "woven into the very fabric" of camp, making "it possible to live Judaism at camp in a total, holistic fashion.'"  *Id.* (quoting Sales and Saxe, *Limud* at 7–15).  Campers typically have "three to five sessions each day devoted to Jewish education and to group prayer," with even the "mundane" like mealtime "infused with Jewish values," *id.* at ¶ 10, such as "appropriate blessings" and "[r]itual handwashing," Schwartz Decl. ¶ 10.  Camp Sabbath "is a life-altering experience for many campers," with "substantial portions of the day devoted to prayers, singing Jewish songs and hearing stories and other lessons conveying Jewish values, history and heroes."  *Id.*; *see also* Schwartz Decl. ¶ 9.  Camps also

provide campers with a unique opportunity to engage with religious role models, such as rabbis and counselors, in their daily lives.  *Id.* ¶¶ 11–12.  "Such opportunities are not readily available outside the overnight camp environment."  *Id.* at ¶ 9.

As overnight camping forms a vital element of religious education and training for many Jewish children, the children who attend overnight camps are disproportionately Jewish.  There are approximately 150,000 overnight campers in New York each summer, with nearly a third of those attending Jewish overnight camp.  Frischman Decl. ¶ 5.  By comparison, approximately 5% of the total K-12 enrollment in New York attend Jewish schools.  *Id.*

Jewish parents who send their children to Jewish overnight camps believe that the camps constitute an indispensable component of their children's religious upbringing and education. Jewish parents, such as Plaintiffs, choose to send their children to overnight camps because the environment "provides a unique opportunity for [their] children to spend the summer immersed in a religious environment that grows and strengthens their understanding of the world and of Judaism" while "isolated from the outside, secular world."  Declaration of Ariela Orkaby Sherman, MD, MPH ("Sherman Decl.") ¶¶ 5–8; *accord* Declaration of Gail Zahtz ("Zahtz Decl.") ¶¶ 4–6. These parents view camps as an "essential component" of their "children's educational and religious growth and wellbeing."  Sherman Decl. ¶ 4; *accord* Zahtz Decl. ¶ 3.  The overnight camps that instill religious values and practices thus form these Jewish parents' "sincerely held religious beliefs" and "right to direct the religious education and upbringing" of their children.  Sherman Decl. ¶ 9; Zahtz Decl. ¶ 8.

## III.   **Overnight Camps Are Uniquely Position to Protect from the Transmission of COVID-19**

Overnight camps are uniquely positioned to protect against the transmission of COVID-19.  Current medical evidence demonstrates that there exists a "minuscule likelihood of an infected

individual entering camp[.]"  Berman Decl. ¶ 10.  For example, on June 15, 2020, only 239 of approximately 20 million individuals in New York were newly diagnosed with COVID-19.  *Id.* at ¶ 8.  Because children constitute just 3.7% of the cases of COVID-19 in the United States, approximately only 9 children in New York were newly infected on June 15.  *Id.*  The chances of any one child being newly infected on that day therefore was 0.0000028; even over a period of 14 days, just 0.0000392—or 0.00392%.  *Id.*  For most staff, the age group 18–29 accounts for 16.4% of COVID-19 cases in the United States, meaning a total of 39 new cases in New York for that age group on June 15.  *Id.* at ¶ 9.  The chances of any one individual being infected on that day thus is 0.0000116; over a 14-day period, the probability would be 0.0001624—or 0.01624%.  *Id.*

Additionally, COVID-19 health concerns in children are significantly lower than in the rest of the population, for several reasons.  *First*, "children are much less susceptible to COVID-19 than adults," accounting for only a few percentage points of all COVID-19 cases despite constituting 22% of the country's population.  Berman Decl. ¶ 20.  *Second*, among children, there are "far fewer severe cases of COVID-19 and almost no mortality."  *Id.* at ¶ 21.  Centers for Disease Control and Prevention ("CDC") data shows that children constitute "*0%* of the deaths related to COVID-19 in the United States."  *Id.* (emphasis in original).  Even those in age group 18–29 account for only 0.4% of deaths.  *Id.*  *Third*, "a significant percentage of children who have COVID-19 have underlying conditions, and the majority of children who are seriously ill from COVID-19 have underlying conditions."  *Id.* at ¶ 22.  23% of pediatric COVID-19 cases, 77% of those hospitalized, and all admitted to intensive care had one or more underlying conditions.  *Id.*  *Fourth*, children are "very poor 'transmitters' of the infection."  *Id.* at ¶ 23.  Studies indicate that children "are not the source of infection of COVID-19."  Berman Decl. ¶¶ 23–25.  There thus "seems to be little reason for concern at overnight camps."  *Id.* at ¶ 27.

Even so, Jewish overnight camps—including the members of the Association—have engaged physicians and health policy professionals to develop health and safety protocols to ensure that camps protect against the introduction of COVID-19 and guard against spread if an infection arises.  Frischman Decl. ¶ 11, Ex. A; Berman Decl. ¶ 10.  Under these protocols, camp staff will be "rigorously trained to ensure a healthy camp experience that mitigates the exposure of campers and staff to COVID-19."  Frischman Decl. ¶ 12, Ex. A at 5.  All campers and staff will be subject to testing for COVID-19 antibodies, *id.* at ¶ 13, Ex. A at 5–7, which has a high likelihood of demonstrating that an individual who tests positive has decreased infectiousness and some degree of immunity from future infection, Berman Decl. ¶¶ 11–15.

Individuals who test negative for antibodies would then be screened using the "overly conservative" polymerase chain reaction ("PCR") test for COVID-19.  *Id.* at ¶ 15; Frischman Decl. ¶ 13, Ex. A at 5–7.  Individuals who test negative must remain isolated at home for two weeks until the commencement of camp, after which the individual is tested again to ensure a negative result.  *Id.*; Berman Decl. ¶ 15.  The camps will not permit at-risk individuals to attend.  Frischman Decl. ¶ 14, Ex. A at 5–7.  This "tight screening procedure," coupled with the "infinitesimal" amount of camp-aged individuals who have COVID-19 and the "extremely low prevalence of COVID-19 throughout New York State," "render[ ] it almost impossible for an infected individual to make it into camp."  Berman Decl. ¶¶ 10, 17, 30.

Once open, camp staff will screen campers and staff regularly with temperature checks and for signs and symptoms of COVID-19.  Frischman Decl. ¶ 15, Ex. A at 9; Berman Decl. ¶ 18. Each camp must retain an on-site health director, Frischman Decl. ¶ 15, Ex. A at 7, and staff will enforce "aggressive sanitization measures," *id.* at 11–12; Berman Decl. ¶ 18.  Any individual who exhibits signs and/or symptoms of COVID-19 will be isolated immediately and receive COVID-

19 testing.  Frischman Decl. ¶ 15, Ex. A at 8, 14–15; Berman Decl. ¶ 18.  And any positive tests timely will be reported to local jurisdictions.  Frischman Decl. ¶ 15, Ex. A at 8.

Considering the "the extremely low prevalence of COVID-19 throughout New York State, the almost nonexistent probability of children currently being infected, together with the tight screening to prevent infected individuals from coming into overnight camps, and the infection control practices which will be in play in the overnight camps, the chances of an individual coming into the camps infected and spreading the disease are almost nonexistent."  Berman Decl. ¶ 30. Given the "literature demonstrating that the incidence of COVID-19 in children is very low to begin with, the severity of illness is dramatically less in children, severe consequences may be limited only to those with underlying conditions (who will be excluded from camp in most protocols) and transmission from children is known to be infrequent," *id.* at ¶ 31, "the chances of a serious outbreak in camp are quite remote," *id.*

## ARGUMENT

In the Second Circuit, the standard for issuance of a temporary restraining order and a preliminary injunction are the same.  *Chestnut Hill NY, Inc. v. City of Kingston*, 2017 U.S. Dist. LEXIS 226807, at *2 (N.D.N.Y. Feb. 22, 2017).   When pursuing injunctive relief against regulation taken in the public interest, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of the hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction.  *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).  "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'"  *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)).

I.      **Plaintiffs Are Likely to Succeed on Their Claims That Defendant's Restrictions Are Unconstitutional**

      A.      **Defendant's Discriminatory Restrictions Violate Plaintiffs' First Amendment Right to the Free Exercise of Religion**

Plaintiffs are likely to prevail on their claim that Defendant's ban on Jewish overnight camps, despite the exemptions he affords to First Amendment activities that he favors and other secular conduct similar to overnight camps, violates Plaintiffs' First Amendment right to the free exercise of religion.

1. The First Amendment to the United States Constitution, through the Fourteenth Amendment, forbids States from enacting laws providing for the establishment of religion or prohibiting the free exercise of religion. The First Amendment protects the right to freely exercise religious beliefs and practices by providing a religious upbringing for children. *See Wisconsin v. Yoder*, 406 U.S. 205, 213–14, 232 (1972).

a. Laws burdening the free exercise of religion that are not neutral or generally applicable are subject to "the most rigorous of scrutiny." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993).

A law is not neutral toward religion where the State provides exemption for secular conduct but not for religious conduct without compelling justification. A law that is facially neutral toward religion is not determinative of neutrality; a court must assess the "effect of a law in its real operation" as "strong evidence of its object" for whether it "infringe[s] upon or restrict[s] practices because of their religious motivation." *Id.* at 533, 535; *see also Cent. Rabbinical Congress of the U.S. & Can. v. NYC Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193–96 (2d Cir. 2014). "[I]n circumstances in which individualized exemptions from a general requirement are available, the government 'may not refuse to extend that system to cases of religious hardship without

compelling reason.'" *Lukumi*, 508 U.S. at 537 (quoting *Employment Div., Dep't of Human Res. of Ore. v. Smith*, 494 U.S. 872, 884 (1990)); *see also Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012) ("A double standard is not a neutral standard."). The government's enforcement of a law cannot "devalue[ ] religious reasons . . . by judging them to be of less import than nonreligious reasons." *Lukumi*, 508 U.S. at 537–38. If so, "religious practice is being singled out for discriminatory treatment." *Id.* at 538.

This principle rings true whether the government "creates a categorical exemption for individuals with a secular objection but not for individuals with a religious objection," *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) (Alito, J.), or issues de facto exemptions by "permitting secular exemptions but not religious ones," *Ward*, 667 F.3d at 739; *see also Litzman v. NYC Police Dep't*, 2013 U.S. Dist. LEXIS 162968, at *8–9 (S.D.N.Y. Nov. 15, 2013) (strict scrutiny applies where the government "exercises discretion with a facially neutral rule in a discriminatory fashion" by granting "de facto exemptions" and "not always enforc[ing]" its rule). Each triggers scrutiny. *Lukumi*, 508 U.S. at 537–38; *Ward*, 667 F.3d at 739; *Fraternal Order*, 170 F.3d at 365. Where such exemptions exist, there must be a "neutral, secular basis for the lines government has drawn." *Commack Self-Service Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 211 (2d Cir. 2012).

A law is not generally applicable when the government "decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Lukumi*, 508 U.S. at 542–43. The regulation cannot be "underinclusive" in advancing the government's interests—that is, it cannot "fail to prohibit nonreligious conduct that endangers [the government's] interests in a similar or greater degree than [the religious conduct] does." *Id.* at 543. "'[A]n exception-ridden policy takes on the appearance and reality of a system

of individualized exemptions, the antithesis of a neutral and generally applicable policy and just the kind of state action that must run the gauntlet of strict scrutiny.'" *Roberts v. Neace*, 958 F.3d 409, 413–14 (6th Cir. 2020) (quoting *Ward*, 667 F.3d at 740).  Exemptions for secular conduct that "pose[s] comparable public health risks" to the religious conduct, *id.* at 414, demonstrate the law's "underinclusive" nature, *Lukumi*, 508 U.S. at 543.  *De facto* exemptions likewise qualify as individualized exemptions and undermine general applicability.  *Ward*, 667 F.3d at 739.

b. To satisfy the "'exceptionally demanding'" strict scrutiny test, *Holt v. Hobbs*, 574 U.S. 352, 364 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014)), the State must show the law "advance[s] 'interests of the highest order' and [is] narrowly tailored in pursuit of those interests," *Lukumi*, 508 U.S. at 546 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)).  Laws "will survive strict scrutiny only in rare cases."  *Id.*  A law fails to advance a compelling interest where government "fails to enact feasible measures to restrict other conduct producing substantial harm or alleged harm of the same sort" as the restricted religious activity. *Id.* at 546–47.  A law is not narrowly tailored if "'less restrictive means [are] available for the Government to achieve its goals[.]'"  *Holt*, 574 U.S. at 365 (quoting *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 815 (2000)).  A law's "underinclusiveness suggests . . . that a more tailored policy, less burdensome to [religious practice], is possible."  *Williams v. Annucci*, 895 F.3d 180, 193 (2d Cir. 2018); *see also Holt*, 574 U.S. at 367–38; *Lukumi*, 508 U.S. at 546.

2. By not exempting Jewish overnight camps from his restrictions, Defendant has burdened Plaintiffs' sincerely held religious beliefs and their desire to direct the religious upbringing of their children.  Parent-Plaintiffs are sincere practitioners of Judaism who believe Jewish overnight camps constitute an "essential component" of their "children's education and religious growth and well-being" because they provide a unique, immersive experience to foster religious identity and

14

to instill Jewish values.  Sherman Decl. ¶¶ 4–7; Zahtz Decl. ¶¶ 2–6.  These camps form part of Parent-Plaintiffs' "sincerely held religious beliefs" and "right to direct the religious education and upbringing" of their children.  Sherman Decl. ¶ 9; Zahtz Decl. ¶ 8.  The members of the Association likewise wish to "provide this vital religious and developmental experience for Jewish children," to render their religious mission to be "a critical facet of the development and growth of the Jewish community."  Frischman Decl. ¶¶ 8, 20.  Because Defendant has not exempted Jewish overnight camps from his restrictions, instead rendering such conduct illegal and subject to penalty, Defendant has deprived Plaintiffs' of their sincerely held religious beliefs.  Sherman Decl. ¶ 10; Zahtz Decl. ¶ 8; Frischman Decl. ¶ 20.

a. Defendant's refusal to exempt Jewish overnight camps from his gathering and closure restrictions, while concurrently creating exemptions from his restrictions for mass gatherings of protestors of racial injustice, as well as a gamut of comparable secular activity, demonstrates that the closure is not neutral towards religious practice.  Despite acknowledging that the protests are "mass gathering[s]" with "no social distancing," Schick Decl. Ex. E at 15, 29, 34, and thus are flatly contrary to Defendant's gathering restrictions, *see id.* at Ex. A at 45, 57, Defendant has exempted that First Amendment activity from his orders.  Defendant has done so because he "agree[s] with the[ ] . . . [r]ightful outrage" and "righteous indignation" of the protestors, declaring that they have "[t]he right to protest, the right to air grievances, and the right to raise issues so government responds."  *Id.* at Ex. E at 4–5.  Yet he has "'refus[ed] to extend that system to cases of religious hardship'" by providing no exemption from his restrictions to Jewish overnight camps.  *Lukumi*, 508 U.S. at 537 (quoting *Smith*, 494 U.S. at 884).

By exempting certain First Amendment activity he favors but not religious activity, Defendant has "devalue[d] religious reasons . . . by judging them to be of lesser import than

nonreligious reasons.  Thus, religious practice is being singled out for discriminatory treatment." *Id.* at 537–38; *see also Ward*, 667 F.3d at 739; *Fraternal Order*, 170 F.3d at 365.

No "neutral, secular basis" exists "for the lines government has drawn" in exempting mass protests from the State's restrictions while strictly enforcing those restrictions against the religious mission of the Jewish overnight camps.  *Commack*, 680 F.3d at 211.  The mass protests involve packed crowds of individuals in very close proximity to each other for an extended period—the very characteristics of public congregation that States usually invoke to justify restrictions to combat the "transmission of COVID-19," Schick Decl. Ex. A at 1.  *See, e.g.*, *Antietam Battlefield KOA v. Hogan*, 2020 U.S. Dist. LEXIS 88883, at *21 (D. Md. May 20, 2020); *Cassell v. Snyders*, 2020 U.S. Dist. LEXIS 77512, at *25 (N.D. Ill. May 3, 2020); *see also S. Bay United Pentecostal Church v. Newsom*, 2020 U.S. LEXIS 3041, at *2 (May 29, 2020) (Roberts, C.J., concurring in the denial of application for injunctive relief) (concluding that exempted business conduct at issue was not activity "in which people [ ] congregate in large groups [ ]or remain in close proximity for extended periods").

Unlike the mass protests, Jewish overnight camps have not ignored the health issues but have engaged physicians and developed health protocols, *see* Frischman Decl. ¶ 11, Ex. A; Berman Decl. ¶ 10, that would ensure camps are much safer than mass protests.  These camps would isolate children (who already are unlikely to contract or transmit the virus, *see* Berman Decl. ¶¶ 8, 20–25) from the outside community, impose strict testing to ensure no individual with COVID-19 enters camp, and aggressively monitor individuals and implement sanitization and isolation protocols to curb any possible spread of COVID-19 while in the camp.  Frischman Decl. ¶¶ 12–15, 19, Ex. A at 5–16; Berman Decl. ¶¶ 15, 18.  Allowing "mass gathering[s]" of thousands of individuals brushing past each other with "no social distancing" and individuals "right in [each other's] face,"

Schick Decl. Ex. E at 15, 29, 34, while concurrently enforcing a ban against Jewish overnight camps that will adhere to health guidelines displays that no "neutral, secular basis" for the discriminatory treatment exists, *Commack*, 680 F.3d at 211; *see also Ward*, 667 F.3d at 739; *Fraternal Order*, 170 F.3d at 365.

Defendant's widespread exceptions for comparable secular activity, such as day camps and child care services that adopt specified health guidelines, Schick Decl. Exs. A at 40–41, 46–52, 55–56; D; E at 4; F, further demonstrates that the closure of overnight camps infringes upon Jewish overnight camps because of their religious orientation. Jewish overnight camps' health protocols are more protective than those the State requires of day camps and child care services, including implementing testing, isolation, disinfection, communication, and screening measures. Frischman Decl. ¶¶ 11–15, 19, Ex. A. This contrasts with day camps and child care services in which children and staff are exposed to their home communities every night, which "would seem to pose a far greater risk of infection for children." Berman Decl. ¶ 29.

Despite exempting comparable secular activities with protocols that Defendant considers sufficient to address the State's interest in preventing the "transmission of COVID-19," Schick Decl. Ex. A at 1–3, Defendant has refused to exempt religious overnight camps with more protective protocols. And Defendant's announcement that he would enforce his restrictions against overnight camps despite his other exemptions effectively and disproportionality affects only Jewish camps, as "almost all, if not all, of non-Jewish overnight camps in New York State had already announced that they would not be opening this summer." Frischman Decl. ¶¶ 3–4.

Defendant cannot make a value judgment in favor of secular views that he favors but restrict those with religious motivations that he does not. By "permitting secular exemptions" with which he agrees "but not religious ones and failing to apply the policy in an even-handed, much

less a faith-neutral, manner," *Ward*, 667 F.3d at 739, Defendant's conduct infringes upon religious overnight camps because he "judg[es] them to be of lesser import than nonreligious reasons." *Lukumi*, 508 U.S. at 537–38. "Thus, religious practice is being singled out for discriminatory treatment." *Id.* at 538; *see also Ward*, 667 F.3d at 739; *Fraternal Order*, 170 F.3d at 365; *Spell v. Edwards*, 2020 U.S. App. LEXIS 19148, at *15 (5th Cir. June 18, 2020) (Ho, J., concurring) ("The First Amendment does not allow our leaders to decide which rights to honor and which to ignore.").

Nor is Defendant's "exception-ridden policy" generally applicable. *Roberts*, 958 F.3d at 413–14. The regulation is massively "underinclusive in relation to its asserted secular goals[.]" *Cent. Rabbinical Cong. of U.S. & Can.*, 763 F.3d at 186. The exempted mass protests and other secular activity, such as day camps and child care services, in which individuals congregate and remain in close proximity for long periods "endangers" the health and welfare of the public through the "transmission of COVID-19," Schick Decl. Ex. A at 1–3, "in a similar or greater degree than" do overnight camps, *Lukumi*, 508 U.S. at 543. That plainly proves the regulation's "underinclusive" nature. *Id.* at 542–43; *see also S. Bay*, 2020 U.S. LEXIS 3041, at *2 (Roberts, C.J., concurring in the denial of application for injunctive relief); *Roberts*, 958 F.3d at 413–14; *Ward*, 667 F.2d at 739.

b. The State cannot satisfy the "'exceptionally demanding'" strict scrutiny test, *Holt*, 574 U.S. at 364 (quoting *Hobby Lobby*, 573 U.S. at 728). Although the State has an undisputed interest in curbing the transmission of COVID-19, the statewide closure of all Jewish overnight camps is not narrowly tailored. "'[L]ess restrictive means'" clearly are available for the State to diminish the transmission of COVID-19, *Holt*, 574 U.S. at 365 (quoting *Playboy*, 529 U.S. at 815), as evidenced by Defendant's "underinclusive[ ]" enforcement of his gathering and closure restrictions to mass protests, as well as to comparable secular activities such as day camps and

child care services that adhere to the State's health protocols, even though that conduct presents the same if not greater health risks to the public than overnight camps, *Williams*, 895 F.3d at 193. Such underinclusiveness demonstrates that the State's interest could be furthered by similarly permitting Jewish overnight camps that implement health protocols comparable to those required of day camps and child care services.  *Id.*; *Holt*, 574 U.S. at 367–68; *Lukumi*, 508 U.S. at 546. Defendant's refusal to exempt Jewish overnight camps thus fails strict scrutiny.

c. Even if strict scrutiny did not apply, Defendant's decision to not exempt Jewish overnight camps still fails.  The Supreme Court's holding in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), that a regulation to "protect the public health and the public safety" is unconstitutional only if it is "arbitrary and oppressive" or "has no real or substantial relation to [protect public health], or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law," *id.* at 25, 31, 38, does not alter traditional Free Exercise Clause scrutiny.  *See Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015).

But even if it did, Defendant's discriminatory conduct would not survive such review.  As discussed above, *see supra* 8–11, the overnight camps are uniquely positioned to protect against the transmission of COVID-19, isolating children from the outside community and implementing strict health protocols to ensure no introduction or spread of COVID-19 in the camps.  These protocols are in addition to the miniscule concerns COVID-19 presents to children, *see supra* 9, and are much more protective than the State's guidelines imposed on exempted secular activity, *see supra* 10–11.  Defendant's refusal to exempt safe religious conduct is "arbitrary and oppressive" and an "palpable invasion of rights secured by fundamental law." *Jacobson*, 197 U.S. at 31, 38.

**B.      Defendant's Discriminatory Restrictions Infringe Upon Parent-Plaintiffs' Fourteenth Amendment Right to Due Process**

Defendant's decision to not exempt Jewish overnight camps from his gathering and closure restrictions, despite the widespread exemptions he affords to other First Amendment activities and secular conduct, also likely violates Parent-Plaintiffs' Fourteenth Amendment right to control the education and upbringing of their children without constitutionally-sufficient justification.

1. The Fourteenth Amendment to the United States Constitution protects an individual's right to due process.  Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend. XIV.  The guarantee of substantive due process "forbids the government to infringe certain 'fundamental' liberty interests *at all*, no matter what process is provided," unless the regulation survives constitutional scrutiny.  *Reno v. Flores*, 507 U.S. 292, 302 (1993) (emphasis in original).

The Supreme Court has held that State laws limiting the rights of parents to choose the education for their children can violate substantive due process.  *See Farrington v. Tokushige*, 273 U.S. 284 (1927); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), *Meyer v. Nebraska*, 262 U.S. 390 (1923).  The Court has emphasized that "the interest of parents in the care, custody, and control of their children [ ] is perhaps the oldest of the fundamental liberty interests recognized by this Court."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Obergefell v. Hodges*, 135 S. Ct. 2584, 2600 (2015) (citing *Pierce* and *Meyer* as protecting the "rights of childrearing, procreation, and education"); *Wisconsin v. Yoder*, 406 U.S. 205, 213–14, 232 (1972) (highlighting that the "primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition" and "the values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society").  Laws that deprive a parent of "fair opportunity to procure for their children instruction which they

think important and we cannot say is harmful" violates the parent's due process "right to direct the education of his own child without unreasonable restrictions[.]" *Farrington*, 273 U.S. at 298.

2. The statewide closure of Jewish overnight camps unconstitutionally burdens Parent-Plaintiffs who wish to send their children to camps to instill Jewish educational and religious values. By banning all Jewish overnight camps, Defendant has deprived Parent-Plaintiffs of their "fair opportunity to procure for their children instruction" at Jewish overnight camps "which they think important" to inspire a religious understanding of the world and inculcate the Jewish way of life for their children, Sherman Decl. ¶¶ 4–9, 12; Zahtz Decl. ¶¶ 2–9. *Farrington*, 273 U.S. at 298.

Defendant's extensive exemptions provided for First Amendment activity with which he agrees and other comparable secular activity such as day camps and child care services that raise the same or greater health risks to the public demonstrate that the enforcement of his gathering and closure restrictions against Jewish overnight camps has "no reasonable relation" to their purported justification. *Pierce*, 268 U.S. at 534–35. Because Defendant's closure of Jewish overnight camps is arbitrary and unreasonable, it is likely that Plaintiff-Parents would prevail on their due process claim. *Farrington*, 273 U.S. at 298, *Pierce*, 268 U.S. at 534–35, *Meyer*, 262 U.S. at 401–03.

### C.   Defendant's Discriminatory Restrictions Violate Parent-Plaintiffs' Hybrid Right to Direct the Religious Education of Their Children

Plaintiffs also are likely to prevail on their claim that Defendant's decision to not exempt Jewish overnight camps from his restrictions, despite the exemptions he affords to other conduct, violates Parent-Plaintiffs' hybrid right to direct the religious upbringing of their children.

1. The First and Fourteenth Amendments together provide Parent-Plaintiffs a hybrid right to control the religious education of their children. The Supreme Court recognized this "hybrid" free exercise of religion and due process claim in *Smith*, identifying the "right of parents . . . to direct the education of their children" as such an example and citing *Yoder* for the proposition.

*Smith*, 494 U.S. at 881.  In *Yoder*, the Court applied strict scrutiny in holding a law that compelled school attendance beyond the eighth grade invalid under the Free Exercise Clause as applied to Amish objectors who claimed that formal education beyond the eighth grade violated their religious beliefs.  406 U.S. at 233–36.  Although the Second Circuit has cast *Smith*'s hybrid-claims language as dicta and declined to apply strict scrutiny to such a claim, *see Leebaert v. Harrington*, 332 F.3d 134, 143 (2d Cir. 2003), the Supreme Court clearly distinguished neutral laws of general applicability that trigger rational basis review from those "hybrid situation[s]," such as in *Yoder*, that include "a free exercise claim [  ]connected with . . . [a] parental right" and "bar[ ] application of a neutral, generally applicable law to religiously motivated action."  *Smith*, 494 U.S. at 881–82.

2.  As discussed above, *see supra* 18–19, the State cannot satisfy the "'exceptionally demanding'" strict scrutiny test, *Holt*, 574 U.S. at 364 (quoting *Hobby Lobby*, 573 U.S. at 728).  Although the State has an interest in curbing the transmission of COVID-19, the statewide closure of all Jewish overnight camps is not narrowly tailored.  The State's "underinclusive[ ]" enforcement of COVID-19 to mass protests and to comparable secular activities that adhere to State health protocols, such as day camp and child care services, despite that conduct presenting the same if not greater health risks to the public as overnight camps, demonstrates that less restrictive means are available for the State to diminish the transmission of COVID-19, *Williams*, 895 F.3d at 193; *Holt*, 574 U.S. at 367–38; *Lukumi*, 508 U.S. at 546.  Defendant's refusal to exempt Jewish overnight camps from his gathering and closure restrictions thus fails strict scrutiny.

## II.   <u>Plaintiffs Will Suffer Irreparable Harm in the Absence of Injunctive Relief</u>

Defendant's statewide closure of all Jewish overnight camps violates Plaintiffs' constitutional rights and causes irreparable harm.  Courts presume irreparable harm where there exists a threatened violation of constitutional rights.  *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir.

1996).  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 473 (1976) (plurality op.); *see also LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 426 (2d Cir. 1995).

Closure of Jewish overnight camps would require Plaintiffs to sacrifice religious practice, education, and child-rearing.  Parent-Plaintiffs are sincere practitioners of Judaism who wish to send their children to Jewish overnight camps because they believe the immersive environment isolated from the outside world offers an unparalleled setting to instill Jewish values, inspire a religious understanding of the world, and inculcate the Jewish way of life.  Sherman Decl. ¶¶ 4–9, 12; Zahtz Decl. ¶¶ 2–9.  The camps "present tremendous opportunities for spiritual growth that are not available elsewhere."  Sherman Decl. ¶ 7.  Parent-Plaintiffs view the camps as an "essential component" of their "children's educational and religious growth and wellbeing," thus forming Parent-Plaintiffs' "sincerely held religious beliefs" and "right to direct the religious education and upbringing" of their children.  *Id.* at ¶¶ 4, 9; Zahtz Decl. ¶¶ 3, 8.  The members of the Association likewise wish to "provide this vital religious and developmental experience for Jewish children," to render their religious mission to be "a critical facet of the development and growth of the Jewish community."  Frischman Decl. ¶¶ 8, 20.

Jewish community and education "ensure[ ] the continuity of the Jewish people as it nurtures and educates children in the practices and beliefs of [Jewish] heritage."  Schwartz Decl. ¶ 2.  The refusal to exempt camps from Defendant's restriction deprives Plaintiffs of their constitutional rights to provide their children and campers with the religious instruction and upbringing they desire.  Plaintiffs would suffer irreparable harm in the absence of an injunction, *Elrod*, 427 U.S. at 473; *Jolly*, 76 F.3d at 482; *LeBlanc-Sternberg*, 67 F.3d at 426, and damages cannot undo or compensate for that harm.

III.     **The Balance of the Hardships Tips in Plaintiffs' Favor**

The balance of the hardships also favors granting the requested injunction. As demonstrated above, Plaintiffs will suffer irreparable harm in the absence of injunctive relief.

In contrast, Defendant will suffer no meaningful harm if the Court issues the injunction. As discussed above, *see supra* 8–11, Jewish overnight camps are uniquely positioned to protect against the transmission of COVID-19, isolating children from the outside community.  Frischman Decl. ¶¶ 17, 19.  Considering the "extremely low prevalence of COVID-19" throughout the State and "the almost nonexistent possibility of children currently being infected," the "likelihood of an infected individual coming into an overnight camp is infinitesimal."  Berman Decl. ¶¶ 7–9, 17, 30. Children are "much less susceptible to COVID-19 than adults," have less serious cases when they do contract COVID-19, and are "very poor 'transmitters' of the infection." *Id.* at ¶¶ 19–25.  Even so, the Jewish overnight camps' rigorous health and safety protocols will safeguard that COVID-19 does not enter the camps and, in the unlikely event it does, curb its transmission.  Frischman Decl. ¶ 11, Ex. A; Berman Decl. ¶ 10.  These protocols impose a "tight screening procedure" for children and staff to ensure that only individuals who test positive for COVID-19 antibodies or who test negative for COVID-19 and isolate themselves for two weeks will enter camp.  Frischman Decl. ¶ 13, Ex. A at 5–7; Berman Decl. ¶¶ 11–15.  The camps also will exclude at-risk individuals. Frischman Decl. ¶ 14, Ex. A at 5–7.

Once open, camp staff will screen campers and staff regularly with temperature checks and for signs and symptoms of COVID-19.  Frischman Decl. ¶ 15, Ex. A at 9; Berman Decl. ¶ 18. Each camp will be required to have an on-site health director, Frischman Decl. ¶ 15, Ex. A at 7, and staff will follow "aggressive sanitization measures," *id.* at 11–12; Berman Decl. ¶ 18.  Any individual who exhibits signs and/or symptoms of COVID-19 will be isolated immediately and

receive COVID-19 testing.  Frischman Decl. ¶ 15, Ex. A at 8, 14–15; Berman Decl. ¶ 18.  And any positive tests will be reported to local jurisdictions.  Frischman Decl. ¶ 15, Ex. A at 8.

Combining the "extremely low prevalence of COVID-19" now in the State and particularly so in children, the low health concerns in children, children's poor transmission of the virus, and the camps' aggressive screening and prevention measures, "the chances of a serious outbreak in camp are quite remote."  Berman Decl. ¶¶ 30–31.  The camps' strict health and safety protocols are much more stringent than the State's health protocols required of comparable secular activity, such as day camps and child care services, *see* Schick Decl. Exs. A at 40–41, 46–52, 55–56; D; E at 4; F, and certainly safer that the free-for-all mass protests exempted from Defendant's COVID-19 gathering restrictions.  Plaintiffs simply seek injunctive relief that "appropriately permits religious services with the same risk-minimizing precautions as similar activities."  *Roberts*, 958 F.3d at 416.  The balance of the equities thus plainly favors Plaintiffs.

## IV.    Injunctive Relief Would Serve the Public Interest

Injunctive relief would benefit the public interest in protecting Plaintiffs' constitutional rights and in treating religious and secular conduct in comparable ways.  "[S]ecuring First Amendment rights is in the public interest."  *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).  And "treatment of similarly situated entities in comparable ways serves public health interests at the same time it preserves bedrock free-exercise guarantees."  *Roberts*, 958 F.3d at 416.  Injunctive relief would serve the public interest given the irreparable injury to Plaintiffs and the lack of constitutionally-sufficient justification for infringing their constitutional rights.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' requests for a temporary restraining order and preliminary injunction.

This 22nd day of June, 2020.

_____
Avi Schick
avi.schick@troutman.com

TROUTMAN SANDERS LLP
875 Third Avenue
New York, NY  10022
(212) 704-6000

Misha Tseytlin (WI Bar No. 102199)
misha.tseytlin@troutman.com
*Pro Hac Vice Pending

TROUTMAN SANDERS LLP
227 W. Monroe Street, Suite 3900
Chicago, IL  60606
(312) 759-1920

W. Alex Smith (Ga. Bar No. 532647)
alex.smith@troutman.com
*Pro Hac Vice Pending

TROUTMAN SANDERS LLP
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia  30308
(404) 885-3000

***Attorneys for Plaintiffs***