UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ASSOC. OF JEWISH CAMP OPERATORS, et al.

*Plaintiffs*,

-against-                                                    20-CV-00687

ANDREW M. CUOMO, Governor of the State of New                (GLS)(DJS)
York, in his official capacity,

*Defendants*.

---

**MEMORANDUM OF LAW ON BEHALF OF DEFENDANTS IN OPPOSITION TO
PLAINTIFFS' APPLICATION FOR TEMPORARY PRELIMINARY INJUNCTIVE
RELIEF**

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendant Andrew M. Cuomo
The Capitol
Albany, New York  12224

Chris Liberati-Conant
Assistant Attorney General, of Counsel
Bar Roll No. 700466
Telephone:  (518) 776-2584
christopher.liberati-conant@ag.ny.gov                    Date: June 26, 2020

## Table of Contents

PRELIMINARY STATEMENT ................................................................................ 1

PROCEDURAL HISTORY ................................................................................... 3

LEGAL AND STATUTORY BACKGROUND .......................................................... 4

EXECUTIVE ORDERS LIMITING GATHERINGS AND REQUIRING PHYSICAL
    DISTANCING ............................................................................................ 5

THE STATE'S DETERMINATION TO DISALLOW OVERNIGHT CAMPS FROM
    OPERATING IN SUMMER 2020 ................................................................. 11

ARGUMENT .................................................................................................. 12

    I.    PLAINTIFFS FAILED TO ESTABLISH THAT THEY ARE LIKELY
        TO SUCCEED ON THE MERITS OF THEIR CLAIMS .................................. 13

        A.  Free Exercise ....................................................................... 16

        B.  14th Amendment Right to Direct Upbringing of Child ................. 200

        C.  So-Called *Hybrid* Claim ....................................................... 21

    II.    PLAINTIFFS FAILED TO ESTABLISH IRREPARABLE HARM ................... 22

    III.    THE EQUITIES BALANCE IN FAVOR OF THE STATE'S EFFORTS
        TO PROTECT THE PUBLIC HEALTH DURING THE EXISTING
        PANDEMIC, AND ISSUANCE OF A TRO IS NOT IN THE  PUBLIC
        INTEREST ............................................................................ 23

CONCLUSION ............................................................................................... 24

## TABLE OF AUTHORITIES

CASES                                                                                    Page(s)

*Amato v. Elicker*,
   2020 U.S. Dist. LEXIS 87758 (D. Conn. May 19, 2020) ............................................... passim

*Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg*,
   111 F.Supp.3d 459 (S.D.N.Y. 2015) ................................................................................16

*Bogan v. Scott-Harris*,
   523 U.S. 44 (1998) ...........................................................................................................15

*Bronx Household of Faith v. Bd. of Educ.*,
   331 F.3d 342 (2d Cir.2003) ..............................................................................................22

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
   508 U.S. 520 (1993) .....................................................................................................16,18

*Compagnie Francaise De Navigation A Vapeur v. La. State Bd. of Health*,
   186 U.S. 380 (1902) ...........................................................................................................4

*CompassCare v. Cuomo*,
   2020 U.S. Dist. LEXIS 98930 (N.D.N.Y. June 5, 2020) ..................................................22

*Congregation of Rabbinical College of Tartikov, Inc. v. Vill. of Pomona*,
   915 F.Supp.2d 574 (S.D.N.Y. 2013) ................................................................................16

*District of Columbia v. Brooke*,
   214 U.S. 138 (1909) ...........................................................................................................5

*Employment Div., Dept. of Human Resources of Ore. v. Smith*,
   494 U.S. 872 (1990) .........................................................................................................16

*Fairfield Cty. Med. Ass'n v. United Healthcare of New England*,
   985 F. Supp. 2d 262 (D. Conn. 2013), aff'd as modified sub nom, *Fairfield
   Cty. Med. Ass'n v. United Healthcare of New England, Inc.*, 557 F. App'x 53
   (2d Cir. 2014) ...................................................................................................................12

*Fortress Bible Church v. Feiner*,
   694 F.3d 208 (2d Cir 2012) .............................................................................................16

*Friends of Devito v. Wolf*,
   2020 Pa. LEXIS 1987 (PA Sup. Ct., Apr. 13, 2020) .....................................................4-5

*Geller v. De Blasio*,
    2020 U.S. Dist. LEXIS 87405 (S.D.N.Y. May 18, 2020) (applying this
    standard to challenge of Executive Order relating to non-essential gatherings
    during the COVID-19 pandemic) ............................................................................12

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1 (1824)....................................................................................4

*Harhay v. Town of Ellington Bd. of Educ.*,
    323 F.3d 206 (2d Cir. 2003).....................................................................................15

*In re Abbott*,
    954 F.3d 772 (5th Cir. 2020) ....................................................................................5

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905).............................................................................. 4-5, 13, 16

*Lawton v. Steele*,
    152 U.S. 133 (1894)...................................................................................................5

*Lee v. Trump*,
    2020 U.S. Dist. LEXIS 49860 (S.D.N.Y. March 23, 2020) ...................................12

*Leebart v. Harrington*,
    332 F.3d 134 (2d Cir. 2003).....................................................................................20

*Legacy Church, Inc. v. Kunkel*,
    2020 U.S. Dist. LEXIS 68415 (D.N.M. Apr. 17, 2020) .......................................4-5

*Meyer v. Nebraska*,
    262 U.S. 390 (1923).................................................................................................20

*Morgan S.S. Co. v. La. Bd. of Health*,
    118 U.S. 455 (1886)...................................................................................................4

*O'Bradovich v. Vill. of Tuckahoe*,
    325 F. Supp. 2d 413 (S.D.N.Y. 2004)......................................................................15

*Phillips v. City of New York*,
    775 F.3d 538 (2d Cir. 2015).....................................................................................13

*Reno v. Flores*,
    507 U.S. 292, 113 S. Ct. 1439 (1993)......................................................................20

*Roberts v. Paterson*,
    19 N.Y.3d 524 (2012) ..............................................................................................19

*Rossi v. Fischer*,
   2014 U.S. Dist. LEXIS 158064 (S.D.N.Y. Sept. 11, 2014)....................................................22

*Smith v. Avino*,
   91 F.3d 105 (11th Cir. 1996) .....................................................................................................5

*Soos v Cuomo*,
   June 26, 2020, NDNY, 1:20-cv-651 .............................................................................. 19-20

*South Bay United Pentecostal Church v. Newsom*,
   2020 U.S. LEXIS 3041 (May 29, 2020) ...................................................................... passim

*Troxel v. Granville*,
   530 U.S. 57 (2000)....................................................................................................................20

*U.L. v. N.Y. State Assembly*,
   No. 13 Civ. 438, 2014 U.S. Dist. LEXIS 11215 (S.D.N.Y. Jan. 29, 2014)............................15

*V.D. v. New York*,
   403 F. Supp. 3d 76 (E.D.N.Y. 2019) .........................................................................................5

*Wisconsin v Yoder*
   (406 US 205 [1972])..................................................................................................................21

*WTC Families for a Proper Burial, Inc. v. City of New York*,
   567 F.Supp.2d 529 (S.D.N.Y. 2008)........................................................................................16

**CONSTITUTIONS**

First Amendment ......................................................................................................... passim

10th Amendment........................................................................................................... passim

U.S. Const.
   Art I § 6 ....................................................................................................................................15

N.Y. Const Art 3 ........................................................................................................................15

**FEDERAL STATUTES**

42 U.S.C. § 1983..........................................................................................................................3

**STATE STATUTES**

Commissioner by the Public Health Law ...................................................................................12

N.Y. Exec. Law Art. 2-b ...............................................................................................................5

N.Y. Exec Law § 28(1) .................................................................................................................6

New York Public Health Law § 206.................................................................11

State Executive Law
    § 29.........................................................................................................6

**STATE REGULATIONS**

EO 202 ............................................................................................. 6-7

EO 202.8 ...............................................................................................7

EO 202.17 ..............................................................................................8

EO 202.38 ..............................................................................................8

EO 202.41 ..............................................................................................7

**RULES**

FRCP 65(b) ...........................................................................................12

## PRELIMINARY STATEMENT

Plaintiffs, an association of Jewish overnight summer camps and parents who would like to send their children to Jewish overnight summer camps, seek an order granting them preliminary injunctive relief in the form of an exemption from the state's blanket prohibition of summer overnight camps in 2020.

Plaintiffs fail to meet the "heavy burden" necessary to establish entitlement to preliminary injunctive relief. Plaintiffs are not likely to succeed on the merits of their claims. Under the 10th Amendment, the state is entitled to broad deference to its actions to protect the public health from a pandemic; the state cannot be hamstrung in its ability and efforts to continue to evaluate and address the continued dangers of COVID-19. Because the determination to prohibit overnight summer camps was made to limit the spread of COVID-19 throughout the state and was rational, it must be upheld.[1]

Plaintiffs' First Amendment Free Exercise Claim fails because the prohibition on overnight camps is not a prohibition on the free exercise of religion. Plaintiffs are not prohibited from providing religious education to their children, even in a camp setting (day camps may open with safety precautions). Rather, the overnight camps have been prohibited in order to "protect the health, safety and welfare of children attending . . . children's overnight . . .camps." Pub Health § 1391. The relief plaintiffs seek would treat Jewish overnight camps differently than camps affiliated with other religions and secular camps. Yet the religious orientation of overnight camps was not and cannot be a consideration in the determination whether to close overnight camps. That

---

[1] As recently stated by Chief Justice Roberts, COVID-19 is a "novel severe acute respiratory illness that has killed…more than 100,000 nationwide.  At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be infected but asymptomatic, they may unwittingly infect others."  South Bay United Pentecostal Church v. Newsom, 2020 U.S. LEXIS 3041, *1 (May 29, 2020).

determination was rationally made on the basis that overnight camps involve children and adults sleeping and eating in close proximity in an enclosed space for an extended period of time – greatly increasing the risk of spread of the virus, as is evidenced by the spread of an influenza-like illness in overnight camps across New York State in 2009 during a global outbreak. The location of many overnight camps in remote areas with limited healthcare resources poses a further risk to children, camp staff, and the communities where camps are located. Finally, overnight camps involve the movement of over 200,000 children across the state and among this state and other states, potentially acting as vectors that spread COVID-19 from high-infection to low-infection areas. This is of particular concern given the resurgence of COVID-19 around the nation and the Governor's recent imposition of quarantines for individuals travelling from high-risk states. Thus, plaintiffs are not likely to succeed on the merits, and are not entitled to preliminary relief.

In addition, plaintiffs have not shown irreparable harm. Plaintiffs are free to continue the religious education of their children during the summer of 2020, including at summer day camps.

And the equities balance in favor of protecting public health and continuing New York's efforts to save lives in the face of the ongoing pandemic. The risk of gutting the state's authority to combat the pandemic cannot be overstated. Likewise, issuance of a temporary restraining order ("TRO") or preliminary injunction allowing Jewish overnight camps to operate, contrary to the generally applicable closure of such camps to combat the pandemic, is not in the public interest. That New York appears to be responding well to the measures undertaken to combat the pandemic does not mean the danger has passed. Accordingly, plaintiffs are not entitled to preliminary injunctive relief.

## PROCEDURAL HISTORY

Plaintiffs commenced this action on June 18, 2020. On June 22, 2020, plaintiffs filed the instant motion for a temporary restraining order and preliminary injunction. "Plaintiff Association of Jewish Camp Operators (the "Association") is a consortium of independent Jewish summer camps that have a shared commitment to creating immersive and unique camp environments to instill traditional religious Jewish values to children." Complaint, ¶ 13. Over 40,000 children attend camps of Association members every summer. Id. The individual plaintiffs are parents of children that would, if Jewish summer camps were open, send their children to such camps. See id. at ¶¶ 14–18.

Plaintiffs contend that, because Jewish "*religious* camps involve the exercise of First Amendment-protected religious activity of conveying Jewish values to children," they are entitled to an exemption from the state's prohibition against the operation of overnight camps in the summer of 2020 as part of the state's response to and efforts to stem the spread of COVID-19. *Id.*, ¶ 54. According to the Complaint, the existence of mass protests and assorted statements by the Governor constitute a de facto exception to the COVID-19 Executive Orders that compels the state to grant Jewish overnight camps an exemption from the universal closure of overnight camps in summer 2020.

The complaint asserts the following causes of action under 42 U.S.C. § 1983: (1) violation of the First Amendment right to the Free Exercise of religion; (2) violation of the individual plaintiffs' Fourteenth Amendment substantive due process right to direct the upbringing of their children; (3) violation of a First and Fourteenth Amendment "hybrid right to provide for and choose the religious education for their children"; and (4) violation of the Free Exercise clause of

the New York State Constitution.[2] For relief, plaintiffs seek an injunction that would give Jewish overnight summer camps a special exemption from the generally applicable closure of overnight summer camps, which would allow them to open, while camps with other religious and secular orientations remain closed.

## LEGAL AND STATUTORY BACKGROUND

The power to impose quarantines and other public health measures in response to a pandemic is among the most fundamental police powers reserved to the states by the Tenth Amendment to the United States Constitution. Jacobson v. Massachusetts, 197 U.S. 11, 25 (1905); Compagnie Francaise De Navigation A Vapeur v. La. State Bd. of Health, 186 U.S. 380, 387 (1902); Morgan S.S. Co. v. La. Bd. of Health, 118 U.S. 455, 460 (1886); Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 203 (1824). "Upon the principle of self-defense, of paramount necessity, a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." Jacobson, 197 U.S. at 27. Accordingly, "when [a] state faces a major public health threat…its Tenth Amendment police and public health powers are at a maximum." Legacy Church, Inc. v. Kunkel, 2020 U.S. Dist. LEXIS 68415, **97-98 (D.N.M. Apr. 17, 2020) (citing Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944) ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease….")). "Even constitutional rights, including First Amendment rights, are subject to 'reasonable conditions' to preserve public health." Amato v. Elicker, 2020 U.S. Dist. LEXIS 87758, *29 (D. Conn. May 19, 2020).

The standard of review accorded to a state's exercise of its emergency police powers is highly deferential. An action taken pursuant to those police powers must only be "reasonably necessary" to respond to a public health emergency to survive constitutional scrutiny. Friends of

---

[2] The fourth cause of action is not discussed herein because plaintiffs have not offered it as a basis for preliminary injunctive relief.

Devito v. Wolf, 2020 Pa. LEXIS 1987, *39 (PA Sup. Ct., Apr. 13, 2020) (relying on Lawton v. Steele, 152 U.S. 133 (1894)). See also In re Abbott, 954 F.3d 772, 784 (5th Cir. 2020); Smith v. Avino, 91 F.3d 105, 109 (11th Cir. 1996) ("the scope of review is limited to . . . determin[ing] whether" state "actions were taken in good faith and whether there is some factual basis" for them); Legacy Church, Inc., 2020 U.S. Dist. LEXIS 68415 at *122. The details of the response represent a "policy choice" within the governor's discretion. Friends of Devito, 2020 Pa. LEXIS 1987 at *39. See also In re Abbott, 954 F.3d at 791. Thus, invalidation of reasonable emergency measures promulgated pursuant to the state's police power to respond to a global pandemic "would usurp the functions of another branch of government." Jacobson, 197 U.S. at 28.

Far more intrusive measures than those at issue here fall within a state's police power to respond to a public health emergency. See, e.g., id. at 26, 31 (state may compel vaccination against smallpox on pain of criminal prosecution); V.D. v. New York, 403 F. Supp. 3d 76 (E.D.N.Y. 2019); cf. Legacy Church, Inc., 2020 U.S. Dist. LEXIS 68415 (emergency order restricting places of worship to five individuals or fewer within state's police power); In re Abbot, 954 F.3d at 787-788 (holding that temporary ban on all "non-essential" abortions did not violate United States Constitution). In sum, emergency measures in the face of a pandemic are "the most essential of powers, at times the most insistent, and always one of the least limitable powers of government." District of Columbia v. Brooke, 214 U.S. 138, 149 (1909).

*New York Statutory Law*

Consistent with the constitutional exercise of the State's police power to respond to imminent threat to the health of the citizenry, the Executive Law gives the governor broad power to respond to a disaster such as COVID-19. See generally N.Y. Exec. Law Art. 2-b ("State and Local Natural and Man-Made Disaster Preparedness"). "Whenever the governor, on his [or her]

own initiative or pursuant to a request from one or more chief executives, finds that a disaster has occurred or may be imminent for which local governments are unable to respond adequately, he shall declare a disaster emergency by executive order." N.Y. Exec Law § 28(1). A "disaster" is any "occurrence or imminent, impending or urgent threat of wide spread or severe damage, injury, or loss of life or property resulting from any natural or man-made causes, including, but not limited to . . . disease outbreak . . . ." Id. at § 20(2)(a).

The EO declaring a state disaster emergency "shall include a description of the disaster, and the affected area." Id. at § 28(3). The state disaster emergency starts on the date of the declaration and ends "upon the termination" of the disaster declaration. Id. at § 20(2)(b). The initial state disaster emergency declaration cannot exceed six months, but "[t]he governor may issue additional orders to extend the state disaster emergency for additional periods not to exceed six months." Id. at § 28(3).

The EOs issued to address the COVID-19 pandemic, Liberati-Conant Decl. at Exhs. 1-45, are in compliance with these standards.  As mentioned above, on March 7, 2020, Governor Cuomo issued EO 202. Supporting the executive order, the Governor found "that a disaster is impending in New York State, for which the affected local governments are unable to respond adequately." Liberati-Conant Decl., Exh. 1. Accordingly, the Governor declared a "state disaster emergency for the entire state of New York," to be in effect until September 7, 2020. Id. EO 202, and each subsequent EO, references the current state disaster emergency.

**EXECUTIVE ORDERS LIMITING GATHERINGS AND REQUIRING PHYSICAL DISTANCING**

On March 7, 2020, in order to combat the burgeoning COVID-19 pandemic, pursuant to New York State Executive Law § 29, Governor Cuomo issued Executive Order ("EO") 202, implementing the State Comprehensive Emergency Management Plan and declaring a statewide

disaster emergency until September 7, 2020.  Liberati-Conant Decl., Exh. 1.  By Executive Order No. 202, the Governor suspended all state and local laws, rules, and regulations to the extent necessary to cope with the COVID-19 disaster emergency.  Id.  Following the issuance of EO 202, Governor Cuomo issued several supplemental EOs, continuing the temporary suspension and modification of certain laws relating to the state of emergency.  To date, the Governor has issued forty-four additional EOs (Nos. 202.1 through 202.44) related to the COVID-19 disaster emergency, each of which suspends or modifies specified legal provisions and makes declarations related to the disaster emergency.  Liberati-Conant Decl., Exhs. 1-45.

On March 20, 2020, the Governor directed all businesses to reduce their workforce by 100 percent. See EO 202.8. The Governor exempted from the closure of businesses "essential business or entity providing essential services or functions." Id. This closure of businesses remains in effect pursuant to Executive Order 202.41, issued on June 13, 2020, except to the extent modified, as described below.

Due to the success of the state's social distancing measures, including business closures, the Governor has been directing the gradual phased re-opening of businesses across the state on a regional basis. Governor Cuomo, with the guidance and assistance of health experts, designed and adopted a four-phase re-opening plan that slowly and methodically modifies gathering limitations, and responds to the continuous evaluation of real-time evolving medical data and the evolving understanding of the transmission of the disease. As regions of the State progress through the phases, more businesses have been permitted to open, people have been permitted to engage in more activities and gathering limitations have relaxed. See Hutton Decl., ¶¶ 23-58. To continue to protect public health and avoid a resurgence of COVID-19 in New York, the re-opening process must be carefully managed. Id.

<u>Phase 1</u>

Pursuant to Executive Orders 202.32 and 202.33, when regions became eligible for Phase 1 reopening, gatherings of ten or fewer individuals were permitted, provided that individuals adhere to physical distancing[3] and cleaning and disinfection protocols required by the New York Department of Health. Liberati-Conant Decl., Exhs. 33, 34.  Outdoor congregations of groups for any purpose, including religious service or ceremony, in excess of ten in-person participants remained prohibited under Phase 1 protocols. Businesses permitted to open in Phase 1[4] must comply with physical distancing protocols.[5] See Hutton Decl., ¶¶ 40-44.

<u>Phase 2</u>

In regions that have reached Phase 2, currently New York City and Long Island, pursuant to Executive Order 202.38, religious gatherings of 25 percent of a house of worship's maximum indoor capacity are permitted, provided that social distancing and cleaning and disinfection protocols required by the Department of Health are followed.  Liberati-Conant Decl., Exh. 39.

Under the EO, the following must remain closed during Phase 2:  (1) any indoor common portions of retail shopping malls with 100,000 or more square feet of retail space available for

---

[3] Effective April 17, 2020, the Governor issued EO 202.17, which requires any individual who is over age two and able to medically tolerate a face-covering to cover his or her nose and mouth with a mask or cloth face-covering when in a public place and unable to maintain, or when not maintaining, social distance. Liberati-Conant Decl, Exh. 17.  This EO remains in effect.

[4] Businesses in the following industries are permitted to re-open in Phase 1: (1) construction; (2) agriculture, forestry, fishing, and hunting; (3) retail limited to curbside or in-store pickup/drop off; (4) manufacturing; and (5) wholesale trade.  Hutton Decl. at ¶42.

[5] These protocols include, but are not limited to, (1) 6-foot distance between personnel; (2) limiting indoor workforce presence to no more than 50% of the maximum occupancy for a particular area set by the certificate of occupancy, inclusive of customers picking up an order who must maintain 6 feet of space from others or wear an acceptable face covering; and (3) wearing of acceptable face covering when personnel are less than 6 feet apart from one another or a customer and without a physical barrier (e.g., plexiglass).  Hutton Decl. at ¶44.

lease; (2) indoor on-premise restaurant and bar service; (3) large gathering/event venues, including

but not limited to, establishments that host concerts, conferences, or other in-person performances

or presentations in front of an in-person audience; (4) gyms, fitness centers, and exercise classes,

except for remote or streaming services; (5) video lottery and casino gaming facilities; (6) indoor

movie theaters; and (7) places of public amusement, whether indoors or outdoors, including, but

not limited to, locations with amusement rides, carnivals, amusement parks, water parks,

aquariums, zoos, arcades, fairs, children's play centers, funplexes, theme parks, bowling alleys,

family and children's attractions. Hutton Decl. at ¶49.  Retail businesses opening in Phase 2 must

comply with physical distancing requirements similar to those required in Phase 1.  Id. at ¶51.

### Phase 3

Currently, all regions other than New York City and Long Island are in Phase 3 of the

state's reopening plan.  In Phase 3, restaurants and personal care service businesses are added to

the non-essential businesses permitted to resume operation.  Food service businesses must limit

indoor capacity to no more than 50 percent of maximum occupancy, exclusive of employees, and

limit outdoor capacity to the number of tables that can be safely and appropriately arranged, such

that each table is a minimum of 6 feet away from another.  Hutton Decl. at ¶55. Additionally, all

indoor and outdoor tables with seating for customers must be separated by a minimum of 6 feet in

all directions. Wherever distancing is not feasible between tables, physical barriers must be erected

between such tables.  Id.

Regardless of physical distance, employees must wear an acceptable face covering at all

times, and patrons must wear face coverings at all times, except while seated.  Individuals seated

at the same table must be members of the same party, with a maximum of 10 people per table.

Seating in bar areas and communal tables is only permitted if at least 6 feet can be maintained between parties.  Id.

Personal care businesses must also limit workforce and customer presence to no more than 50 percent of the maximum occupancy, inclusive of customers, who must maintain 6 feet of separation from others, except during the service.  Id. at ¶56.  Customers may only be permitted entry if wearing an acceptable face covering.  Id.  Six feet of distance must be maintained between individuals at all times, unless safety or the core activity requires a shorter distance (e.g. performing a piercing/tattoo, providing a massage, performing a manicure/pedicure).  Id. Employees must wear face coverings any time they interact with customers, and any time they come within 6 feet of another person.  Id.  Customer seating must allow customers to maintain 6 feet of distance from all others except for the employee providing service, unless a physical barrier is in place in accordance with OSHA guidelines.  Id.

Additionally, employees at appointment desks or cash registers must maintain 6 feet of distance from others, unless there is a physical barrier between them, or the employee is wearing a face covering.  Id.  However, even with a barrier, employees must wear a face covering any time they interact with a customer.  Id.  All waiting rooms must remain closed. Id.

<u>Phase 4</u>

1)   The Central New York, Finger Lakes, Mohawk Valley, North Country, and Southern Tier are on Track to Enter Phase 4 of Reopening on June 26, 2020. For Phase 4, the Department has provided reopening guidance in the following areas on its website:

- Higher Education

- Low-Risk Outdoor Arts and Entertainment

- Low-Risk Indoor Arts and Entertainment

10

- Media Production

<u>See</u> Hutton Decl., ¶57.

## THE STATE'S DETERMINATION TO DISALLOW OVERNIGHT CAMPS FROM OPERATING IN SUMMER 2020

On June 2, 2020, the Governor announced that day camps could open—with social distancing and heightened hygiene protocols—beginning June 29, 2020, and stated the question of whether overnight camps would be allowed to open was still under consideration. <u>See</u> https://www.governor.ny.gov/news/governor-cuomo-announces-western-new-york-enters-phase-2-reopening-today (last visited June 25, 2020).

Pursuant to New York Public Health Law § 206, the Commissioner of the Department of Health "shall: (a) take cognizance of the interests of health and life of the people of the state, and of all matters pertaining thereto and exercise the functions, powers and duties of the department prescribed by law." One of the duties given the Commissioner by the Public Health Law is upholding the "declared policy of the state of New York to protect the health, safety and welfare of children attending what are commonly called children's overnight, summer day, and traveling summer day camps." N.Y. Pub Health § 1391.

On June 12, 2020, Commissioner Zucker announced that summer overnight camps would not be allowed to open this season.

> "Using the best currently available science and data, I have reached a decision to prohibit overnight children's camps from operating this season in New York State.
>
> Unlike day camps, which are approved to open June 29, overnight camps are a difficult setting to manage social distancing and face covering and infection control practices. Overnight camps have congregate settings and sleeping arrangements in close quarters that present too many risks. In such a setting, even a single positive case in a camper or staff member could create an untenable quarantine situation and overwhelm camp health personnel that may not be able to handle a serious infectious outbreak of this nature."

Hutton Declaration, ¶62.

## ARGUMENT

Plaintiffs cannot establish a likelihood of success on the merits because the closure of overnight summer camps, made in the exercise of the state's 10th Amendment power to protect the health and safety of its people, was rationally related to the state's important interest in mitigating the COVID-19 pandemic and in protecting the health and safety of children. Likewise, under the First Amendment, because the overnight summer camp closure is neutral, generally applicable, and rationally related to a legitimate state interest, it does not violate plaintiffs' right to free exercise of their religion. Plaintiffs' claim under the 14th Amendment is also meritless. The emergency temporary closure of overnight summer camps does not threaten plaintiffs' right to raise their children in a manner consistent with their religion.

To establish entitlement to temporary preliminary relief under FRCP 65(b), a plaintiff must satisfy a very heavy burden.[6] Specifically, plaintiffs here must establish (1) the likelihood of success on the merits; (2) that they will suffer irreparable harm if a TRO is not issued; (3) that the equities balance in their favor; and (4) that the TRO is in the public interest.  Amato v. Elicker, 2020 U.S. Dist. LEXIS 87758, *7 (D. Conn. May 19, 2020) (applying this standard to an application for a TRO challenging Executive Orders issued during the COVID-19 pandemic).  See also Geller v. De Blasio, 2020 U.S. Dist. LEXIS 87405, *6 (S.D.N.Y. May 18, 2020) (applying this standard to challenge of Executive Order relating to non-essential gatherings during the COVID-19 pandemic); Lee v. Trump, 2020 U.S. Dist. LEXIS 49860, *1 (S.D.N.Y. March 23,

_____

[6] In this Circuit, the standard that must be met is the same as the standard governing the issuance of a preliminary injunction.  Fairfield Cty. Med. Ass'n v. United Healthcare of New England, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), aff'd as modified sub nom, Fairfield Cty. Med. Ass'n v. United Healthcare of New England, Inc., 557 F. App'x 53 (2d Cir. 2014).

2020) (applying this standard to challenge of travel ban during the COVID-19 pandemic).

Plaintiffs cannot satisfy any of these elements.

## I.      PLAINTIFFS FAILED TO ESTABLISH THAT THEY ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

The business restrictions implemented by the COVID-19 Executive Orders and prohibition against the operation of overnight camps in the summer of 2020 are expressions of the state's police power in the area of public health and safety, squarely protected by the Tenth Amendment. See Jacobson v. Massachusetts, 197 U.S. 11, 38 (1905). Because the summer overnight camp closure is supported by a rational basis, plaintiffs are unlikely to succeed on the merits, and their motion for preliminary injunctive relief must be denied.

The Supreme Court's recent decision in South Bay United Pentecostal Church v. Newsom, 2020 U.S. LEXIS 3041 (May 29, 2020) is dispositive. The plaintiffs in South Bay challenged an EO issued by the Governor of California that limits "attendance at places of worship to 25% of building capacity or a maximum of 100 attendees." Id. at *1.  Concurring with the court's denial of plaintiffs' application for preliminary injunctive relief, Chief Justice Roberts stated as follows:

> "The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.' When those officials "undertake[] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad."'

Id. at *2-*3 (quoting Jacobson, 197 U.S. at 38); see also Phillips v. City of New York, 775 F.3d 538, 543 (2d Cir. 2015) ("'The right to practice religion freely does not include liberty to expose the community . . .  to communicable disease . . . .'") (quoting Prince v. Massachusetts, 321 U.S. 158, 166-67 (1944)).

13

Here, as in South Bay, the Governor has exercised his power and duty to protect the health and safety of the people of this state from the COVID-19 pandemic. With respect to overnight camps, the determination to close them for the 2020 summer camping season was made to protect the children who would attend such camps, camp staff, and the communities both where such camps are located and where children will be returning upon the conclusion of camp. See Hutton Decl., ¶¶ 59-75. Over 200,000 children attend approximately 550 overnight camps throughout the state each year. Id. at ¶ 64. Closure for summer 2020 is necessary because of the high risk of transmission and spread of COVID-19 presented by the summer camp environment, which typically includes congregate eating and sleeping. In 2009, during an outbreak of influenza-like illness, 1,600 infections were reported in summer camps statewide. 97 percent of the cases occurred at overnight camps. Id., ¶ 70. Further heightening the risk is the emergence of "Kawasaki Syndrome," or MIS-C. MIS-C is a condition that may arise in children in connection with COVID-19, where different body parts can become inflamed, including the heart, lungs, kidneys, brain, skin, eyes, or gastrointestinal organs." Id. at ¶¶ 70-74. As the Commissioner stated, "even a single positive case in a camper or staff member could create an untenable quarantine situation and overwhelm camp health personnel that may not be able to handle a serious infectious outbreak of this nature." Id., ¶¶ 62, 75.

Plaintiffs nevertheless ask the Court to usurp the State's police power and direct the State to provide an exemption from the universal closure of summer overnight camps to Jewish overnight camps, despite the fact that the State has granted zero explicit or implicit exemptions to such closure. At the heart of plaintiffs' complaint is the argument that by issuing statements generally supportive of the George Floyd protesters' position and not taking some undefined action against protestors, the state has forfeited its ability to enforce all executive orders issued in

response to the pandemic. Such reasoning tramples New York's right under the Tenth Amendment to enforce its own laws in its discretion and to protect the health of the public. How to respond to the "facts on the ground" of a public health crisis is precisely the type of discretionary determination that the Supreme Court has affirmed must be left to the states. [7] See Amato v. Elicker, 2020 U.S. Dist. LEXIS 87758, **27-32 (D. Conn. May 19, 2020). Because the closure of overnight summer camps to combat the COVID-19 pandemic is a lawful exercise of the State's police power, plaintiffs cannot succeed on the merits.

Moreover, legislative immunity, as enshrined in both the New York State and United States Constitutions, see N.Y. Const. Art. III § 11, U.S. Const. Art I § 6, and provides state officials with "absolute immunity for civil liability for their legislative activities." Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 210 (2d Cir. 2003); see also U.L. v. N.Y. State Assembly, No. 13 Civ. 438, 2014 U.S. Dist. LEXIS 11215, **9-10 (S.D.N.Y. Jan. 29, 2014). Absolute legislative immunity applies not only to legislators, but also to officers in the executive and judicial branches when they are acting "in a legislative capacity." Bogan v. Scott-Harris, 523 U.S. 44, 55 (1998). The EOs and overnight summer camp closure are legislative in nature because they cover all New York State businesses and all New Yorkers and lay out rules that apply prospectively statewide. O'Bradovich v. Vill. of Tuckahoe, 325 F. Supp. 2d 413, 429-30 (S.D.N.Y. 2004) ("Official action … is legislative when it has 'general application and look[s] to the future."). In sum, the relief plaintiffs seek would not only impermissibly intrude on the state's Tenth Amendment police power, but violate the Governor's entitlement to legislative immunity.

---

7 Plaintiffs also contend that Jewish overnight camps must be permitted because other activities that plaintiffs have deemed comparable to overnight summer camps have been permitted to open. They similarly put forward their own safety protocol and vouch for its effectiveness. These are precisely the type of decisions "subject to reasonable disagreement" that must be left within the state's discretion to act to ensure the health and safety of its citizens. In any event, day camps and childcare services are not comparable to overnight camps. Because closure of overnight summer camps in 2020 is a lawful exercise of the state's police power, the Complaint must be dismissed. See South Bay United Pentecostal Church v. Newsom, 2020 U.S. LEXIS 3041 (May 29, 2020).

### A.  Free Exercise

"Even if the deferential <u>Jacobson</u> standard did not apply . . ., Plaintiffs['] . . . claim is unlikely to succeed under standard First Amendment analysis." <u>See</u> <u>Amato</u>, 2020 U.S. Dist. LEXIS 87758 at *32. To "state a free exercise claim, a plaintiff generally must establish that 'the object of [the challenged] law is to infringe upon or restrict practices because of [its] religious motivation,' or that the law's 'purpose…is the suppression of religion or religious conduct.'" <u>Congregation of Rabbinical College of Tartikov, Inc. v. Vill. of Pomona</u>, 915 F.Supp.2d 574, 619 (S.D.N.Y. 2013) (quoting <u>Church of Lukumi Babalu Aye, Inc. v. Hialeah</u>, 508 U.S. 520, 533 (1993)). The right of the free exercise of religion does not relieve an individual or entity of the obligation to comply with a "valid and neutral law of general applicability." <u>Employment Div., Dept. of Human Resources of Ore. v. Smith</u>, 494 U.S. 872 (1990).   As a result, where an alleged limitation on the exercise of religion "is not the object ... but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been offended." <u>Id.</u> at 878.  <u>See also Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg</u>, 111 F.Supp.3d 459, 484 (S.D.N.Y. 2015) (stating that a "law or regulation that is neutral and of general applicability is constitutional even if it has an incidental effect on religion"). Therefore, a law that only incidentally imposes a burden on the exercise of religion need only be supported by a rational basis.  <u>WTC Families for a Proper Burial, Inc. v. City of New York</u>, 567 F.Supp.2d 529, 539-540 (S.D.N.Y. 2008) (quoting <u>Leebart v. Harrington</u>, 332 F.3d 134, 143 (2d Cir. 2003)); <u>see</u> <u>Fortress Bible Church v. Feiner</u>, 694 F.3d 208, 220 (2d Cir 2012).

Here, the COVID-19 Executive Order closure of businesses and the determination not to allow the opening of overnight summer camps in summer 2020 are neutral and generally applicable. Plaintiffs do not contend that the COVID-19 Executive Orders generally, or the prohibition against overnight camps specifically, explicitly disfavor Judaism or any religion,

because they do not. Neither religious camps generally, nor Jewish camps specifically, have been singled out for disparate treatment.  See Generally, Liberati-Conant Declaration, at Exhibits 1-45. The closure of overnight camps is universal. Additionally, because day camps may operate—with heightened safety and hygiene protocols—the individual plaintiffs are free to send their children to Jewish day camps.  The individual plaintiffs are in the same position as every other parent who wishes to send their child to a New York overnight camp this summer. Any infringement on plaintiffs' free exercise of their religion is therefore incidental. Courts have upheld more extreme measures taken in response to public health needs, including quarantines, which limit a person's right to assemble with *any* other person."  See Amato, 2020 U.S. Dist. LEXIS 87758, at 31. (emphasis in original); see South Bay United Pentecostal Church v. Newsom, 2020 U.S. LEXIS 3041 (May 29, 2020). Accordingly, the summer overnight camp closure need only be supported by a rational basis.

The rational basis for the State's action is, of course, the state's continuing exercise of its police power to mitigate the ongoing state disaster emergency of COVID-19. As Commissioner Zucker explained,

> "Unlike day camps, which are approved to open June 29, overnight camps are a difficult setting to manage social distancing and face covering and infection control practices. Overnight camps have congregate settings and sleeping arrangements in close quarters that present too many risks. In such a setting, even a single positive case in a camper or staff member could create an untenable quarantine situation and overwhelm camp health personnel that may not be able to handle a serious infectious outbreak of this nature."

Hutton Declaration, Exhibit S. The risk of COVID-19 spread is primarily controlled by the concentration of the virus in the air. Thus, the highest risk of transmission is presented by activities that involve sustained indoor exposure, such as occurs with the congregate sleeping and eating arrangements typical of overnight camps. Hutton Decl., ¶ 64. Further emphasizing the gravity of

the risk posed to children by COVID-19 is the emergence of what has been called "Kawasaki Syndrome" or MIS-C. See Hutton Decl., ¶¶ 71-76. "[T]he opening of summer camps would cause the movement of hundreds of thousands of children from their home communities inside and outside the state, to the communities where the summer camps are located." Id., ¶ 67. Protection of the public, including children, from a deadly, fast-spreading disease with no vaccine or cure is a significant state interest, <u>Amato</u>, 2020 U.S. Dist. LEXIS 87758, **28-29, and the EOs and protocols have a "'real and substantial relation' to the state's goal of curbing the spread of the virus." <u>Id</u>. at *30. The risk presented by too-hasty re-opening of businesses is highlighted by the surging rates of COVID-19 infection in states such as Texas and Arizona. <u>See</u> Hutton Decl., ¶ 79.. Accordingly, the EOs and the prohibition of the operation of overnight camps satisfy rational basis review.

Plaintiffs' arguments that the closure of overnight summer camps in 2020 is not neutral and generally applicable are meritless. While the facial neutrality of a law is not always determinative, and the circumstances and effects of a facially neutral law may indicate an intent to target a disfavored religion, <u>see</u> <u>Church of Lukumi Babalu Aye v. City of Hialeah</u>, 508 U.S. 520, 534 (1993), plaintiffs fail to offer any record evidence to support a finding that the EOs and overnight summer camp determination targeted religion. Rather, the prohibition against the operation of overnight camps is neutral on its face and affects all overnight camps equally regardless of whether they have a particular religious affiliation. Plaintiffs' attempt to paint New York's closure of overnight summer camps as unconstitutional "targeting" of religion is thus meritless. <u>See</u> <u>Emp't Div. v. Smith</u>, 494 U.S. 872, 878-879 (1990) ("We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate").

Further, no exemption from the prohibition against opening overnight summer camps exists, religious or otherwise, and plaintiffs present no evidence of selective enforcement of the closure of overnight summer camps. Lacking evidence of targeting, plaintiffs attempt to conflate the spontaneous George Floyd protests with the closure of overnight camps statewide. Neither the existence of protests, nor the Governor's statements can be viewed as evidence of targeting. First, they are not evidence of official policy and do not create law. The Governor makes public statements for many reasons including, but not limited to, reassuring the public in times of crisis, or to express his own personal opinions. But comments like those alleged to have been made by the Governor in the midst of a heated public policy crisis do not establish law. See Roberts v. Paterson, 19 N.Y.3d 524 (2012) (Governor Paterson's public statements assuring retirees of a soon-to-be disbanded state agency that their health benefits would continue did not constitute a legally enforceable promise).  Second, the statements of the Governor selected by plaintiffs bear no relation to overnight summer camps. And third, the Governor's statements evince no hostility—direct, or indirect—to religion.

The holding in the preliminary injunction decision in Soos, et al. v Cuomo is not applicable. See Mem Dec & Order, June 26, 2020, NDNY, 1:20-cv-651, Dkt. 35. First, in Soos the plaintiffs asserted that greater restrictions were being placed on gatherings for religious observances than other types of gatherings, while here plaintiffs argue that Jewish overnight camps should be treated differently than all other overnight camps. Second, the plaintiffs in Soos alleged that their attempts to gather outside for religious purposes had been forbidden, while the protests and outdoor graduations were permitted. In this case the protests are a non-sequitur and bear no rational relationship to overnight camps. Third, in Soos, the EOs at issue explicitly limited the capacity of houses of worship in a manner held by the Court to be inconsistent with what it determined were

comparable businesses. The court therefore precluded the defendants "from enforcing any indoor gathering limitations against plaintiffs greater than imposed for Phase 2 industries, provided that plaintiffs follow social distancing requirements as set forth in the applicable executive orders and guidance." Here, there are no secular overnight camps that are being treated differently than religious overnight camps. Indeed, plaintiffs here seek to be treated *differently* than secular overnight camps.

In sum, the evidence establishes that the object of the EOs in general, and the determination here to close overnight summer camps, in particular, is to stop the spread of COVID-19 and protect public health, including children. Defendants demonstrate both that the closure of summer camps is neutral and generally applicable and that it is rationally related to the state's interest in protecting the public health and arresting the spread of COVID-19 in the state. Accordingly, plaintiffs are not likely to succeed on the merits of their First Amendment claim.

## B. 14th Amendment Right to Direct Upbringing of Child

Plaintiffs' Fourteenth Amendment claim is meritless. For the reasons stated above, the summer camp closure should be subject to a 10th Amendment rational basis analysis. See Amato, 2020 U.S. Dist. LEXIS 87758). None of the cases cited by plaintiff involved restrictions imposed pursuant to the State's authority to protect the public health during a pandemic. See, e.g., Troxel v. Granville, 530 U.S. 57, (2000) (invalidating state court order of visitation that compelled visitation with grandparents); Reno v. Flores, 507 U.S. 292, 113 S. Ct. 1439 (1993) (approving of the constitutionality of immigration authorities detention of unaccompanied minors); Meyer v. Nebraska, 262 U.S. 390, 400 (1923) (striking down law that forbade "the teaching in school of any subject except in English; also the teaching of any other language until the pupil has attained and successfully passed the eighth grade, which is not usually accomplished before the age of twelve").

20

In any event, plaintiffs' evidence is insufficient to show a constitutional violation. Plaintiffs contend that "the statewide closure of Jewish overnight camps unconstitutionally burdens Parent-Plaintiffs who wish to send their children to camps to instill Jewish educational and religious values." Dkt. 70-2, at 21. The closure of overnight summer camps statewide is a burden on parents across the State. Further, it is of the type that all parents in this State have endured during this pandemic. The closure of overnight summer camps does not prevent parents from inculcating their children with their values, religious or otherwise; it merely limits, temporarily, the means by which they do so.

Plaintiffs' reliance on Wisconsin v Yoder (406 US 205 [1972]), is misplaced.  In Yoder, an Amish adherent was convicted of violating a law that required that children up to the age of 16 attend school. Id. at 208. The Court held that compelling 14 and 15 year old Amish children to attend school would "contravene[ ] the basic religious tenets and practice of the Amish faith, both as to the parent and the child."[8] Id. at 218.

Here, plaintiffs have not produced evidence that a single-season closure of overnight camps would threaten their way of life. Nor have they produced evidence that inability to attend overnight camp would "contravene[ ] the basic religious tenets and practice of" their faith. Id. at 217. Accordingly, plaintiffs are unlikely to succeed on the merits of their 14th Amendment claim.

## C. So-Called *Hybrid* Claim

Plaintiffs' "hybrid rights" cause of action fails to state a claim because the Second Circuit does not recognize the existence of a hybrid claim. Leebaert v Harrington, 332 F.3d 134, 144 (2d Cir 2003).

---

[8] The Court also noted that "[n]othing we hold is intended to undermine the general applicability of the State's compulsory school-attendance statutes or to limit the power of the State to promulgate reasonable standards that, while not impairing the free exercise of religion, provide for continuing agricultural vocational education under parental and church guidance by the Old Order Amish or others similarly situated." 406 U.S. at 236.

## II.    PLAINTIFFS FAILED TO ESTABLISH IRREPARABLE HARM

Plaintiffs contend that they have established irreparable harm because such harm should be presumed and because the individual plaintiffs' constitutional rights allegedly are threatened. Plaintiffs assert that plaintiffs would be forced to "sacrifice religious practice, education, and well being." See Plaintiffs' Memorandum of Law in Support of TRO, Dkt. 7-2, at 22-23. However, under the circumstances here, irreparable harm cannot be presumed. The Executive Orders mandate the continued closure of overnight camps through September 7, 2020, at which point the disaster emergency is set to expire. Any incidental infringement of plaintiffs' First Amendment rights by the generally applicable closure determination will be fleeting and of a kind endured by all citizens across the State during the COVID-19 pandemic. Presumably, next summer, Jewish and non-Jewish parents alike will be able to again send their children to overnight summer camp.

"Although 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury,'" courts "have not consistently presumed irreparable harm in cases involving allegations of the abridgement of First Amendment rights[.]" Bronx Household of Faith v. Bd. of Educ., 331 F.3d 342, 349 (2d Cir.2003) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).  See also CompassCare v. Cuomo, 2020 U.S. Dist. LEXIS 98930, *30 (N.D.N.Y. June 5, 2020).  A movant is entitled to the presumption that an infringement on First Amendment rights only when he or she "alleges injury from a rule or regulation that *directly limits*" a First Amendment right. Bronx Household of Faith, 331 F.3d at 349 (emphasis added).  See also Rossi v. Fischer, 2014 U.S. Dist. LEXIS 158064, *40 (S.D.N.Y. Sept. 11, 2014).

Here, plaintiffs are not entitled to a presumption of irreparable harm because, as is explored more fully above in Point I, the state has not directly limited the ability of either parents or their children to exercise their religious freedoms. Instead, the place  of religious and cultural values instruction has been limited incidentally to the statewide closure of all summer camps. None of

the evidence submitted by plaintiffs establishes that they have been prevented from guiding their children in Jewish faith or culture. The individual plaintiffs simply are temporarily unable to deliver such guidance by way of overnight summer camp.

In sum, plaintiffs failed to establish that they will suffer irreparable harm if interim injunctive relief is not granted.

### III.   THE EQUITIES BALANCE IN FAVOR OF THE STATE'S EFFORTS TO PROTECT THE PUBLIC HEALTH DURING THE EXISTING PANDEMIC, AND ISSUANCE OF A TRO IS NOT IN THE  PUBLIC INTEREST

Because plaintiffs cannot establish the likelihood of success on the merits of their claims, or irreparable harm, the court need not consider "the public's interests in a temporary restraining order or the balance of the equities." Amato at **38-39.  In any event, and critically, the equities balance in favor of continuing the State's aggressive response to a deadly pandemic, in accordance with the State's thoroughly informed, complex paradigm based upon a "dynamic and fact intensive" analysis, without the interference of the courts that lack such expertise.  South Bay at *3.  Moreover, the risk of dispersing hundreds of thousands of children across the state in the midst of the COVID-19 pandemic outweighs plaintiffs' interest in sending their children to overnight camps in 2020. New York's success in bending the curve may be short-lived if the state is not permitted to rationally control the easing of restrictions intended to slow the spread of COVID-19. For their part, plaintiffs are free to guide their children in whatever values they wish, and may do so by multiple means, including, for example, day camps. For these reasons, preliminary injunctive relief would not be in the public interest and would, in fact, run counter to the public intertest in stopping the spread of the virus and protecting the public health.

**CONCLUSION**

For the reasons stated above, plaintiffs' motion for temporary preliminary injunctive relief should be denied in its entirety.

Dated: Albany, New York
June 26, 2020

LETITIA JAMES
Attorney General of the State of New York
Attorney for Defendants Andrew M. Cuomo
    and Letitia James
The Capitol
Albany, New York  12224

By: s/ *Chris Liberati-Conant*
Chris Liberati-Conant
Assistant Attorney General, of Counsel
Bar Roll No. 700466
Fax:  (518) 915-7738 (Not for service of papers)
Email: christopher.liberati-conant@ag.ny.gov

TO:   Bennet J. Moskowitz
      Troutman, Sanders Law Firm - NY Office
      875 Third Avenue
      New York, NY 10022
      *By ECF*