# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Association of Jewish Camp Operators**, ) ) **Samuel Werzberger, MD, FAAP**, ) ) **Ariela Orkaby, MD, MPH**, ) ) **Beth Statfeld**, ) ) **Gail Zahtz**, ) ) *Plaintiffs*, ) ) *v.* ) ) **Andrew M. Cuomo**, Governor of the ) State of New York, in his official capacity, ) ) ) *Defendant.* ) ) | Case No. 1:20-CV-0687 (GLS-DJS) |

## SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ....................................................................................................................... 3

I.     Plaintiffs Are Likely to Succeed on Their Claims ............................................... 3

II.    Plaintiffs Will Suffer Irreparable Harm Without Injunctive Relief .................... 7

III.   The Balance of the Hardships and the Public Interest Favor Plaintiffs ............ 8

CONCLUSION .................................................................................................................... 9

## TABLE OF AUTHORITIES

**CASE** **Page(s)**

*Cent. Rabbinical Cong. of the U.S. v. NYC Dep't of Health & Mental Hygiene*,
    763 F.3d 183 (2d Cir. 2014)......................................................................................1, 2, 3, 4

*Church of Lukumi Babalu Aye v. City of Hialeah*,
    508 U.S. 520 (1993)..............................................................................................................7

*Espinoza v. Mont. Dep't of Rev.*,
    591 U.S. __, No. 18-1195 (June 30, 2020) .....................................................................2, 7

*Soos v. Cuomo*
    2020 U.S. Dist. LEXIS 111808 (N.D.N.Y. June 26, 2020)...........................................1, 2, 3, 4

**OTHER AUTHORITIES**

U.S. CONST. amend. I...............................................................................................................7, 8

N.Y. Exec. Order No. 202.8........................................................................................................3

N.Y. Exec. Order No. 202.10......................................................................................................3

N.Y. Exec. Order No. 202.41......................................................................................................3

Professor Michael A. Helfand, *Is Gov. Cuomo About to Be Overruled on Jewish Summer Camps?*, Tablet, https://www.tabletmag.com/sections/news/articles/cuomo-synagogues-summer-camps ......................................................................................................7

*Suggestions for Youth and Summer Camps*, CDC (updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/summer-camps.html ...............................................................................................................................5

## INTRODUCTION

Defendant has publicly explained that his decisions about which conduct to exempt from the prohibitions of his Executive Orders and which should be subject to strict enforcement of them are "about balancing risk versus the reward." *Soos v. Cuomo*, 2020 U.S. Dist. LEXIS 111808, at *11–12 (N.D.N.Y. June 26, 2020) (quoting Defendant's June 4 press conference). In other words, two activities that pose equal risks (of the transmission of COVID-19) are susceptible of disparate treatment under the Executive Orders – one exempt from their restrictions, the other strictly bound by them – depending on the level of "reward" or value the Governor sees in the proposed conduct.

That is precisely what the Second Circuit prohibited in *Central Rabbinical Congress of the United States v. New York City Department of Health & Mental Hygiene*, 763 F.3d 183 (2d Cir. 2014). In *Central Rabbinical*, the court did not question the City's assertion that its challenged law was appropriately motivated to address health concerns. Yet the Second Circuit concluded that the City's restriction on religious practice, even if to address health concerns, was subject to strict scrutiny because it was "substantially underinclusive" in that it failed to similarly regulate secular conduct that was "at least as harmful to the legitimate government interests purportedly justifying it." *Id.* at 197. The court explained that without "evidence in support of explanation" of its "selectivity," it is impermissible to "impos[e] burdens only on conduct motivated by religious belief" but not secular conduct that posed similar risk. *Id.* at 196–97 (citation omitted).

The same is true of Defendant's conduct here. Defendant asserts that his refusal to exempt Jewish overnight camps from his restrictions is driven by the risk of transmission of COVID-19. Yet Defendant has not set forth any evidence justifying his series of exemptions for secular conduct such as day camps and dormitories, and his support for and *de facto* exemption of mass protests, all of which pose equal risks of the transmission of COVID-19.

The Court asked about Defendant's exemptions for mass protests and theaters' "Open Your Lobby" campaign (T.30–31, 35-37), yet Defendant has *never* disputed that these activities present a greater risk than overnight camps. Defendant merely repeats that there are risks present at overnight camps, all the while ignoring the equal or greater risks in the exempted secular activity.

Taken together, this demonstrates that Defendant has decided that the risk of COVID-19 transmission is too great when the reward is simply Jewish overnight camp, but that the same risk is tolerable when the conduct is broader-based secular activities such as day camps, higher education, child care, and mass protests. This ignores not only the *Central Rabbinical* holding but also, as the Supreme Court reiterated yesterday, "the rights of parents to direct 'the religious upbringing' of their children," which are "protected by the Constitution." *Espinoza v. Mont. Dep't of Rev.*, 591 U.S. __, No. 18-1195 at 19 (June 30, 2020) (slip op.) (quoting *Yoder v. Wisconsin*, 406 U.S. 205, 213–14, 232 (1972)); *see also* Pls. Br. 20–22.

This Court is not being asked to substitute its medical judgment for that of Defendant, or the opinions of Drs. Berman and Henderson for those of Drs. Zucker and Hutton. Defendant has exempted secular day camps and higher education dormitories, issuing health protocols for each that the State concludes sufficiently stems the risk of COVID-19. Yet Defendant cites that very same risk to justify his refusal to provide Jewish overnight camps with a parallel exemption.

Defendant cannot decide that the equal or greater risk of secular day camps and dormitories are justified by the reward or value he finds inherent in those activities while simultaneously determining that the equal or lesser risk of Jewish overnight camps with the same State health protocols in place is not justified by the reward Plaintiffs see in that activity. Judge Sharpe in *Soos* and the Second Circuit in *Central Rabbinical* did not make medical judgments. Each court simply held that the State cannot employ a double standard. That is all Plaintiffs ask of this Court.

2

**ARGUMENT**

**I.     Plaintiffs Are Likely to Succeed on Their Claims**

Plaintiffs challenge Defendant's application of his Executive Orders to prohibit Jewish overnight camps from operating while exempting secular conduct that poses equal or greater risks. Defendant reiterated his position at the hearing that his action is neutral and generally applicable because it applies to all overnight camps. T.27, 29–30. As explained at the hearing, Defendant has not issued any executive order expressly directed at overnight camps. Rather, Plaintiffs challenge Defendant's refusal to accommodate Jewish overnight camps under his orders imposing statewide gathering and closure restrictions, despite the widespread exemptions he has granted to comparable secular activity from the same restrictions.[1] Contrary to Defendant's contention that it is not his burden to prove the comparability of those activities (T.33–34), his disparate regulation of religious versus secular conduct triggers strict scrutiny because the exempted secular activities raise equal or greater health risks. *Cent. Rabbincal*, 763 F.3d at 196–97.

Judge Sharpe addressed a similar challenge in *Soos* to Defendant's exemptions of secular activity from his restrictions. Judge Sharpe explained that Defendant's decision to exempt mass protests and graduation ceremonies requires that Defendant "extend a similar exemption to plaintiffs absent a compelling reason to the contrary." *Soos*, 2020 U.S. Dist. LEXIS 111808, at *32. Judge Sharpe concluded that Defendant's "applaud[ing] and encourag[ing] protesting" while "discourag[ing] others from violating outdoor limitations" sent "a clear message that mass protests are deserving of preferential treatment." *Id.* at *31–32. Judge Sharpe likewise found that "there

---

[1] Executive Order Nos. 202.8 and 202.10 impose the gathering and closure restrictions. Schick Decl., Ex. A at 17–22. Executive Order No. 202.41, which Defendant referred to at the hearing (T.46), simply extends such closures through July 13, 2020. Schick Decl., Ex. A at 55–56.

3

is nothing materially different about a graduation ceremony and a religious gathering such that defendants' justifications for a difference in treatment can be found compelling." *Id.* at *32–33.

The undisputed evidence before the Court shows that the exempted mass protests and secular activities are "at least as harmful" regarding the spread of COVID-19 as are Jewish overnight camps. *Cent. Rabbinical*, 763 F.3d at 197. Defendant has never disputed that the exempted mass protests and "Open Your Lobby" campaign present an equal or greater risk than overnight camps. Defendant has raised several generic concerns about Jewish overnight camps that he contends make them riskier than day camps and dormitories. Yet each of the supposed risks Defendant cites are present to the same or greater degree in the permitted secular activity. "[O]vernight camps would be as safe as higher education, day camps, and child care programs, provided the overnight camps adhere to the health protocols that the Department of Health has issued for those activities." Dr. Henderson Decl. ¶ 5 (attached hereto). This renders the application of his Executive Orders anything but neutral and generally applicable.

At the hearing, Defendant suggested that sleeping arrangements at overnight camps render them incomparable to the secular activity exempted by Defendant. T.31. Defendant does not dispute, however, that his exemption for higher education allows dormitories with shared residences and shared bathroom and shower facilities, as well as shared dining halls. Schick Reply Decl., Ex. Q at 2, 5–6, 10, 17. The State thus has decided that its safety protocols can sufficiently guard against the "risk" of COVID-19 transmission for shared sleeping spaces when the "reward" is the secular activity of higher education. Those protocols include "capacity limits, enhanced cleaning and disinfection, appropriate social distancing, use of acceptable face coverings in common areas," among other things, such as "increase[d] ventilation with outdoor air to the greatest extent possible," to protect against COVID-19 in shared residential living. *Id.* at 2, 6.

4

Defendant cannot then determine that with those same safety protocols in place, the "risk" of COVID-19 transmission is too great to justify the "reward" of the religious activity provided for in Jewish overnight camps. Indeed, the CDC does not even recommend closing overnight camps. *Suggestions for Youth and Summer Camps*, CDC (updated June 25, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/summer-camps.html.

Nor can the State rely upon an inchoate concern that the risk of shared living space in overnight camps without the use of masks creates too great a risk (T.47), since the State's higher education protocols do "not . . . require physical distancing among roommates, or require face coverings to be worn while inside an individual's residence." Schick Reply Decl., Ex. Q at 5.[2] Defendant fails to explain how these risks were sufficient to justify prohibiting Jewish overnight camps under the Executive Orders but not sufficient to prevent the granting of an exemption from those same Executive Orders for higher education dormitories. *See also* Dr. Henderson Decl. ¶ 5.

Defendant also wrongly claims that overnight camps generate greater risks than permitted activities because the camps will not be fully isolated and could overwhelm rural jurisdictions. Day camps, child care programs, and higher education likewise are not isolated; children and students travel to and from the programs with much more regularity than do children in overnight camps. Berman Decl. ¶ 29. Mass protests have no isolation protocols whatsoever. Not only do deliveries not pose a problem unique to Jewish overnight camps (T.43–44), the State has issued protocols that it believes sufficiently mitigate that risk for exempted secular activities, *see* Schick Reply Decl., Exs. Q at 9 ("Responsible Parties should establish designated areas for pickups and deliveries, limiting contact to the extent possible."); R at 9 (same). And Defendant has concluded that higher education institutions, which service far more students than Jewish overnight camps,

---

[2] College-aged students are more susceptible to COVID-19 than children. Berman Decl. ¶¶ 8–9.

5

both individually and in the aggregate, can sufficiently guard against the risk of overwhelming those jurisdictions by requiring the institutions to consult with "the local health department" to identify where to quarantine students (residencies and/or hotels) and how to meet those students' needs. *Id.* at Ex. Q at 6.

Defendant also argued that a rare inflammatory syndrome in children and the need for children to travel to camps create additional risks. But these risks likewise apply to permitted secular activities. Defendant has exempted day camps and child care programs, each of which relate to children and could create a risk of the inflammatory syndrome. Travel likewise applies to the exempted secular activities: higher education institutions draw tens of thousands of students from around the country and overseas.

Plaintiffs do not dispute that Defendant has an interest in minimizing the risk of COVID-19 transmission. But the undisputed evidence demonstrates that each risk Defendant cites in support of his prohibition of Jewish overnight camps applies to an equal or greater degree to exempted secular activity.

The bottom line is that there is no neutral and generally applicable standard that the State is applying to prohibit Jewish overnight camps. The religious activity of these camps instead is being subjected to an impermissible double standard. It is not any neutral or generally applicable level of "risk" that is driving the prohibition on overnight camps. It is the State's refusal to see the value or "reward" in Jewish overnight camps. The result is that equal "risks" of COVID-19 transmission are being treated unequally: broad-based secular conduct is deemed to have sufficient value such that the "reward" outweighs the risk when Defendant balances the two, while the narrower religious conduct of Jewish overnight camp is deemed to have no value such that its "reward" is always outweighed by any risk. That is why Defendant suggested that Plaintiff-

6

Parents, unlike mass protests, higher education dormitories, and day camps, can simply wait until "next summer" for the religious experience they want for their children.

Defendant's refusal to extend similar accommodation to Jewish overnight camps establishes "discriminatory treatment;" he "judg[es] them to be of lesser import than nonreligious reasons." *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 537–38 (1993). This refusal fails strict scrutiny, as it "is fatally underinclusive because its 'proffered objectives are not pursued with respect to analogous nonreligious conduct.'" *Espinoza*, No. 18-1195 at 20 (quoting *Lukumi*, 508 U.S. at 546).

## II.     Plaintiffs Will Suffer Irreparable Harm Without Injunctive Relief

Defendant cannot avoid the presumption of irreparable injury for First Amendment violations by arguing that Plaintiffs simply can substitute day camps for Jewish overnight camps. T.37, 39. Defendant has not disputed that overnight camps offer an immersive environment isolated from "outside, negative influences" that allows children an unparalleled setting to learn "by their lived experience [ ] that Jewish learning and Jewish life never stops, but instead continues in all contexts." Schwartz Decl. ¶¶ 3, 6. Overnight camps permit children to learn alongside religious role models, such as rabbis, counselors, and other campers, *id.* at ¶ 11, and to experience the Camp Sabbath, which "is a life-altering experience for many campers," Frischman Decl. ¶ 10. Studies demonstrate that the unique environment "powerfully promotes interest in, and passion for, Jewish literacy and living" that leads children to be "more connected to the Jewish community and have an increased adherence to religious practice." *Id.* at ¶¶ 7–8. Overnight camps thus "have emerged as a central religious institution of the American Jewish community, leveraging informal educational methods to inculcate faith and values and thereby foster intergenerational continuity." Professor Michael A. Helfand, *Is Gov. Cuomo About to Be Overruled on Jewish Summer Camps?*,

7

Tablet, https://www.tabletmag.com/sections/news/articles/cuomo-synagogues-summer-camps. Overnight camps thus present opportunities not available in other settings for children to grow in the Jewish faith and community. Schwartz Decl. ¶ 9; Orkaby Sherman Decl. ¶ 7. The overnight camps are particularly vital this summer, as the schools that typically provide religious instruction to many Jewish children have been closed since March. Schick Decl., Ex. A at 10, 25, 36, 39.

### III.     The Balance of the Hardships and the Public Interest Favor Plaintiffs

Defendant has failed to show that his interests would suffer meaningful harm if this Court grants injunctive relief. Each of the risks he cites for Jewish overnight camps applies to a same or greater extent to secular activity that he has decided to exempt from his Executive Orders, as long as they adhere to State issued health protocols. Plaintiffs simply request that the religious conduct they favor be given comparable treatment to the comparable secular activity Defendant favors. Such comparable treatment is required by the First Amendment and promotes the public interest.

## CONCLUSION

The Court should grant a temporary restraining order and preliminary injunction that prohibits Defendant from holding Jewish overnight camps to a different standard than he has applied to exempted secular activities such as day camps, child care, and dormitories.

This 1st day of July, 2020.

/s/ Avi Schick
Avi Schick
avi.schick@troutman.com

TROUTMAN PEPPER HAMILTON SANDERS LLP
875 Third Avenue
New York, NY  10022
(212) 704-6000

Misha Tseytlin (WI Bar No. 102199)
misha.tseytlin@troutman.com

TROUTMAN PEPPER HAMILTON SANDERS LLP
227 W. Monroe Street, Suite 3900
Chicago, IL  60606
(312) 759-1920

W. Alex Smith (Ga. Bar No. 532647)
alex.smith@troutman.com

TROUTMAN PEPPER HAMILTON SANDERS LLP
600 Peachtree Street, N.E., Suite 3000
Atlanta, Georgia  30308
(404) 885-3000

*Attorneys for Plaintiffs*