UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ASS'N OF JEWISH CAMP OPERATORS;
SAMUEL WERZBERGER; ARIELA ORKABY;
BETH STATFIELD; and GAIL ZAHTZ,

                              Plaintiffs,

v.                                              1:20-CV-0687
                                                (GTS/DJS)
ANDREW M. CUOMO, Governor of the State of
New York, in his official capacity,

                              Defendant.
_____

APPEARANCES:                    OF COUNSEL:

TROUTMAN PEPPER              BENNET J. MOSKOWITZ, ESQ.
  Counsel for Plaintiffs       AVI SCHICK, ESQ.
875 Third Avenue             WILLIAM ALEXANDER SMITH, ESQ.
New York, NY 10022

HON. LETITIA A. JAMES           CHRISTOPHER LIBERATI-CONANT, ESQ.
Attorney General for New York    Assistant Attorney General
  Counsel for Defendants
The Capitol
Albany, NY 12224

GLENN T. SUDDABY, Chief United States District Judge

## DECISION and ORDER

        Currently before the Court, in this civil rights action filed by the Association of Jewish

Camp Operators, Samuel Werzberger, Ariela Orkaby, Beth Statfield, and Gail Zahtz ("Parent-

Plaintiffs") (collectively "Plaintiffs") against Andrew M. Cuomo (in his capacity as Governor

of the State of New York) ("Defendant"), is Plaintiffs' motion for a preliminary injunction

enjoining Defendant from prohibiting the operation of overnight children's camps anywhere in

New York State for the summer of 2020, pursuant to Fed. R. Civ. P. 65(b).  (Dkt. No. 7, Attach.

2 [Pls.' Mem. of Law].)[1]  Defendant opposed Plaintiffs' motion.  (Dkt. No. 17.)  For the reasons

set forth below, Plaintiffs' motion for a preliminary injunction is denied.

## I.     RELEVANT BACKGROUND

### A.     Plaintiffs' Claims

Generally, liberally construed, Plaintiffs' Complaint asserts the following four claims: (1)

a claim that Defendant violated the Free Exercise Clause of the First Amendment pursuant to 42

U.S.C. § 1983, by discriminatorily banning children's Jewish overnight camps (while exempting

favored secular conduct) in a way that is not narrowly tailored to curbing the transmission of the

COVID-19 virus;[2] (2) a claim that Defendant violated the Due Process Clause of the Fourteenth

Amendment pursuant to 42 U.S.C. § 1983, by infringing on parents' fundamental right to control

the upbringing and education of their children through banning children's Jewish overnight

camps without a reasonable relationship between the ban and the curbing of the spread of the

COVID-19 virus; (3) a claim that Defendant violated the First and Fourteenth Amendments

pursuant to 42 U.S.C. § 1983 by discriminatorily banning Jewish overnight camps (while

exempting favored secular conduct) in a way that is not narrowly tailored to sufficient state

interest; and (4) a claim that Defendant violated Article One, Section Three of the New York

---

[1]     Plaintiffs' initially filed a motion for a temporary restraining order, but at the beginning
of the motion hearing on June 30, 2020, the Court proposed allowing the parties to supplement
the record and argument to address the application for preliminary injunctive relief without
requiring an additional evidentiary hearing.  (Hearing Transcript.)  The parties agreed to the
Court's proposed course of action, obviating the need for the Court to consider Plaintiffs' motion
for a temporary restraining order.

[2]     Although Defendant's decision to prohibit overnight children's camps applies to all
overnight children's camps (Dkt. No. 1 at ⁋ 52), Plaintiffs argue that Defendant's decision
essentially affects only Jewish overnight camps because the decision was not announced until
after almost all of the non-Jewish overnight camps in New York State had decided to close
during the summer of 2020.  (Dkt. No. 7, Attach. 2 at 11.)

State Constitution because any interest advanced by Defendant in closing overnight children's camps to purportedly curb the transmission of COVID-19 is outweighed by the substantial burden imposed on the right to free exercise of religion.  (*See generally* Dkt. No. 1.)  Familiarity with the factual allegations supporting these claims in Plaintiffs' Complaint is assumed in this Decision and Order, which is intended primarily for the review of the parties.  (*Id.*)

### B.      Plaintiffs' Motion

#### 1.      Plaintiffs' Memorandum of Law

Generally, in support of their motion for a preliminary injunction, Plaintiffs assert the following three arguments: (1) Plaintiffs have shown that they are likely to succeed on the merits of their claims because (a) Defendant's executive order[3] violates the Free Exercise Clause of the First Amendment, (b) Defendant's executive order infringes on the Parent-Plaintiffs' fundamental right to control the education and upbringing of their children under the substantive Due Process Clause of the Fourteenth Amendment, and (c) Defendant's executive order violates the Parent-Plaintiffs' hybrid right to direct the religious education of their children; (2) Plaintiffs have demonstrated irreparable harm based on the threatened loss of First Amendment freedoms; (3) the balance of hardships tips in Plaintiffs' favor because (a) the overnight camps are uniquely positioned to protect against the transmission of COVID-19, (b) the overnight camps' have implemented aggressive screening and prevention measures, (c) children are much less susceptible to COVID-19 than adults, (d) there is "low prevalence" of COVID-19 throughout

---

[3]      Plaintiffs argue that the general closures implemented by Executive Orders 202.8 and 202.10 are the basis for their claims because overnight children's camps were closed as a result of those executive orders rather than as a result of any clarifying statements made by Defendant or his representatives on June 12, 2020.  (Hearing Transcript.)  For purposes of brevity and convenience, the Court will refer to Defendant's statewide closure order as an "executive order" throughout the remainder of this Decision and Order.

New York State at this time, and (e) there is a "remote" chance of a serious outbreak; and (4)

Plaintiffs have demonstrated that the preliminary injunction would be in the public interest

because Defendant lacks the constitutionally sufficient justification for infringing on Plaintiffs'

constitutional rights.  (*See generally* Dkt. No. 5, Attach. 9 [Pls.' Memo. of Law].)

### 2. Defendant's Opposition Memorandum of Law

Generally, in opposition to Plaintiffs' motion, Defendant assert the following three

arguments: (1) Plaintiffs failed to establish that they are likely to succeed on the merits of their

claims because (a) Defendant exercised his lawful power to protect the health and safety of the

people of New York State from the COVID-19 virus, (b) Defendant is entitled to legislative

immunity because his actions were taken in a "legislative capacity," (c) the executive order

barring overnight camps from opening during the summer of 2020 was neutral, generally

applicable, and rationally related to stopping the spread of the COVID-19 virus, (d) the closure

of overnight camps does not amount to a constitutional violation of parents' Fourteenth

Amendment right to direct the upbringing of their child, and (e) the Second Circuit does not

recognize the existence of a "hybrid" claim; (2) Plaintiffs failed to establish irreparable harm

because the State only incidentally religious and cultural instruction by temporarily closing all

summer camps; and (3) the issuance of a TRO and/or preliminary injunction is not in the public

interest because the equities balance in favor of the State's efforts to protect the public health

during an existing pandemic.  (*See generally* Dkt. No. 17 [Def.'s Opp'n Memo. of Law].)

### 3. Plaintiffs' Reply Memorandum of Law

Generally, in reply to Defendant's response, Plaintiffs, focusing only on their Free

Exercise claim, argue as follows: (1) they are likely to succeed on the merits of this claim

because (a) Defendant's explicit and de facto exemptions to the restrictions imposed by the

executive orders for mass protests and secular activity unconstitutionally treat religion less favorably than secular conduct, and (b) Defendant's refusal to accommodate overnight camps is not neural in that (although it also applies to non-Jewish overnight camps) it was imposed only after almost all of the non-Jewish overnight camps in the state had already canceled their summer programs, and it is not generally applicable in that it does not apply to nighttime protestors (who are permitted by Defendant to congregate for extended durations in enclosed theater and museum lobbies); and (2) Plaintiffs will suffer irreparable harm without injunctive relief because overnight camps offer such an uncommon and immersive experience (of fostering religious identity and instilling religious values) that they constitute an "essential component" of their children's education and religious growth and well-being; (3) the balance of hardships and public interests weighs in favor of Plaintiffs because Defendant cannot establish that his interests would suffer meaningful harm were the Court to issue an injunction; and (4) Defendant is not entitled to legislative immunity. (*See generally* Dkt. No. 20 [Pls.' Reply Memo. of Law].)

### C.     June 30, 2020, Hearing

After granting Plaintiff's application for an order to show cause, the Court held a hearing on Plaintiffs' motion through video conference on June 30, 2020. (Dkt. No. 13.) At the conclusion of the hearing, the Court provided the parties with an opportunity to supplement the record and submit additional argument.

### D.     The Parties' Supplemental Briefs

Generally, in their supplemental brief, Plaintiffs assert the following five arguments: (1) Plaintiffs are likely to succeed on the merits of their claims because Defendant exempted, either explicitly or through a de facto nature, mass protests and secular activities that are at least as harmful to the spread of the COVID-19 virus as are overnight camps; (2) Defendant wrongly

claims that overnight camps generate greater risks than do permitted secular activities because the undisputed evidence demonstrates that each risk Defendant cites to support the ban on overnight camps applies to an equal or greater degree to exempted secular activity; (3) Defendant's decision to prohibit overnight camps from opening during the summer of 2020 is not neutral and generally applicable because Defendant's refusal to extend similar accommodations to Jewish overnight camps establishes discriminatory treatment; (4) Plaintiffs will suffer irreparable harm without injunctive relief because Jewish overnight camps are a "central religious institution [to] the American Jewish community;" and (5) the balance of hardships and the public interest favor Plaintiffs because the risks Defendant cites for prohibiting overnight camps applies to the same or greater extent to already exempted secular activity.  (*See generally* Dkt. No. 26.)

Generally, in his supplemental brief, Defendant asserts the following three arguments: (1) the correct standard of review for all of Plaintiffs' claims is rational basis; (2) neither residential higher education facilities nor day camps are comparable to overnight camps because day camps and higher education facilities do not involve the same level of risk of COVID-19 related harm; and (3) even if the Court applies strict scrutiny to the facts of this case, the closure of overnight camps was narrowly tailored to meet a compelling state interest because Defendant's decision was no broader than necessary to combat the COVID-19 virus.  (*See generally* Dkt. No. 25.)

## II.    GOVERNING LEGAL STANDARD

"'The purpose of a preliminary injunction is . . . to preserve the relative positions of the parties.'"  *N. Am. Soccer League, LLC. v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37-38 (2d Cir. 2018) ("*N. Am. Soccer*") (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 [1981]).  "A

preliminary injunction is an 'extraordinary and drastic remedy' . . . ; it is never awarded as of right . . . ." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (internal citations omitted). Generally, in the Second Circuit, a party seeking a preliminary injunction must establish the following three elements: (1) that there is either (a) a likelihood of success on the merits and a balance of equities tipping in the party's favor or (b) a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in the party's favor; (2) that the party will likely experience irreparable harm if the preliminary injunction is not issued; and (3) that the public interest would not be disserved by the relief. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (reciting standard limited to first part of second above-stated element and using word "equities" without the word "decidedly"); *accord, Glossip v. Gross*, 135 S. Ct. 2726, 2736-37 (2015); *see also Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (reciting standard including second part of second above-stated element and using words "hardships" and "decidedly"); *Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 (2d Cir. 2010) (holding that "our venerable standard for assessing a movant's probability of success on the merits remains valid [after the Supreme Court's decision in *Winter*]").

With regard to the first part of the first element, a "likelihood of success" requires a demonstration of a "better than fifty percent" probability of success. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *disapproved on other grounds, O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349, n.2 (1987). "A balance of equities tipping in favor of the party requesting a preliminary injunction" means a balance of the hardships against the benefits. *See, e.g., Ligon v. City of New York,* 925 F. Supp.2d 478, 539 (S.D.N.Y. 2013) (characterizing the balancing "hardship imposed on one party" and "benefit to the other" as a "balanc[ing] [of] the equities");

*Jones v. Nat'l Conference of Bar Examiners,* 801 F. Supp. 2d 270, 291 (D. Vt. 2011) (considering the harm to plaintiff and any "countervailing benefit" to plaintiff in balancing the equities); *Smithkline Beecham Consumer Healthcare, L.P. v. Watson Pharm., Inc.,* 99-CV-9214, 1999 WL 34981557, at *4-5 (S.D.N.Y. Sept. 13, 1999) (considering the harm to defendant and the "benefit" to consumers in balancing the equities); *Arthur v. Assoc. Musicians of Greater New York*, 278 F. Supp. 400, 404 (S.D.N.Y. 1968) (characterizing "balancing the equities" as "requiring plaintiffs to show that the benefit to them if an injunction issues will outweigh the harm to other parties"); *Rosenstiel v. Rosenstiel*, 278 F. Supp. 794, 801-02 (S.D.N.Y.1967) (explaining that, in order to "balance the equities," the court "will consider the hardship to the plaintiff . . . , the benefit to [the] plaintiff . . . , and the relative hardship to which a defendant will be subjected") [internal quotation marks omitted].[4]

With regard to the second part of the first element, "[a] sufficiently serious question as to the merits of the case to make it a fair ground for litigation" means a question that is so "substantial, difficult and doubtful" as to require "a more deliberate investigation." *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953); *accord, Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205-06 (2d Cir. 1970).[5] "A balance of hardships tipping decidedly toward the party requesting a preliminary injunction" means that, as compared to the hardship suffered by other party if the preliminary injunction is granted, the hardship suffered by the moving party if the preliminary injunction is denied will be so much greater that it may be

---

[4]     *See also Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12, n.2 (7th Cir. 1992) ("Weighing the equities as a whole favors X, making preliminary relief appropriate, even though the *undiscounted* balance of harms favors Y.") [emphasis added].

[5]     *See also Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997); *Rep. of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988); *City of Chanute v. Kansas Gas and Elec. Co.,* 754 F.2d 310, 314 (10th Cir. 1985); *R.R. Yardmasters of Am. v. Penn. R.R. Co.*, 224 F.2d 226, 229 (3d Cir. 1955).

characterized as a "real hardship," such as being "driven out of business . . . before a trial could be held." *Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc.*, 601 F.2d 48, 58 (2d Cir. 1979); *Int'l Bus. Mach. v. Johnson*, 629 F. Supp.2d 321, 333-34 (S.D.N.Y. 2009); *see also Semmes Motors, Inc.,* 429 F.2d at 1205 (concluding that the balance of hardships tipped decidedly in favor of the movant where it had demonstrated that, without an injunctive order, it would have been forced out of business as a Ford distributor).[6]

With regard to the second element, "irreparable harm" is "certain and imminent harm for which a monetary award does not adequately compensate." *Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113 (2d Cir. 2003).  Irreparable harm exists "where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999).

With regard to the third element, the "public interest" is defined as "[t]he general welfare of the public that warrants recognition and protection," and/or "[s]omething in which the public as a whole has a stake[,] esp[ecially], an interest that justifies governmental regulation." Public Interest, *Black's Law Dictionary* (9th ed. 2009).

---

[6]     The Court notes that, under the Second Circuit's formulation of this standard, the requirement of a balance of *hardships* tipping *decidedly* in the movant's favor is added only to the second part of the first element (i.e., the existence of a sufficiently serious question as to the merits of the case to make it a fair ground for litigation), and not also to the first part of the first element (i.e., the existence of a likelihood of success on the merits), which (again) requires merely a balance of *equities* (i.e., hardships and benefits) tipping in the movant's favor.  *See Citigroup Global Markets, Inc.*, 598 F.3d at 36 ("Because the moving party must not only show that there are 'serious questions' going to the merits, but must additionally establish that 'the balance of hardships tips decidedly' in its favor . . . , its overall burden is no lighter than the one it bears under the 'likelihood of success' standard.") (internal citation omitted); *cf. Golden Krust Patties, Inc. v. Bullock*, 957 F. Supp.2d 186, 192 (E.D.N.Y. 2013) ("[T]he *Winter* standard . . . requires the balance of equities to tip in the movant's favor, though not necessarily 'decidedly' so, even where the movant is found likely to succeed on the merits.").

The Second Circuit recognizes three limited exceptions to the above-stated general standard. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4.

First, where the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme, the district court should not apply the less rigorous "serious questions" standard but should grant the injunction only if the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim. *Id.* (citing *Able v. United States*, 44 F.3d 128, 131 [2d Cir. 1995]); *see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) ("A plaintiff cannot rely on the 'fair-ground-for-litigation' alternative to challenge governmental action taken in the public interest pursuant to a statutory or regulatory scheme.") (internal quotation marks omitted). This is because "governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." *Able,* 44 F.3d at 131.

Second, a heightened standard–requiring both a "clear or substantial" likelihood of success and a "strong" showing of irreparable harm"–is required when the requested injunction (1) would provide the movant with all the relief that is sought and (2) could not be undone by a judgment favorable to non-movant on the merits at trial. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 [2d Cir. 2006]); *New York v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) ("When either condition is met, the movant must show [both] a 'clear' or 'substantial' likelihood of success on the merits . . . *and* make a 'strong showing" of irreparable harm' . . . .") (emphasis added).

Third, the above-described heightened standard may also be required when the preliminary injunction is "mandatory" in that it would "alter the status quo by commanding some

positive act," as opposed to being "prohibitory" by seeking only to maintain the *status quo*. *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).[7]

Because the parties have demonstrated in the memoranda of law an adequate understanding of this legal standard, the Court need not, and does not, further elaborate on this legal standard in this Decision and Order, which is intended primarily for the review of the parties.

## III.   ANALYSIS

As a threshold matter, the Court must elaborate on the standards to be applied under the facts of this case.  First, it is uncontested that Plaintiffs seek to stay a government action (the cancellation of all overnight camps throughout New York State for the summer of 2020) taken in the public interest (to minimize the transmission of the sometimes deadly COVID-19 virus) pursuant to a regulatory scheme (Defendant's Executive Order 202 and its continued directives). (*See generally* Dkt. No. 1.)  Accordingly, pursuant to Second Circuit precedent, the Court will analyze Plaintiffs' claims only under the likelihood of success prong (not also the sufficiently serious question prong).  *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4.

### A.    Likelihood of Success on the Merits

After carefully considering the parties' arguments on this issue, the Court finds that Plaintiff has not demonstrated a likelihood of success on the merits for the reasons stated by Defendant in his memorandum of law.  (Dkt. No. 17, at 19-27 [Def.'s Opp'n Mem. of Law].)  To

---

[7]     Alternatively, in such a circumstance, the "clear or substantial likelihood of success" requirement may be dispensed with if the movant shows that "extreme or very serious damage will result from a denial of preliminary relief."  *Citigroup Global Markets, Inc.*, 598 F.3d at 35, n.4 (citing *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 34 [2d Cir. 1995]).

those reasons, the Court adds the following analysis (which is intended to supplement and not

supplant Defendant's reasons).

### 1.      Legislative Immunity

Defendant argues that he is entitled to legislative immunity because he was acting in his

legislative capacity.  "[L]egislative immunity *may* bar . . . *certain* claims for injunctive relief

against state officials."  *State Employees Bargaining Agent Coalition v. Rowland*, 494 F.3d 71,

76 (2d Cir. 2007) (emphasis added).  "More specifically, legislative immunity shields an official

from liability if the act in question was undertaken 'in the sphere of legitimate legislative

activity.'"  *Almonte v. City of Long Beach*, 478 F.3d 100, 106 (2d Cir. 2007) (quoting *Harhay v.*

*Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210 [2d Cir. 2003]); *33 Seminary LLC v. City of*

*Binghamton*, 120 F. Supp. 3d 223, 256 (N.D.N.Y. 2015) (D'Agostino, M.), *aff'd*, 670 F. App'x

727 (2d Cir. 2016).  Legislative immunity can apply not only to legislators, but also to "officials

in the executive and judicial branches when they are acting 'in a legislative capacity.'"  *Rowland*,

494 F.3d at 82 (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 55 [2003]).

A defendant is entitled to legislative immunity if the defendant (1) was acting in his or

her "legislative" capacity under the test articulated in *Bogan*, and (2) the grant of the requested

relief would enjoin the defendant in his or her performance of legislative functions.  *Rowland*,

494 U.S. at 76-77 (citing *Bogan*, 523 U.S. at 55).  Courts apply a two-part element test to

determine whether a defendant's actions were taken within the "sphere of legitimate legislative

activity."  *Id.* at 89 (quoting *Bogan*, 523 U.S. at 54); *NRP Holdings LLC, v. City of Buffalo*, 916

F.3d 177, 191-92 (2d Cir. 2019).  First, courts evaluate "whether the defendant's actions were

legislative 'in form,' *i.e.*, whether they were 'integral steps in the legislative process.'"  *Id.*

(quoting *Bogan*, 523 U.S. at 55).  Second, courts evaluate whether the defendant's "actions were

legislative 'in *substance*,' *i.e.*, whether the actions 'bore all the hallmarks of traditional

legislation,' including whether they 'reflected . . . discretionary, policymaking decision[s] implicating the budgetary priorities of the [government] and the services the government] provides to its constituents.'" *Id.* (quoting *Bogan*, 523 U.S. at 55-56).

The Court recognizes the extenuating circumstances and the difficulty of responding to a pandemic in real-time; however, Defendant's position is untenable. Were the Court to adopt Defendant's position, the Governor of New York would be able to unilaterally issue executive orders without providing the opportunity for his or her constituents to sue to enjoin these actions. In other words, the Governor would be able to shield his or her executive actions from suit, without judicial review. This position conflicts with one of the foundational principles of our democracy—a system of checks and balances, regardless of circumstance.

Moreover, the Court remains unconvinced that Defendant's executive orders are entitled to legislative immunity under Second Circuit precedent. First, Defendant's executive orders are not legislative in form. *See* Executive Order, *Black's Law Dictionary* (10th ed. 2014) ("An order issued by or on behalf of the President, [usually] intended to direct or instruct the actions of executive agencies or government officials, or to set policies for the executive branch to follow."). By nature, executive orders are not legislative. *See Manzi v. DiCarlo*, 982 F. Supp. 125, 128 (E.D.N.Y. 1997) ("Legislative immunity covers only legislative acts 'generally done in the course of the process of enacting legislation'. . . ."). The legislature plays no part in the drafting or passing executive orders, that power is reserved for the executive branch. Defendant's executive orders do not qualify as an "integral step" in the legislative process; in fact, they avoid the legislative process altogether.

With respect to the second *Rowland* element, it is arguable that, in this case, Defendant's executive orders are legislative in substance. Here, Defendant's executive orders

implementation of various restrictions on businesses and citizens statewide reflects the discretionary policymaking decision of limiting and eradicating of the transmission of the COVID-19 virus.  Defendant's executive orders have re-prioritized the services it provides its citizens and have unquestionably impacted the budgetary priorities of the State of New York.  However, because Defendant fails to satisfy both elements of the *Rowland* test, Defendant's executive orders cannot meet the "legislative capacity" standard for the purposes of this motion.

Even assuming the Court were to find that Defendant's actions were taken in a legislative capacity, Plaintiffs' desired injunctive order is requested in a purely non-legislative capacity.  There is "no reason why a defendant should be entitled to legislative immunity simply because the harm alleged originated, in some sense, with a legislative act."  *Rowland*, 494 F.3d at 89 (citing *Kilbourn v. Thompson*, 103 U.S. 168, 196-205 [1880]).  Here, Plaintiffs' seek to enjoin the enforcement of some of Defendant's executive orders.  Defendant has failed to demonstrate, how the enforcement of an injunctive order infringes on Defendant's legislative capacity.  The Court has been unable to find Second Circuit precedent standing for the point of law that a Governor is entitled to blanket legislative immunity barring preliminary injunctive relief when his or her citizens seek to enjoin enforcement of an executive order.  Therefore, the Court finds that Defendant's executive orders were not an act in his legislative capacity.

Accordingly, the Court finds that Defendant is not entitled to legislative immunity under the facts of this case.

### 2.    **Manifold-Restraints Analysis Under *Jacobson***

"[T]he liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint."  *Jacobson v. Massachusetts*, 197 U.S. 11, 26 (1905).

"There are manifold restraints to which every person is necessarily subject for the common good." *Jacobson*, 197 U.S. at 26.  "'The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community.'" *Id.* (quoting *Crowley v. Christensen*, 137 U.S. 86, 89 [1890]).  "Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will.  It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others." *Id.* at 26-27.

Because Plaintiffs' challenge public health measures issued to address the outbreak of a deadly disease, the Court joins the many courts throughout the country that rely on *Jacobson* when determining if a governor's executive order has improperly curtailed an individual's constitutional right during the COVID-19 pandemic.  *In re Abbot*, 954 F.3d 772 (5th Cir. 2020); *In re Rutledge*, 956 F.3d 1018 (8th Cir. 2020); *Robinson v. Attorney General*, 957 F.3d 1171 (11th Cir. 2020); *Antietam Battlefield KOA v. Hogan*, 20-CV-1130, 2020 WL 2556496 (D. Md. 2020*); Cassell v. Snyders*, 20-CV-50153, 2020 WL 2112374 (N.D. Ill. 2020); *Calvary Chapel of Bangor v. Mills*, 20-CV-0156, 2020 WL 2310913 (D. Me. 2020); *see also Wisconsin v. Yoder*, 406 U.S. 205, 239 n.1 (1972) (White, J., concurring) ("The challenged Amish religious practice here does not pose a substantial threat to public safety, peace, or order; if it did, analysis under the Free Exercise Clause would be substantially different.") (collecting cases, including *Jacobson*, 197 U.S. at 25).

To the extent that Plaintiffs argue that *Jacobson* does not apply to the Free Exercise Clause under Second Circuit precedent, the Court disagrees.  Plaintiffs position is based on one section from a distinguishable Second Circuit case.  *See Phillips v. City of New York*, 775 F.3d 538, 543 (2d Cir. 2015) (reasoning that *Jacobson* does not control plaintiffs' free exercise claim

because, at the time of the *Jacobson* decision, the Free Exercise Clause was not yet binding on the states).  Contrary to Plaintiffs' position, the Second Circuit explicitly stated that it followed the reasoning of *Jacobson* when concluding that a mandatory vaccination policy, as a condition for admission to school, did not violate the Free Exercise Clause.  *Phillips*, 775 F.3d at 543.

Recently, the Supreme Court denied injunctive relief related to a California-based executive order that limited religious gatherings, finding that the restrictions were consistent with the Free Exercise Clause of the First Amendment.  *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) ("*S. Bay*").  Chief Justice Roberts, in his concurrence, explained that the Constitution entrusts the safety and health of the people to the politically accountable officials of the individual States.  *S. Bay*, 140 S. Ct. at 1613.  "When those officials 'undertake[] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'"  *Id.* at 1613-14 (quoting *Marshall v. United States*, 414 U.S. 417, 427 [1974]); *see also League of Indep. Fitness Facilities and Trainers, Inc. v. Whitmer*, 20-CV-1581, 2020 WL 3468281, at *3 (6th Cir. June 24, 2020) (applying the rational basis test to its *Jacobson* analysis).  Chief Justice Roberts further indicated that, where the broad limits are not exceeded, they should not be subject to "second guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to people."  *S. Bay,* 140 S. Ct. at 1614.

"*Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency."  *In re Abbot*, 954 F.3d at 786 (emphasis in original).  However, "[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease or . . . to ill health or death."  *Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944).  Instead, courts overturn rules only when they lack a "real or substantial relation [to

public health]" or are "beyond all question, a plain, palpable invasion of rights[.]" *Jacobson*,

197 U.S. at 31.  As the Fifth Circuit explained,

> The bottom line is this: when faced with a society-threatening
> epidemic, a state may implement emergency measures that curtail
> constitutional rights so long as the measures have at least some "real
> or substantial relation" to the public health crisis and are not 'beyond
> all question, a plain, palpable invasion of rights secured by the
> fundamental law.' [*Jacobson*, 197 U.S.] at 31. Courts may ask
> whether the state's emergency measures lack basic exceptions for
> 'extreme cases,' and whether the measures are pretextual—that is,
> arbitrary or oppressive. *Id.* at 38. At the same time, however, courts
> may not second-guess the wisdom or efficacy of the measures. *Id.*
> at 28, 30.

*In re Abbot*, 954 F.3d at 784-85.  Given the "broad latitude" afforded to government officials

responding to "areas fraught with medical and scientific uncertainties," *S. Bay*, 140 S. Ct. at

1613-14, the Court agrees with the Sixth Circuit that the rational basis test is the appropriate

standard of review when analyzing *Jacobson*. *Whitmer*, 2020 WL 3468281, at *3.

In this case, Plaintiffs do not dispute that Defendant has the right to issue executive

orders barring overnight camps from opening during the summer of 2020 or that these orders

have a real or substantial relation to the protection of public health.  Instead, Plaintiffs argue that

Defendant's actions unconstitutionally infringed on their First and Fourteenth Amendment rights

in that they were both arbitrary and oppressive.  However, following Chief Justice Roberts'

guidance, the Court will not second-guess the wisdom or efficacy of Defendant's emergency

measures to combat a public health crisis, unless the Court finds that the actions taken do not

lack a real or substantial relation to the public health crisis and are not, beyond all question, a

plain, palpable invasion of rights secured by the fundamental law.  *S. Bay*, 140 S. Ct. at 1613;

*Jacobson*, 197 U.S. at 28.

a.     **Real or Substantial Relation**

Under the facts of this case, the Court finds that Defendant's decision to close overnight

camps for the summer of 2020 had a "real or substantial relation" to the public health crisis.

"The precise question of when restrictions on particular social activities should be lifted during

the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement." *S.*

*Bay*, 140 S. Ct. at 1613.  "The Constitution does not compel courts to turn a blind eye to the

realities of the COVID-19 crisis.  For more than a century, the Supreme Court has recognized

that 'a community has the right to protect itself against an epidemic of disease which threatens

the safety of its members.'"  *Cassell*, 2020 WL 2112374, at *6 (quoting *Jacobson*, 197 U.S. at

27).

Although the daily number of positive COVID-19 cases are decreasing in New York

State, the number of individuals infected throughout the state has continued to increase, albeit at

a drastically decreased rate.  (Dkt. No. 17, Attach. 3, at ⁋ 27-28.)  What is particularly worrisome

is the recent dramatic rise in COVID-19 cases and deaths in several other states, which provides

ample warning that a momentary decrease in the daily rate of infection does not mean that it

cannot increase in the future in New York State if the conditions imposed by Defendant's

executive orders are not sufficiently followed.

Defendant's actions are substantially related to limiting the spread of the COVID-19

virus for several reasons.  First, the COVID-19 virus "spreads through droplets released into the

air when an infected person coughs or sneezes."  (Dkt. No. 17, Attach. 3, at ⁋ 10.)  One of the

best methods to limit one's exposure to COVID-19 is through social distancing, where people

keep at least six feet away from one another and limit close contact with others outside the

individual's household.  (*Id.* at ⁋ 13.)  This includes avoiding groups and crowded places.  (*Id.*)

Dr. Howard Zucker, the New York State Health Commissioner, explained that overnight camps, unlike day camps or childcare facilities, "are a difficult setting to manage social distancing and face covering and infection control practices." (*Id*. at ⁋ 62.) "Overnight camps have congregate settings and sleeping arrangements in close quarters that present too many risks."[8] (*Id*.) Defendant also argues that activities inherent to overnight camps, such as employing shared sleeping areas in which groups of campers are in a confined space together for long hours night after night, conflict with the principals of social distancing and other principals that have helped New York limit the transmission of the COVID-19 virus. (*Id*. at ⁋ 63.)

Although Plaintiffs disagree with Health Commissioner Zucker's conclusions that overnight camps present a dangerous setting for the transmission of the COVID-19 virus when certain precautions are taken (Dkt. No. 20, Attach. 1, at ⁋ 2), the Court will not second-guess Defendant on the wisdom or efficacy of his emergency measures to fight the spread of the COVID-19 virus. *S. Bay*, 140 S. Ct. at 1613; *see also Jacobson*, 197 U.S. at 30 ("It is no part of the function of a court . . . to determine which one of two modes was likely to be the most effective for the protection of the public against disease."). The Court's self-restraint is particularly warranted given the fact that the restrictions are based on the suppression of the virus. *Legacy Church, Inc. v. Kunkel*, 20-CV-0327, 2020 WL 1905586, at *40 (D. N.M. 2020); *S. Bay*, 140 S. Ct. at 1613. From the Court's humble perspective, there appears to be more than one reasonable response to the COVID-19 virus. Defendant's decision to ban overnight camps (even without exception) bears a real or substantial relation to his interest in suppressing the

---

[8]    Defendant further cites to a 2009 influenza-like-illness outbreak that swept through New York State. (Dkt. No. 17, Attach. 3, at ⁋ 70.) Of the 1,600 reported cases, 1556 of those cases, or 94% of all influenza-like-illness reported from camps, occurred at overnight camps. (*Id.*)

spread of the COVID-19 virus.  The Court will not substitute its own view of another measure it believes would have been more appropriate under the circumstances.

### b.    Plain, Palpable Invasion Beyond All Question

Defendant's executive orders do not, beyond all question, amount to a "plain, palpable invasion" of Plaintiffs' constitutional rights, as will be discussed more thoroughly below in Part III.A.3.a. and Part III.A.3.b. of this Decision and Order.

### c.    Limits of Government Authority in a Pandemic

In light of the above analysis, it is important to emphasize that Defendant may not eliminate or circumvent an individual's constitutional rights merely because he is responding to a public health crisis.  "[T]he police power of a state . . . may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression."  *Jacobson*, 197 U.S. at 38.  The Court interprets the above language to stand for the point of law that the Government's authority to respond to an emergency, while broad, is not without limits: it may not be arbitrary or oppressive.  Although the facts before the Court suggest that Defendant possesses the constitutional authority to temporarily limit Plaintiffs' constitutional rights in these circumstances, the Court expresses no opinion on the scope of Defendant's authority outside of the facts before the Court.

For all of these reasons, the Court concludes that Plaintiffs are unlikely to succeed on their claims that Defendant's executive orders violated their constitutional rights.

### 3.   Traditional Constitutional Analysis

Even if the *Jacobson* standard was inapplicable, the Court finds that Defendant's executive orders would still likely survive Plaintiffs' constitutional challenges.

### a.  Free Exercise of Religion

The Supreme Court has established "the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993) ("*Lukumi*").  However, as stated above in Part III.A.2. of this Decision and Order, "[t]he right to practice religion freely does not include liberty to expose the community . . . to communicable disease or . . . ill health or death." *Prince*, 321 U.S. at 166-67.  "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Employment Div. v. Smith*, 494 U.S. 872, 876 (1990).  The Free Exercise Clause "protect[s] religious observers against unequal treatment" and laws that target religious individuals based on their "religious status" are subjected to strict scrutiny. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (quoting *Lukumi*, 508 U.S. at 533).  However, "[n]ot all burdens on religion are unconstitutional." *Bowen v. Roy*, 476 U.S. 693, 701 (1986).

The Supreme Court has "never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Smith*, 494 U.S. at 879.  "[T]he right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct his religion prescribes (or proscribes).'" *Id.* (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 [1982]).  "'Where the government seeks to enforce a law that is neutral and of general applicability,' the government 'need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices.'" *CompassCare v. Cuomo*, 20-CV-1409, 2020 WL 3035648, at *14 (N.D.N.Y. June 5,

2020) (McAvoy, J.) (quoting *Fifth Ave. Presbyterian Church v. City of New York*, 293 F.3d 570,

574 [2d Cir. 2002]).  "A law burdening religious conduct that is *not* both neutral and generally

applicable, however, is subject to strict scrutiny."  *Cent. Rabbinical Cong. of the United States v.*

*New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) (emphasis

in original) (quoting *Lukumi*, 508 U.S. at 533).

### i.      Neutrality

"To determine neutrality, we begin with the statute's text, 'for the minimum requirement

of neutrality is that a law does not discriminate on its face.'"  *Cent. Rabbinical*, 763 F.3d at 193

(quoting *Lukumi*, 508 U.S. at 533).  "'Facial neutrality is not determinative,' however, because

the neutrality requirement extends beyond facial discrimination."  *Id.* at 193-94 (quoting *Lukumi*,

508 U.S. at 534).  "A neutral law that target[s] the practices of a particular religion is not

neutral."  *CompassCare*, 2020 WL 3035648, at *14 (internal quotation marks omitted) (quoting

*Cent. Rabbinical Cong.*, 763 F.3d at 194).  When determining the neutrality of a law, courts

primarily focus on "the historical background of the decision under challenge, the specific series

of events leading to the enactment or official policy in question, and the legislative or

administrative history, including contemporaneous statements made by members of the

decisionmaking body."  *Lukumi*, 508 U.S. at 540.

Here, the Court finds that Defendant's executive orders are neutral.  Executive Order

202.8 barred, among other things, an in-person workforce for all nonessential businesses and not-

for-profit entities, while Executive Order 202.10 cancelled or postponed the non-essential

gatherings of individuals of any size for any reason.  (Dkt. No. 7, Attach. 4, at 18-23.)

Defendant used broad language throughout his executive orders and intended them to apply to all

facets of society.  By using the word "all," Defendant's executive orders, on their face, did not discriminate against Plaintiffs.

However, the facial neutrality of Defendant's executive orders is not determinative. Historically, Defendant has been granted the authority to respond to imminent threats to the health of the citizens of New York.  N.Y. Exec. Law Art. 2-b.  "Whenever the governor . . . finds that a disaster has occurred or may be imminent for which local governments are unable to respond adequately, he shall declare a disaster emergency by executive order."  N.Y. Exec. Law § 28(1).  Here, Defendant issued Executive Order 202, declaring a state of disaster emergency throughout New York State.  (Dkt. No. 7, Attach. 4, at 2-4.)  By declaring a state of disaster emergency, Defendant acted pursuant to the authority historically bestowed on him by the New York State Constitution.

The Court turns next to the series of events and legislative history factors.  Because the events leading to the enactment of Defendant's executive orders in question have been thoroughly recounted by numerous other courts, the Court will make only a few observations on the subject.  One factor courts find relevant in these circumstances is the lack of legislative or administrative history regarding the government's restriction.  Here, in March 2020, the United States, along with the rest of the world, began fighting the COVID-19 virus.  Labelling the spread of the virus a "Public Health Emergency of International Concern" Defendant issued Executive Order 202 on March 7, 2020, declaring a state of disaster emergency throughout New York State.  (*Id*.)  Additionally, the Court finds that the legislative or administrative history factor is irrelevant to the current case because Defendant's executive orders lack such a history.

Plaintiffs argue that Defendant's executive orders are not neutral because his refusal to allow overnight camps to open effectively targets Jewish overnight camps (given that almost all

of the secular or non-Jewish overnight camps had already decided they would not open in the

summer of 2020 by the time Defendant and Health Commissioner Zucker specifically clarified

on June 12, 2020, that overnight camps would not be allowed to open).  Although it is true that

"[t]he effect of the law in its real operation is strong evidence of its object," it is likewise true

that "adverse impact will not always lead to a finding of impermissible targeting."  *Lukumi*, 508

U.S. at 535.  Plaintiffs have provided no factual allegations or evidence to indicate that the fact

that only Jewish overnight camps have continued to plan to open for the summer leads to the

conclusion that Defendant's executive orders have targeted the Jewish faith.  To the contrary, it

is undisputed that Defendant's ban on overnight camps applies equally to all such camps,

regardless of the camps' religious (or secular) nature.  The fact that Plaintiffs have maintained a

hope and willingness to operate or send their children to overnight camps this summer longer

than most persons involved with secular or non-Jewish overnight camps does not somehow turn

Defendant's facially neutral executive order into impermissible targeting.

Overall, Plaintiffs have failed to show that Defendant's executive orders were taken

because of, not merely in spite of, their religious practice.  *Id*. at 540.  In addition to being

facially neutral, the Court finds that Executive Orders 202.8 and 202.10 were substantively

neutral.

### ii.     General Applicability

"The general applicability requirement prohibits the government from 'in a selective

manner impos[ing] burdens only on conduct motivated by religious belief.'"  *Cent. Rabbinical

Cong.*, 763 F.3d at 196 (quoting *Lukumi*, 508 U.S. at 543).  "It 'protect[s] religious observers

against unequal treatment, and inequality [that] results when a legislature decides that the

governmental interests it seeks to advance are worthy of being pursued only against conduct with

a religious motivation.'"  *Id.* at 196-97 (quoting *Lukumi*, 508 U.S. at 542-43).  Although all laws are selective to some extent, "'categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice.'"  *Id.* at 197 (quoting *Lukumi*, 508 U.S. at 542).  A law is not generally applicable if "it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it."  *Id.* (citing *Lukumi*, 508 U.S. at 535-38).

A law that might be generally applicable on its face can be made not generally applicable where "the State has in place a system of individual exemptions," but it "refuse[s] to extend that system to cases of 'religious hardship' without compelling reason."  *See Litzman v. New York City Police Dept.*, 12-CV-4681, 2013 WL 6049066, at *3 (S.D.N.Y. Nov. 15, 2013) (noting that "facial neutrality is not determinative when the record shows that Plaintiff was terminated pursuant to a policy that is not uniformly enforced," and concluding that "[b]ecause there is evidence that the NYPD exercises discretion with respect to a facially neutral rule in a discriminatory fashion, strict scrutiny is appropriate"); *Ungar v. New York City Housing Auth.*, 363 F. App'x 53, 56 (2d Cir. 2010) (finding the challenged regulation did not have the effect of discriminating against Hasidic Jews by failing to grant them a special exemption to a housing policy because the only exceptions to the regulation were for specified categories and those exceptions were available to Hasidic Jews if they fell into one of the categories).  In this case, Plaintiffs argue that, even if the executive orders had been generally applicable when enacted, they have been stripped of that laurel through the variety of explicit and de facto exemptions that Defendant has granted to preferred groups.  More specifically, Plaintiffs argue that (1) Defendant's exemptions are driven not by the level of risk of the activity, but the degree to which

Defendant himself favors the activity, and (2) the precautionary measures under which Plaintiffs' proposed overnight camps would reopen would render those camps safer (in terms of the risk of spread of COVID-19) than Defendant's favored activities.  (*Id.*; Dkt. No 20, at 8-12.)

At first glance, Plaintiffs seem to make a strong argument that Defendant's exemption of higher education dormitories renders Defendant's executive orders not generally applicable. (Dkt. No. 20, at 7; Hearing Transcript; Dkt. No. 25.)  However, the Court finds that these dormitories are not sufficiently comparable to overnight camps to support Plaintiffs' argument that a failure to grant a similar exemption to overnight camps requires the application of strict scrutiny.  Traditionally, colleges and universities throughout the country have used their facilities for a wide variety of overnight camps, including ones focused on education, athletics, and several other activities.  Although some overnight camps may use higher education facilities, or facilities that mirror the individualized nature of dormitories, Plaintiffs have provided no evidence regarding the sleeping arrangements for the overnight camps themselves, other than to say that they are generally "bunkhouse" style accommodations.  Plaintiffs also fail to mention whether individuals would be required to wear masks during camp activities, including sleeping.

Instead, outlining several measures that, in theory, properly screen individuals prior to arrival (Dkt. No. 7, Attach. 20, at ¶¶ 10-17), Plaintiffs' proposed procedures detailing the sleeping arrangements merely state that the individual beds will be configured in a manner to prevent the possible transmission of the COVID-19 virus in shared sleeping quarters.  (*Id*. at ¶ 18.)  However, Plaintiffs' protocol does not sufficiently ensure (a) that campers self-quarantine for two weeks after negative test (setting aside the fallibility of tests), and (b) that campers and staff dot not violate quarantine at camp. The latter of these assurances warrants further discussion.

Plaintiffs fail to elaborate on how they will ensure that the individual campers and staff will enforce social distancing protocols among the individuals in their sleeping quarters, or how communal areas such as bathrooms and dining facilities will implement the appropriate safety measures.  During oral argument, Plaintiffs conceded that several of the overnight camps utilize cabins for housing and could have anywhere from eight to twelve individuals sharing an enclosed space.[9]  (Hearing Transcript.)  The Court notes that cabins traditionally consist of one large room that can accommodate a large group of people who share a living space while higher education dormitories range in size and space and typically consist of a large building with numerous separate rooms that individually accommodate a smaller number of people than do cabins.  Also traditionally, dormitories hold one to four people per room, and depending on the dormitory, can even have separate bathrooms for each individual.  Although Plaintiffs acknowledged that the number of campers assigned to a cabin may have to be smaller to abide by social distancing practices, the Court concludes that the overnight camps' cabins are not comparable to higher education dormitories.

Plaintiffs also argue that Defendant's exemptions for activities such as day camps and childcare facilities are comparable conduct to overnight camps.  Try as the Court might to sincerely understand Plaintiffs' analogy, the Court must ultimately admit that Plaintiffs' analogy is weak.  Although day camps and childcare facilities have congregate settings, they are significantly more limited than those settings present in overnight camps.  Day camps' congregate settings are traditionally limited to the dining facility, where campers usually

---

[9]     The Court notes that, despite having been asked about the details of this subject during the hearing, Plaintiffs have (other than estimate the upper and lower ranges of the number of campers who would, on average, sleep in cabin) not provided the Court with evidence of that fact, or of even representations of the dimensions of the cabins and proximity of beds.

congretate for just one meal a day, as compared to overnight camps where campers traditionally congregate for three meals a day and then congregate again (this time with a smaller group) for approximately eight hours in an enclosed area, usually for weeks on end. By nature, day camps and childcare facilities provide less opportunity for the transmission of the COVID-19 virus simply because the individual attendees spend significantly less time with their fellow campers as compared to overnight camps. As the State argues, groups of individuals contained within a confined sleeping area each night runs contrary to the public health principals that have helped New York State substantially reduce the transmission of the COVID-19 virus. (Dkt. No. 25, Attach. 1, at ⁋ 3.)

Moreover, Defendant argues that overnight camps are uniquely situated as potential vectors for the spread of the COVID-19 virus because overnight camps pose a great risk not only within itself, but to the local communities as well. This is because, unlike day camps or childcare facilities, where travel by campers is necessarily limited to a reasonable distance due to the need for them to return home at the end of the day, overnight camps involve significant long-distance travel and an influx of people from multiple areas to a more remote location where those campers will become a part of the community, from a practical standpoint, for a significant period of time. This can create burdens on local resources that are not present with day camps or childcare facilities. For example, Defendant cites to the circumstances in Sullivan County, located in the Catskills region of New York State, where Defendant estimates that approximately sixty-two percent of the Jewish overnight camps are located. (Dkt. No. 25, Attach. 1, at ⁋⁋ 9-14.) According to Defendant, Sullivan County has only one hospital, with two locations throughout the entire county, in addition to ten Article 28 diagnostic treatment centers and hospital extension clinic sites. (*Id.* at 10, 13.) In total, Sullivan County has approximately 169

licensed beds, thirteen intensive-care-unit beds, and fifteen certified beds that can provide both

acute and subacute rehabilitation services.  (*Id.* at 11-12.)  At oral argument, Plaintiffs explained

that in a usual summer, approximately forty-two thousand campers attended approximately fifty

to sixty Jewish overnight camps located in New York State.  (Hearing Transcript.)  Although a

significant drop off in these numbers is expected due to a truncated summer and concerns over

the COVID-19 virus (Hearing Transcript), should an outbreak occur at the camps, the situation

could overrun the hospitals within Sullivan County and require hundreds of individual children

to be quarantined at the individual camps, potentially hundreds of miles away from their

families.  As discussed above in Part III.A.3.a.iv. of this Decision and Order, Plaintiffs have

failed to provide factual allegations or evidence regarding how they could avoid this scenario.

Overall, the Court is unpersuaded that day camps pose a similar or greater risk than do overnight

camps.

  As a result, the Court finds that none of the specific explicit exemptions that Plaintiff

mentions are sufficiently comparable to permitting an overnight camp for the purposes of a

general-applicability analysis.

  Plaintiffs also argue that Defendant created a de facto exemption from the executive

orders for the mass protests following the death of George Floyd in Minneapolis, Minnesota.

"Case law within [the Second] Circuit supports the notion that individualized de facto

exemptions can demonstrate that a challenged law is not generally applicable, and is therefore

subject to heightened scrutiny."  *Soos v. Cuomo*, 20-CV-0651, 2020 WL 3488742, at *9

(N.D.N.Y. June 26, 2020) (Sharpe, J.) (citing *Litzman v. N.Y.C. Police Dep't,* 12-CV-4681, 2013

WL 6049066, at *3 [S.D.N.Y. Nov. 15, 2013]).  Courts first evaluate the plain language of the

challenged statute or regulation to determine whether an entity has the power to issue a de facto

exemption.  *Hudson River Fishermen's Ass'n v. City of New York*, 751 F. Supp. 1088, 1099

(S.D.N.Y. 1990); *Smith v. Quinlan*, 91-CV-1187, 1992 WL 25689, at *2 (D. D.C. Jan. 13, 1992).

If the entity is found to have the power to issue a de facto exemption, courts then examine

whether the entity exercised its discretion in an inconsistent manner to create an implied

exception to the policy.  *Soos*, 2020 WL 3488742, at *11-12; *Litzman*, 2013 WL 6049066, at *3;

*Consumers Union of U.S., Inc., v. Sawhill*, 512 F.2d 1112, 1118 (Temp. Ct. App. 1975).

As discussed above in Part III.A.3.a.i. of this Decision and Order, Defendant has the

authority to issue executive orders under N.Y. Exec. Law Art. 2-b.  Defendant also has the lesser

power to supervise and grant exemptions from the executive orders.  *See Selia Law LLC v.*

*Consumer Fin. Prot. Bureau*, No. 19-7, 2020 WL 3492641, at *2 (June 29, 2020) ("The

President's executive power generally includes the power to supervise . . . ."); *see also Brendale*

*v. Confederated Tribe and Bands of Yakima Indian Nation*, 492 U.S. 408, 434 (1989) ("An

Indian tribe's power to exclude nonmembers from a defined geographical area obviously

includes the lesser power to define the character of that area.").  As discussed by both parties,

Defendant has issued a four-phase approach to limiting the spread of the COVID-19 virus

throughout New York State and exercised his authority by granting exemptions to specific

policies for regions that have hit certain benchmarks. (*See generally* Dkt. No. 7, Attach. 2; Dkt.

No. 17, at 14-17.)   Accordingly, the Court finds that Defendant has the power to issue a de facto

exemption.

Although the Court agrees that not taking enforcement measures against various

protestors (including those seeking refuge in enclosed theater and museum lobbies for

indeterminate periods of time) arguably indicates that Defendant created a de facto exemption to

the executive orders, the existence of an exemption is not by itself determinative, as discussed

above: the individualized exemptions must also be properly comparable to the challenged action, suggesting discrimination. *See Soos*, 2020 WL 3488742, at *9 (comparing outdoor graduations with outdoor church services when determining whether allowance of such graduations while prohibiting such church services made the executive orders not generally applicable).

In this case, Defendant's executive orders bar *all* overnight camps from opening during the summer of 2020. Instead of explaining why Jewish overnight camps are being treated differently than are secular overnight camps, Plaintiffs (with all due respect) confuse Defendant's public comments seemingly showing support for the rights implicated by the mass protests over the death of George Floyd with Defendant's alleged disregard for religion in failing to grant a similar exemption to Jewish overnight camps. (Dkt. No. 7, Attach. 2, at 9-11.) Simply stated, the Court finds that permitting children to sleep in groups in enclosed spaces for eight hours per day in overnight camps is not sufficiently comparable to permitting conscious adults to shelter for shorter periods of time inside theater and museum lobbies during mass protests. For example, at the time of this writing, although many mass protestors appear to have been violating social distancing protocols by engaging in various outdoor protests, no evidence has emerged that protestors have been so often assembling in such close proximity in enclosed spaces for such a long period of time that reasonably compares to the way children typically sleep in cabins at overnight camp. As discussed more thoroughly above in Part III.A.2.a. of this Decision and Order, overnight camps, unlike day camps or childcare facilities "are a difficult setting to manage social distancing and face covering and infection control practices." (Dkt. No. 17, Attach. 3, at ¶ 62.) Although mass protests may provide somewhat similar difficulties to manage social distancing and infection control practices, overnight camps "have congregate settings and sleeping arrangements in close quarters that present too many risks," which causes those camps

to be potentially more dangerous for the transmission of the COVID-19 virus, as compared to the mass protests.  (*Id.*)  Finally, Plaintiffs have provided no factual allegations or evidence to support their argument that businesses and non-profit organizations (such as theaters or museums) that temporarily open their lobbies (and their bathroom facilities) for public use generate the same or greater risk of transmission of the COVID-19 virus than overnight camps generate.

Additionally, even accepting the argument that Defendant's failure to enforce the executive orders against the protests constitutes a de facto exemption, Defendant implored people to be cautious while protesting and advocated for individuals to wear a mask if they were going to participate in protests throughout New York State.  (Dkt. No. 7, Attach. 8, at 16.)  However, as already discussed, such caution and wearing of masks is much less feasible in the setting of an overnight camp, where children are spending all day and night in each other's company for weeks at a time, and where situations arise in which even wearing of a mask might not be possible  sometimes (such as while sleeping).  As a result, the Court finds that the mass protests are not sufficiently comparable to overnight camps to allow Plaintiffs to show that the executive orders are not generally applicable because of the existence of exemptions.

### iii.    Rational Basis

Having found that Defendant's executive orders are neutral and generally applicable, the Court finds Defendant's actions are subject to rational basis review and thus need only be rationally related to a legitimate government interest.  *New Hope Family Servs. Inc. v. Poole*, 387 F. Supp. 3d 194, 216 (N.D.N.Y. 2019) (D'Aogstino, J.).  For many of the reasons already discussed above, Defendant's interest in preventing the spread of COVID-19 is a legitimate interest, and that interest is rationally related to the prohibition on overnight camps: it is entirely

32

legitimate to send campers home at night because the alternative (letting them stay overnight) does not sufficiently ensure (a) that the campers will indeed self-quarantine for two weeks after negative test (setting aside the fallibility of the tests), or (b) that campers and staff do not violate quarantine protocols while at camp.

Accordingly, for all of these reasons, the Court finds that Plaintiffs have failed to show that they are likely to succeed on the merits of their Free Exercise Clause claim.

### iv.    Strict Scrutiny

In the alternative, even if strict scrutiny were to apply, Plaintiffs have not shown a likelihood of success on the merits of their Free Exercise Clause claim. Defendant argues that, even if the ban (which is certainly neutral) is not generally applicable, it meets the strict scrutiny test because the strength of the compelling state interest here (i.e., the avoidance of COVID-19) lightens Defendant's burden to narrowly tailor the rule in pursuit of that interest.[10] The Court has found no case for the point of law that a stronger interest lessens the need to narrowly tailor a rule in furtherance of that interest. However, even setting aside the question of whether the compelling state interest here is strong or *really* strong, Defendant has shown that the ban is sufficiently narrowly tailored to serve that interest.

Plaintiffs argue that the ban is not narrowly tailored because their protocols would make overnight camping safe enough to sufficiently satisfy Defendant's compelling interest, and thus complete closure is more restrictive than necessary. But Plaintiffs' argument assumes their

---

[10]     Multiple courts that have considered the issue have concluded that "controlling the spread of COVID-19 counts as a compelling interest." *Cassell*, 2020 WL 211273, at *12; *Workman v. Mingo Cty. Bd. of Educ.*, 419 F. App'x 348, 353 (4th Cir. 2011) ("[T]he state's wish to prevent the spread of communicable diseases clearly constitutes a compelling interest."); *United States v. Salerno*, 481 U.S. 739, 755 (1987) (acknowledging that the government has a "compelling" interest in the safety of its citizens).

protocol will be followed.  As a practical matter, the protocol is so dependent on voluntarily compliance as to not be reliable, or not "feasible" in the language of the relevant standard.  For example, it is uncertain how Plaintiffs could ensure that new campers comply with the self-quarantine requirement for two weeks before entering the camp, or how Plaintiffs could ensure that campers and staff will at no point leave the camp or come in contact with an outsider who enters the camp.

Moreover, Plaintiffs' argument ignores the fact that, were the Court to grant Plaintiffs' requested relief, the ban on overnight camps would have to be lifted not only for Jewish overnight camps, and not only for all religious overnight camps, but also for all *secular* overnight camps located throughout New York State.  To say otherwise would be to contradict the Supreme Court's decision in *Everson v. Bd. of Educ. of the Township of Ewing*.  330 U.S. 1, 15 (1947) ("Neither [a state nor the Federal Government] can pass laws which aid one region, aid all religions, or prefer one religion over another.").  This universal lifting of the ban significantly exacerbates the potential drawback of a protocol that relies heavily on voluntary compliance.  Enjoining Defendant's ban on overnight camps would only further increase the danger of a potential "second wave" of the COVID-19 virus in New York State, particularly because overnight campers and/or staff would not all be traveling from the same state or even the same regions of the state.  At oral argument, after conceding that the Jewish overnight camps would be open to residents from other states, Plaintiffs attempted to reassure the Court that approximately two-thirds of the attendees of Jewish overnight camps would be from New York State and the other largest contingent of attendees would be from New Jersey.[11]  (Hearing

---

[11]    Although the Court is aware of Defendant's Executive Order 205, which mandates that all travelers entering New York from a state with a positive test rate higher than ten per 100,000 residents, or higher than a 10% test positivity rate, over a seven day rolling average, will be

Transcript.)  However, Plaintiffs failed to identify the number of secular overnight campers that would travel from outside of New York State.  (*See generally* Hearing Transcript.)  According to the CDC, one of the biggest risks beleaguring overnight camps is the fact that not all of the campers are from the local geographic area.  (Dkt. No. 17, Attach. 4, at 115; Dkt. No. 17, Attach. 3, at ¶ 76.)

Finally, Plaintiffs' argument ignores the fact that their protocol does not adequately address how the overnight camps would handle sick individuals who are required to self-quarantine far away from hospitals.  Generally, overnight camps do not employ the medical staff necessary to manage a camp-wide quarantine.  (Dkt. 25, Attach 1, at ¶ 22.)  Although Plaintiffs argue that Jewish overnight camps would have rigorous training on health and safety protocols developed from physicians and health policy professionals (Dkt. No. 7, Attach 2, at 15-16), Defendant's executive orders apply to all overnight camps throughout the state, which may not have the appropriate resources.  Overnight camps are also generally a significant distance away from hospitals and located in remote areas with limited healthcare access.  (Dkt. No. 25, Attach. 1 at ¶¶ 15, 22.)  Due to the general remoteness of overnight camps, a sudden outbreak would put great strain on healthcare infrastructure and resources of smaller rural hospitals, which have significantly fewer ICU beds as compared to more urban areas.  (*Id*, at ¶ 15.)

In sum, the lessening of these assurances compels the diminishment of safety in the overnight camp (where campers could be exposed to the COVID-19 virus from seven to eleven bunkmates for eight hours per night, should what Plaintiffs' call a "bubble" spring a leak).

---

required to quarantine for a fourteen day period, the Court expresses no opinion as to the constitutionality of this order.  Exec. Order. 205 (2020), https://www.governor.ny.gov/news/no-205-quarantine-restrictions-travelers-arriving-new-york (last accessed July 4, 2020).

Simply stated, Defendant's ban appears to be at least as safe as Plaintiffs' protocol, rendering it narrowly tailored.

### b.      Due Process Rights of Parents

Parent-Plaintiffs also argue that Defendant's executive orders unconstitutionally infringe on their substantive due process right to control the education and upbringing of their children under the Fourteenth Amendment.  (Dkt. No. 7, Attach. 2, at 25-26.)

To show a violation of substantive due process, a plaintiff must show that (a) he or she has a valid liberty or property interest, and (b) the defendant infringed on the liberty interest in an arbitrary or irrational manner.  *Harlan Assocs. v. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001).  Notably, substantive due process does not protect against all perceive infringement of valid liberty or property interests (even those that are incorrect or ill-advised), but rather only against those that are "arbitrary, conscious-shocking, or oppressive in a constitutional sense." *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995).

A "[s]ubstantive 'due process' analysis must begin with a careful description of the asserted right, for '[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'"  *Reno v. Flores*, 507 U.S. 292, 302, (1993) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 [1992]).  Under *Pierce*, parents have the liberty "to direct the upbringing and education of children under their control."  *Pierce v. Society of Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510, 534-35 (1925). Through a plurality opinion, the Supreme Court further recognized a parent's liberty interest in the "'care, custody, and control of their children,'" however, the scope of the right was left undefined.  *Leebaert v. Harrington*, 332 F.3d 134, 142 (2d Cir. 2003) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 [2000]).  On June 30, 2020, the Supreme Court reaffirmed the rights

of parents to direct "the religious upbringing" of their children.  *Espinoza v. Mont. Dep't. of Rev.*, No. 18-1195, 2020 WL 3518364, at *9 (June 30, 2020) (citing *Yoder*, 406 U.S. at 213-14).  It is therefore clear that the right Plaintiffs assert here is indeed a protected right under the Fourteenth Amendment.  *See Jackson v. Peekskill City Sch. Dist.*, 106 F. Supp. 3d 420, 425 (S.D.N.Y. 2015) (finding that a parental interest in the care, custody, and control of their child in an education context was "perhaps the oldest of the fundamental liberty interests recognized").

However, as noted above, showing the existence (and even the infringement) of a right is not sufficient to merit success on a substantive due process claim; Plaintiffs must also show that Defendant infringed on that right in an arbitrary manner.  *See Calicchio v. Sachem Cent. Sch. Dist.*, 14-CV-5958, 2015 WL 5944269, at *9 (E.D.N.Y. 2015) (stating that, in a case where the parent-plaintiffs alleged a violation of their right to direct the custody, care, and management of their children, they were required to show that the school district's actions were arbitrary or irrational).  For all of the reasons already discussed above regarding the threat of the COVID-19 virus, both in general and in the setting of an overnight camp, as well as the shortcomings in Plaintiffs' plan to mitigate those threats, the Court cannot say that Plaintiff would be likely to succeed in showing that Defendant's choice to close overnight camps during the summer of 2020 is either arbitrary or conscious-shocking.

In particular, Defendant has shown that permitting overnight camps to open during the summer of 2020 would jeopardize the health and safety of each child who attended an overnight camp.  The Court recognizes that at the time of this writing, we are already in the heart of summer.  Practically speaking, overnight summer camps could be open for approximately four to six weeks for the summer of 2020, after considering the logistics of registering participants and staff, as well as the beginning of the academic school year.  The Court is extremely sympathetic

to Parent-Plaintiffs' sincerely held religious beliefs but it also must acknowledge the extenuating circumstances of the COVID-19 virus and its impact throughout the world.  Although the State of New York has made progress in limiting the transmission of the virus in recent weeks, the recent resurgence of positive COVID-19 cases in several states raises concerns and is a painful reminder that the fight is far from over.  (Dkt. No. 25, Attach. 1, at ¶¶ 16-17.)   Such extenuating circumstances make it unlikely that Plaintiffs will be able to meet their burden to show that Defendant's actions were arbitrary or conscious shocking.

For all of these reasons, the Court finds that Parent-Plaintiffs are unlikely to succeed on the merits of their due process claim.

### c.      Plaintiffs' "Hybrid" Claim

Contrary to Defendant's argument, the Second Circuit has recognized the existence of "hybrid" claims that implicate the Free Exercise Clause.  *Leebaert*, 332 F.3d at 143-44; *Doe v. Mastoloni*, 14-CV-0718, 2016 WL 593439, at *9 (D. Conn. Feb. 12, 2016) (finding *Leebaert* recognized hybrid claims).  Reasoning that the standard of review should not vary simply based on the number of constitutional rights allegedly violated, the Second Circuit has applied the rational basis standard to such claims.  *Leebaert*, 332 F.3d at 144 ("'at least until the Supreme Court holds that legal standards under the Free Exercise Clause vary depending on whether other constitutional rights are implicated, we will not use a stricter legal standard' to evaluate hybrid claims.") (quoting *Kissinger v. Bd. of Trs. of the Ohio State Univ., Coll. of Veterinary Med.*, 5 F.3d 177, 180 [6th Cir. 1993]).  In particular, the Second Circuit has held that a plaintiff's claim based on a combination of the Free Exercise Clause and Due Process Clause failed to satisfy the rational basis standard.  *Id.*; *Mastoloni*, 2016 WL 593439, at *9.

As discussed above in Parts III.A.3.a. and III.A.3.b. of this Decision and Order, Plaintiffs have failed to show that Defendant's executive orders violated the Free Exercise Clause because Defendant's executive orders were neutral and generally applicable, and in the alternative, were narrowly tailored to address a compelling government interest.  The Court also concluded above in Part III.A.3.b. of this Decision and Order that Parent-Plaintiffs' fundamental right to control the education and upbringing of their children was not violated by Defendant's executive orders because Defendant did not *arbitrarily* interfere with Parent-Plaintiffs' ability to control the education and upbringing of their children.  Having already evaluated and found that each individual claim would fail under rational basis test, the Court employs the Second Circuit's reasoning in its refusal to apply a heightened standard of review to Plaintiffs' "hybrid" claim.  As a result, the Court relies on its analysis above in Part III.A.3.a. and Part III.A.3.b. of this Decision and Order in its finding that Plaintiffs have failed to show that they will likely succeed on their "hybrid" claim.

Accordingly, for all of these reasons, the Court rejects Plaintiffs' argument that they have demonstrated a likelihood of success on the merits for each of their claims.

## B.     Irreparable Harm

After carefully considering the matter, the Court find that Plaintiffs have sufficiently demonstrated irreparable harm.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 473 (1976) (plurality); *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 426 (2d Cir. 1995); *see also Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("The district court therefore properly relied on the presumption of irreparable injury that flows from a violation of constitutional rights."). "In any event, it is the *alleged* violation of a constitutional right that triggers a finding of

irreparable harm." *Jolly*, 76 F.3d at 482.  However, the Second Circuit has "not consistently

presumed irreparable harm in cases involving allegations of the abridgment of First Amendment

rights." *Bronx Household of Faith v. Bd. of Educ. of City of New York*, 331 F.3d 342, 349 (2d

Cir. 2003).  "Where a plaintiff alleges injury from a rule or regulation that directly limits speech,

the irreparable nature of the harm may be presumed." *Bronx Household of Faith*, 331 F.3d at

349.

       In this case, Plaintiffs are entitled to the presumption of irreparable harm.  Contrary to

Defendant's argument, Defendant's executive orders have directly limited Plaintiffs Free

Exercise rights under the First Amendment by barring overnight camps for the summer of 2020.

As discussed above in Part III.A.3.a. of this Decision and Order, Defendant's executive orders

were an incidental burden on Plaintiffs' Free Exercise rights.  Regardless of the extent of the

burden, Defendant's executive orders are still the source of the infringement on Plaintiffs' First

Amendment rights.  The Court has found no Second Circuit case to suggest that a plaintiff's

irreparable harm depends on the extent of the burden.  Because Defendant's executive orders are

the source of the alleged loss of Plaintiffs' First Amendment freedoms, Defendant's executive

orders directly limit Plaintiffs' constitutional rights.  Additionally, because summer has already

begun and resolution of Plaintiffs' claims through litigation would be unlikely to happen during

the span of time in which the overnight camps would have been open, a denial of injunctive

relief will in all likelihood result in Plaintiffs being unable to operate or send their children to

overnight camps in 2020, effectively depriving them of their ultimate relief they seek.  *See*

*Allstate Ins. Co. v. Harvey Family Chiropractic*, 677 F. App'x 716, 718 (2d Cir. 2017)

("Irreparable harm is defined as certain and imminent harm for which a monetary award does not

adequately compensate . . . [and] exists where, but for the grant of equitable relief, there is a

substantial chance that upon the final resolution of the action the parties cannot be returned to the positions they previously occupied.").

For these reasons, the Court concludes that Plaintiffs have shown that they will likely suffer irreparable harm if denied injunctive relief.

### C.        Balance of Equities and Public Interest

Lastly, the Court finds that, in the alternative, the public interest would be disserved by the relief requested by Plaintiffs.  Although Plaintiffs have demonstrated that they will likely suffer irreparable harm in the absence of injunctive relief, a careful balancing of the equities nevertheless favors Defendant.  For example, Defendant must consider the impact of all overnight camps, not just the 50-60 Jewish overnight camps that Plaintiffs claim are impacted by Defendant's executive orders.  (Hearing Transcript.)  As discussed more thoroughly above in Part III.A.3.a.ii. of this Decision and Order, enjoining Defendant's executive orders would encourage both secular and non-secular overnight camps alike to open, even for a truncated period, and could encourage a significant influx of individuals from outside of New York State.

Permitting all overnight camps to open for the summer of 2020 would also encourage the multiplication and diffusion of areas of New York State into which both in-state and out-of-state children could travel.  This is because secular and non-Jewish religious overnight camps would be permitted to open *all across* New York State, even in regions that have not yet reached Phase Four of Defendant's reopening plan.  Although Plaintiffs argue that few if any secular or non-Jewish religious overnight camps in New York will in fact attempt to open, the Court is not convinced of that fact based on the evidence presented.

Finally, permitting all overnight camps to open would put an immense strain on local governments and rural areas with limited healthcare resources. Were the Court to enjoin

Defendant's executive orders, individuals located in more densely populated areas (or "hot

spots" for the COVID-19 virus) would likely be traveling to rural areas with already limited

healthcare resources.  (Hearing transcript.)  Not only would this potentially strain the

infrastructure of the rural regions within the District by forcing these counties to further extend

their already limited resources but it would further strain the local governments that are

traditionally tasked with ensuring that the overnight camps are abiding by the strict health and

safety protocols that would be required. (Hearing transcript.)

      Plaintiffs argue that the balance of hardships favors Jewish overnight camps because they

will implement rigorous health and safety protocols that will safeguard campers and staff from

the COVID-19 virus through regular screening and subjecting symptomatic individuals to

immediate testing.  (Dkt. No. 7, Attach. 2, at 29-30.)  However, testing is fallible.  *See* Lauren M.

Kucirka, Stephen A. Lauer, Oliver Laeyendecker, Denali Boon, Justin Lessler, *Variation in*

*False-Negative Rate of Reverse Transcriptase Polymerase Chain Reaction-Based SARS-CoV-2*

*Tests by Time Since Exposure*, Annals of Internal Medicine (published online ahead of print May

13, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7240870/ (detailing a Johns Hopkins

study that found that testing people for the COVID-19 virus too early in the course of infection is

likely to result in a false negative test, even though the individual may eventually test positive for

the COVID-19 virus).  As alluded to above, encouraging travel from more densly populated

areas throughout New York State that have been more heavily impacted by the COVID-19 virus

and from several neighboring states has the potential to catastrophically eliminate the progress

New York State has made to date in limiting the transmission of the COVID-19 virus and to

create "hot spots" in areas where the overall level of the virus has been relatively low.

At this time, the Court finds that granting injunctive relief to open overnight summer camps runs contrary to the public interest in stopping the spread of the COVID-19 virus. Although "securing First Amendment rights is in the public interest," *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013), and "treatment of similarly situated entities in comparable ways serves public health interest at the same time it preserves bedrock free-exercise guarantees," *Roberts v. Neace*, 958 F.3d 409, 416 (6th Cir. 2020), the Court rejected Plaintiffs' arguments that Defendant infringed on their First Amendment rights and was not treating religion and secular conduct comparably above in Part III.A.3. of this Decision and Order. Given the unprecedented nature of the COVID-19 pandemic, the deadly nature of the virus itself, the lack of a vaccine at the time of this writing, and lack of scientific agreement about its transmission, the Court concludes that the issuance of an injunction is not in the public interest at this time.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiffs' motion for a preliminary injunction (Dkt. No. 7) is **<u>DENIED</u>**.

Dated: July 6, 2020
       Syracuse, New York

Hon. Glenn T. Suddaby
Chief U.S. District Judge